# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JYOTINDRA PATEL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 3:16-cv-00182-VLB |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | August 1, 2016 |
| CIGNA CORP., DAVID M. CORDANI, THOMAS A. MCCARTHY, and HERBERT A. FRITCH, | ) ) ) ) ) | |
| Defendants. | ) | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................. 2

II.    JURISDICTION AND VENUE .......................................................... 7

III.   PARTIES .............................................................................................. 8

       A.    Relevant Non-Parties ............................................................ 10

IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .................. 11

       A.    Medicare Became a Key Component  of Cigna's Long-Term
             Strategy .................................................................................... 11

       B.    HealthSpring Emerged as an Attractive Target for Acquisition ........ 13

       C.    Cigna Bet Big on the Medicare Segment and Acquired
             HealthSpring ............................................................................ 15

       D.    Defendants Achieved the Increased Revenue They Hoped for
             After Cigna Acquired HealthSpring ......................................... 16

       E.    Defendants Knew Compliance with CMS Rules Was Essential ........ 17

       F.    Defendants Knew that CMS Rules Require a Robust
             Compliance Program Including Communication of All
             Noncompliance to Senior Management ................................. 18

       G.    Defendants Immediately Began Undermining the Effectiveness
             of HealthSpring's Compliance Systems and Management By
             Putting Inexperienced Cigna Insiders in Charge of Relevant
             Operations ................................................................................ 20

       H.    CMS Sanctioned Cigna for Consistent Compliance Violations
             Dating Back to At Least 2013 .................................................. 24

V.     DEFENDANTS' MATERIALLY FALSE AND  MISLEADING
       STATEMENTS AND OMISSIONS ..................................................... 29

       A.    The 2013 Form 10-K ................................................................ 29

       B.    December 2014 Code of Ethics and Principles of Conduct ............. 32

       C.    The 2014 Form 10-K ................................................................ 33

VI.    THE TRUTH EMERGES ................................................................. 36

VII.   DEFENDANTS MISSTATEMENTS AND OMISSIONS WERE MADE
       KNOWINGLY, OR WITH INTENTIONAL RECKLESSNESS............................ 38

       A.   Defendant Fritch's January 22, 2016 Statement Demonstrates
            Actual Knowledge............................................................................. 39

       B.   CMS Regulations Further Support a Strong Inference of
            Scienter............................................................................................ 40

       C.   Defendants' Statements Concerning Compliance Supports a
            Strong Inference of Scienter............................................................. 41

       D.   HealthSpring, and Its Compliance Systems, Were a Core
            Operation of Cigna's Overall Business, and Therefore the Most
            Plausible Inference Is That Defendants Knew the Relevant
            Details of Cigna-HealthSpring's Compliance Problems..................... 43

VIII.  DEFENDANTS CORDANI'S AND FRITCH'S SUSPICIOUS STOCK
       SALES DURING THE CLASS PERIOD ARE FURTHER EVIDENCE OF
       THEIR SCIENTER.................................................................................. 44

IX.    LOSS CAUSATION AND ECONOMIC LOSS ........................................... 47

X.     INDIVIDUAL DEFENDANT AND CONTROLLING PERSON
       ALLEGATIONS...................................................................................... 47

XI.    CLASS ACTION ALLEGATIONS ........................................................... 49

XII.   LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A
       PRESUMPTION OF RELIANCE .............................................................. 52

XIII.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
       DOCTRINE ARE INAPPLICABLE........................................................... 54

XIV.   CAUSES OF ACTION ............................................................................ 55

       A.   COUNT I: Asserted Against All Defendants for Violations of
            Section 10(b) of the Securities Exchange Act of 1934 and SEC
            Rule 10b-5 Promulgated Thereunder .............................................. 55

       B.   COUNT II: Asserted against Defendants Cordani and McCarthy
            for Violations of Section 20(a) of the Securities Exchange Act
            of 1934 ............................................................................................ 59

XV.    PRAYER FOR RELIEF ........................................................................... 60

XVI.   JURY DEMAND ..................................................................................... 60

Court-appointed Lead Plaintiff Minohor Singh ("Lead Plaintiff"), individually and on behalf of himself and all persons and entities that, between February 27, 2014 and January 21, 2016, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock of Cigna and were damaged thereby (the "Class"),[1] by and through his attorneys, as and for his Consolidated Amended Class Action Complaint ("Complaint") asserting claims against Cigna Corporation ("Cigna" or the "Company") and the individual defendants named below (together with Cigna, the "Defendants"), alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

The allegations of Lead Plaintiff are based upon the investigation of his counsel, which included a review of reports filed by Cigna with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Cigna; securities analysts' reports about Cigna; media and news reports concerning Cigna; data and other information concerning Cigna securities; other publicly available information concerning the Company and the Individual Defendants (as defined below); interviews with former employees of Cigna and Cigna-HealthSpring ("HealthSpring"); and a review of federal regulations governing Defendants' business conduct.

---

[1] Excluded from the Class are Defendants; present and former executive officers of Cigna; members of Cigna's Board of Directors; and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); the legal representatives, heirs, successors, or assigns of any of these individuals and entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of Cigna, including Cigna's employee retirement and benefit plan(s).

I.     **NATURE OF THE ACTION**

1.     This Action is the story of a large, national insurance company, and its senior-most officers, that wanted to bring Cigna into the fast-growing—and immensely profitable—Medicare provider segment, an area in which specialized (and often smaller) insurers were taking advantage of an aging population of "Baby Boomers" in need of greater amounts of health care.

2.     Unfortunately, from Defendants' perspective—and ultimately, for investors in Cigna' stock— Cigna's business was centered primarily on its commercial health offerings and, therefore, Defendants had very little experience offering Medicare coverage or complying with established regulations with which private Medicare insurers must comply.

3.     Thus, Defendants made the decision to spend $3.8 billion to acquire HealthSpring, a relatively small, Nashville-based health insurance company with a long-standing reputation for success in marketing and administering private Medicare plans, both in terms of profitability (due to a large base of beneficiaries), and for complying with strict regulations enacted and enforced by the Centers for Medicare & Medicaid Services ("CMS").  CMS is an agency within the Department of Health and Human Services that administers Medicare, including Medicare Advantage and Part D.[2]

---

[2] Medicare Advantage (also known as Medicare Part C) is a health insurance program offered by commercial insurance companies that serves as a substitute for traditional Medicare.  Medicare Advantage plans are typically managed care plans (such as an HMO or PPO) that offer more benefits than traditional Medicare while limiting the network of providers that patients may use.  Medicare Part D ("Part D") is a federal program to subsidize the cost of prescription drugs, which commonly is operated by commercial insurers such as Cigna.

4.      As relevant here, CMS is also the agency that regulates, monitors, and governs (and has jurisdiction to level sanctions against) insurance companies, including Cigna and HealthSpring, that offer private Medicare plans. CMS also pays premiums to such insurance companies, which typically cover all or a majority of the cost of such plans.

5.      In stark contrast to Cigna's minimal experience with Medicare compliance, by 2012, HealthSpring had more than a decade of experience in marketing and administering private Medicare plans, and had acquired extensive institutional knowledge of the substantial regulatory requirements established by CMS.  In fact, _HealthSpring had never been cited or sanctioned by CMS for non-compliance_, and had _never previously been prohibited by CMS from marketing or selling its Medicare policies to new customers_.

6.      In the wake of the acquisition, Defendants highlighted HealthSpring's well-established reputation for compliance by touting the new, integrated Company's adherence to CMS's regulatory and compliance requirements.  At the start of the Class Period, in 2013, Defendants told investors that Cigna "ha[s] _established policies and procedures to comply with applicable regulations._"[3]

7.      Throughout the Class Period, Defendants also expressly referenced HealthSpring's longstanding reputation for CMS compliance, announcing publicly that Cigna would "_continue to allocate significant resources to our compliance_, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan

---

[3] **All emphases added unless otherwise noted.**

3

programs," and would "*continue to allocate significant resources to comply with these regulations and requirements* . . . ."

8.      The effect of the HealthSpring acquisition on Cigna's financial results was substantial and immediate—within one year CMS' Medicare premiums became the Company's largest single source of revenues, accounting for 21.9% of Company revenues in 2012 alone.  That trend would continue, with CMS premiums accounting for approximately 21-22% of Cigna's overall 2013 and 2014 revenues.  Prior to and throughout the Class Period, CMS was Cigna's only client that accounted for more than 10% of Company revenues.

9.      Unknown to investors, however, Defendants intentionally undertook steps to maximize profits by: (i) failing to allocate the necessary money, time, and staffing that had allowed HealthSpring successfully to navigate the minefield of CMS regulations and possible sanctions; (ii) engaging in a pattern of conduct that all but ensured that HealthSpring employees (including compliance employees) left the Company; and (iii) replacing those employees with Cigna commercial health employees who had little or no background with CMS regulations or compliance therewith.  In effectuating these steps, non-compliance with CMS regulations became the Company's cultural norm.

10.     For example, Cigna appointed a long-time Cigna employee to head up HealthSpring's compliance group in the aftermath of the acquisition, despite the fact that he had *less than two years of experience with Medicare*. Notwithstanding such minimal CMS experience, this employee was placed in a supervisory role over HealthSpring's senior-most compliance employees,

including the erstwhile head of the group, who had _seventeen_ years of Medicare experience.

11.     The material negative effect these developments would have on Cigna was understood by Defendants.  Indeed, Defendants noted after the acquisition that if they were "unable effectively to integrate the HealthSpring business successfully . . . it could have material adverse effects on Cigna's business."

12.     Moreover, Defendants also knew that CMS regulations specify that companies including Cigna and HealthSpring must appoint a compliance officer and maintain a compliance committee, both of which are responsible for reporting to senior management (specifically including the CEO and the Board of Directors) details regarding the status of the Company's compliance program, and identifying and resolving any instances of compliance issues.

13.     Unfortunately for Cigna's shareholders, the pattern of conduct which focused only on profits at the expense of compliance with CMS regulations would have devastating consequences.  On January 22, 2016, Defendants announced that Cigna received a letter from CMS (the "CMS Letter") the prior day, highlighting Cigna's "_longstanding history of non-compliance_ with CMS requirements."  Specifically, CMS noted that "_Cigna's conduct poses a serious threat to the health and safety of Medicare beneficiaries_," and that the "violations resulted in enrollees experiencing delays or denials in receiving medical services and prescription drugs, and increased out of pocket costs for medical services and prescription drugs."

14.    The CMS Letter further explained that "Cigna's acquisition of HealthSpring, Inc. in 2012, which expanded its presence in the Medicare segment and added more than 1 million beneficiaries to Cigna's existing operations, contributed to creating *an organizational structure that is decentralized and fragmented*."  Indeed, CMS characterized this as a "[b]reakdown in operations [that] has made it difficult for Cigna to adequately monitor and oversee whether it is in compliance with Medicare Parts C and D requirements and *has resulted in substantial failures that require considerable correction* in order for Cigna to return to a state of compliance with CMS."

15.    Moreover, CMS imposed harsh sanctions prohibiting Cigna from enrolling any new members in any of its private Medicare plans.  Thus, as of January 22, 2016, Cigna was not permitted to market any of its Medicare Advantage or Part D offerings anywhere in the United States, and Cigna remains in that status.

16.    The CMS Letter also left no doubt as to Defendants role in, and knowledge of, these glaring breakdowns in compliance controls.  The CMS Letter notes a December 9, 2015 meeting between *Cigna's senior leadership* and CMS "to discuss the *serious nature of the deficiencies discovered during the audit*."  Moreover, CMS noted that "Cigna discussed with CMS that an integration of operations among its various legal entities is necessary to run an effective organization."

17.    Thus, the CMS Letter makes clear that since nearly the 2012 acquisition of HealthSpring by Cigna, the Company had demonstrated a failure to

6

comply with CMS regulations, and had been notified of such non-compliance no later than 2013.  Ultimately, these compliance problems were so severe that CMS was concerned that Medicare patients were receiving inadequate care that represented a risk to their safety and health.

18.     As a result of this disclosure, Cigna stock fell from its $140.13 closing price on January 21, 2016, to close at $135.85 on January 25, 2016, a market cap loss of approximately *$1.1 billion*.

19.     Notably, during the Class Period, but after Defendants received the first notices of non-compliance from CMS, Defendants Cordani and Fritch engaged in suspiciously timed stock sales that were dramatically out of line with their prior trading practices.  Specifically, although Mr. Cordani (CEO of Cigna) had sold nearly 138,000 shares in the two years prior to the Class Period, with proceeds of $8.6 million, during the Class Period, he sold nearly 600,000 shares, with proceeds of *more than $62 million*.  Likewise, Mr. Fritch (President of HealthSpring), had sold no shares in the two years prior to the Class Period, but sold more than 450,000 shares for proceeds of *nearly $60 million* during the Class Period.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Defendant Cigna maintains its principal executive offices in this District at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to: the mails; interstate telephone communications; and the facilities of the national securities markets.

III.    PARTIES

24.     Lead Plaintiff Minohor Singh purchased shares of Cigna common stock during the Class Period, as set forth in the certification previously filed with the Court (*see* Ex. 1 hereto), and suffered damages as a result of the federal securities law violations alleged herein.  By order dated May 17, 2016, the Court appointed Mr. Singh as the Lead Plaintiff in this action.

25.     Defendant Cigna Corporation ("Cigna" or the "Company") is a health services organization that, through its subsidiaries (including HealthSpring, a wholly owned subsidiary), provides medical, dental, disability, life and accident insurance and related products and services in the United States and internationally.  The Company was incorporated in Delaware in 1981 upon the merger of Connecticut General Life Insurance Company and INA Corporation. Since at least 2012, the Company has provided private Medicare coverage through HealthSpring in pursuit of its corporate strategy to expand into the seniors segment and to "treat individuals through all stages of their lives."

8

26.     Defendant David M. Cordani served throughout the Class Period as the Company's Chief Executive Officer ("CEO"), President, and Director. According to the Company's public website, Cordani was charged with responsibilities for the integration of HealthSpring into Cigna's operations following the 2012 acquisition.  Prior to his promotion to CEO in December 2009, he was Cigna's Chief Operating Officer from June 2008 through December 2009, and has held various other positions within Cigna since 1999.

27.     Defendant Thomas A. McCarthy served throughout the Class Period as the Company's Chief Financial Officer ("CFO") and Executive Vice President. In this role, he is responsible for all of Cigna's financial operations and functions, including investment management and strategic planning.  Prior to being named CFO, McCarthy served as Vice President of Finance, in which capacity he was charged with leading the acquisition of HealthSpring (according to the Company's public website).  McCarthy has more than 31 years of experience in health care and insurance services, including more than 26 years with Cigna.

28.     Defendant Herbert A. Fritch (together with Cordani and McCarthy, the "Individual Defendants") served throughout the Class Period as President of HealthSpring.  Fritch joined Cigna in February 2012, upon its acquisition of HealthSpring.  Prior to joining Cigna, Fritch founded HealthSpring, and served as its CEO and Chairman of the Board of Directors.  Originally an actuary by training, Defendant Fritch has more than 40 years of experience in the health care field.

9

A.     Relevant Non-Parties

29.     CW 1 was employed by HealthSpring from March 1996 until March 2012 and last held the position as the Senior Vice President of Government Programs/Medicare Compliance.  In this role, CW 1 was in a position to know and did know HealthSpring's compliance policies and procedures, and was HealthSpring's primary contact with CMS.  Upon Cigna's acquisition of HealthSpring in 2012, the Company brought in Richard Appel to supervise CW 1.

30.     CW 2 was employed by HealthSpring and Cigna-HealthSpring from 2010 until April 2013.  CW 2 last held the position of Director of Enterprise Star Rating Operations Group and reported directly to Ashok Sudarshan.  Sudarshan reported to HealthSpring's Chief Operating Officer, Mark Tulloch.  CW 2 worked closely with the compliance department, specifically interacting with Dana Fields, the Vice President of Internal Audit & Risk Management, and met with Cordani and other high-ranking Cigna senior executives on a monthly basis.

31.     CW 3 was employed by Cigna from July 2014 until March 2016 and last held the position of Human Resources Clinical HealthCare Consultant.  CW 3 routinely interacted with Kila Sweeney, who was the Director of Human Resources at HealthSpring since May 2011.  CW 3 was aware that Cigna executives regularly sent out surveys, as well as held conference calls and meetings, regarding personnel shortages.

32.     CW 4 was employed by HealthSpring and Cigna-HealthSpring from October 2006 until March 2016.  CW 4 last held the position of Vice President of IT-Software Development, Infrastructure, and Architecture.  During CW 4's employment at HealthSpring, CW 4 reported to Andy Flatt, HealthSpring's Senior

10

Vice President and Chief Information Officer, and David Crocker, who was the Senior Vice President of IT/Head of IT for Cigna-HealthSpring since 2014.

33.     HealthSpring is a wholly owned subsidiary of Cigna, founded by Defendant Fritch in 1996, whose principal offices are located at 530 Great Circle Road, Nashville, Tennessee 37228.  It describes itself as "a leading health services company committed to helping [ ] Medicare and Medicaid beneficiaries live healthier, more active lives through personalized, affordable and easy-to-use health care solutions."  Cigna acquired HealthSpring in 2012, and operates HealthSpring within its Global Health Care business segment.

34.     Prior to its acquisition by Cigna in 2012, HealthSpring was an independently owned and operated managed health care organization that focused primarily on providing Medicare Advantage and Part D.  Prior to and during the Class Period, Medicare premiums were the source of substantially all of HealthSpring's revenue.

IV.     **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

A.     **Medicare Became a Key Component
       of Cigna's Long-Term Strategy**

35.     By the early 2010s, private Medicare offerings emerged as a tremendous growth opportunity, primarily because private Medicare offerings deal with older patient populations than do traditional commercial health insurance plans.  Put simply, these older (and generally more ill) patients bring in approximately *three times as much revenue per customer* than do patients in traditional commercial plans.

36.     Indeed, Medicare Advantage and Part D generate higher revenue than traditional commercial health insurance offerings precisely because the senior patient population typically seeks medical providers much more regularly, and generally do not have insurance available to them through employers.  As Chris Rigg, analyst for Susquehanna Financial Group has noted, "[t]he person who is 70 years old uses a lot more healthcare.  It's lower margins, but higher overall dollars."

37.     As noted by Reuters, "the entry of the postwar baby boom generation into retirement is expected to swell the ranks of privately run Medicare Advantage Plans, which [as of 2011] account for 25 percent of Medicare enrollment," with an expectation that this percentage would increase with additional growth in the segment of the population eligible for Medicare coverage.

38.     There was one large problem, however, that prevented Cigna and Defendants Cordani and McCarthy from reaping the potential benefits of this expanding, and profitable space—Cigna had very limited experience in offering Medicare Advantage or Medicare Part D plans.  Thus, from Defendants' perspective, an acquisition of a private Medicare insurer (like HealthSpring) provided an opportunity for Cigna to offer new products to an entirely new (and growing) pool of potential customers that they knew would generate significantly more revenue than Cigna's traditional commercial health customers.

39.     Furthermore, such an acquisition would provide the added benefit of matching the competitive offerings of other large national health insurance companies such as UnitedHealth and Humana, who at the time were the largest

private Medicare insurers, as well as WellPoint and Aetna, who had engaged in similar deals to expand their Medicare offerings.

### B. HealthSpring Emerged as an Attractive Target for Acquisition

40. By 2010, HealthSpring had grown to one of the largest private Medicare insurers in the U.S., offering Medicare Advantage and Part D plans. Both offerings are and were subject to CMS regulations, which require insurers to establish substantial internal policies and procedures intended to ensure that the insurer complies with federal standards requiring that Medicare patients receive the benefits to which they are entitled.

41. HealthSpring's model of providing Medicare coverage is (and has been historically) a bit different from the traditional fee-for-service model of Medicare and other types of health insurance in that it offers patients "coordinated care structures of comprehensive networks of local hospitals and physicians," and focuses heavily on engaging medical providers who are "experienced and effective in managing the healthcare needs of the Medicare population and align[s HealthSpring's] incentives with those of the [medical providers] through a payment structure that rewards cost-effective care and improved outcomes." Under this model, physicians that are in-network with HealthSpring share in the risks and cost savings associated with each HealthSpring patient.

42. This unique model was one of the key factors in Defendants' decision to acquire HealthSpring. They believed that HealthSpring's model would reduce treatment costs substantially through its focus on preventative medicine, and would allow medical providers to share in financial risks and rewards of

13

patient treatment.  It also provided patients with proactive and preventative medical advice to address medical needs before they become more severe (and costlier to treat).

43.     Moreover, prior to its acquisition by Cigna, compliance was one of the HealthSpring's strong suits.  In fact, _HealthSpring had never been cited or sanctioned by CMS for non-compliance_, and had _never previously been prohibited by CMS from marketing or selling its Medicare policies to new customers_ (the sanctions eventually levied against the Company by CMS).  CW 1, who worked in compliance with HealthSpring from 1996 until the time of its acquisition by Cigna (and primarily responsible for HealthSpring's relationship with CMS by the time of his/her departure), stated that "in 17 years there was not one serious problem with CMS, not one significant issue raised by CMS in all that time."

44.     This attention to compliance prior to the acquisition by Cigna was well understood within HealthSpring, especially by senior leadership.  Defendant Fritch, in his capacity as CEO and Chairman of HealthSpring, told _Managed Healthcare Executive_, an industry publication, in November 2010 that "[t]here's no question that [HealthSpring] spend[s] a lot of time and effort on compliance."  Indeed, foreshadowing the very compliance breakdown that would soon be cited against Cigna in the CMS Letter, Fritch emphasized in that same article that "[i]t would be really hard to have Medicare Advantage as a sideline business and not really focus on it and dedicate the resources to things like compliance."

14

C.    **Cigna Bet Big on the Medicare**
      **Segment and Acquired HealthSpring**

45.    In October 2011, Cigna announced that it had reached an agreement

to acquire HealthSpring for $3.8 billion in cash, its largest ever acquisition.

*Forbes Magazine* described the deal as "a big bet on the seniors and Medicare

segment."  Ultimately, as *Forbes* explained, "Cigna [was] buying HealthSpring's

customers, in particular those subscribed to its Medicare Advantage programs."

46.    Cigna and HealthSpring issued a joint press release lauding the

benefits of the merger, noting the "opportunities to further expand upon its

successful growth strategy," including:

> Scaled presence in the highly-attractive Seniors
> segment, with a highly differentiated Medicare
> Advantage business that currently has approximately
> 340,000 Medicare Advantage members in 11 states and
> Washington, D.C., as well as a large, national
> stand-alone Medicare prescription drug business with
> over 800,000 customers; [and]
>
> *       *       *
>
> Future growth opportunities to expand HealthSpring's
> customer base by leveraging Cigna's current client
> relationships and to further the expansion of
> HealthSpring into new geographic regions, leveraging
> Cigna's nationwide presence, customer base and
> distribution capabilities.

47.    Defendant Cordani commented that Cigna entered the transaction

because senior care is "a fast-growing space, and the demographics are there."

He also acknowledged that "Cigna had long identified HealthSpring's specialty—

providing a private insurance plan that combines traditional Medicare coverage

with additional services—as an important area for [Cigna's] growth."  Following

this announcement, Defendants regularly reiterated the fact that the Medicare

plans that Cigna was or would be able to offer through its HealthSpring subsidiary represented a primary avenue for the Company's growth over the coming years.

48.     Only a few months later, in its 2011 Form 10-K, Defendants specifically noted that they considered the acquisition a "milestone" to "the Company's strategy [of] effectively deploying capital in pursuing additional opportunities in high-growth markets."  The acquisition "strengthen[ed] Cigna's ability to serve individuals across their life stages . . . [and] deepen [its] presence in a number of geographic markets."

49.     Similarly, in April 2012, only months following the formal finalization of the acquisition, Defendants noted in a publicly available newsletter to medical providers that this was part of the Cigna's much larger strategic vision: "[HealthSpring will] be able to offer Cigna's current individual [commercial, non-government] customers consistency as they transition to Medicare, and offer enhanced specialty and clinical capabilities to HealthSpring customers."

**D.     Defendants Achieved the Increased Revenue They Hoped for After <u>Cigna Acquired HealthSpring</u>**

50.     Prior to acquiring HealthSpring, Cigna had extremely limited offerings and revenues from Medicare Advantage.  With the addition of HealthSpring's one million Medicare customers, Cigna instantly gained a vast geographic network of insureds and providers, and obtained the benefits of CMS-paid premiums, such that within one year, HealthSpring became Cigna's *<u>single largest source of revenue</u>*.

51.     The dramatic effect of HealthSpring's Medicare income on Cigna's overall revenues became apparent almost immediately.  In 2012, approximately 21.9% of Cigna's overall revenues (not just for the Global Health segment) came exclusively from Medicare Advantage and Part D plans, nearly all of which were only offered as a result of the 2012 acquisition of HealthSpring.

52.     This trend continued; by the end of 2013, Defendants acknowledged that these private Medicare plans accounted for 22% of its consolidated revenues for 2013.  In fact, no single income source *other than CMS* accounted for more than 10% of Company revenues during that year.  In 2014, CMS remained Cigna's single most significant source of income, bringing in 21% of the Company's total consolidated revenues.  As with 2013, no other single income source accounted for more than 10% of the Company's revenues in 2014.

E.     **Defendants Knew Compliance with CMS Rules Was Essential**

53.     Defendants Cordani and McCarthy acknowledged in the Company's 2011 Form 10-K that regulatory reviews by CMS (and/or other federal/state regulatory agencies) could ultimately result in sanctions being imposed on Cigna:

> Cigna's operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including . . . [CMS] to assess compliance with applicable laws and regulations. . . . These examinations, reviews, subpoenas and requests may result in changes to or clarifications of Cigna's business practices, as well as fines, penalties or other sanctions.

54.     Indeed, Defendants acknowledged early in 2012 that there were "potential difficulties" in integrating its operations with HealthSpring, and that if it

17

was "unable to integrate the HealthSpring business successfully . . . it could have [a] material adverse effect on Cigna's business."  Notwithstanding this acknowledgement of "potential difficulties," from the time of the acquisition until the end of the Class Period, Defendants never specified publicly that there _were_ any such problems with integrating the operations of HealthSpring into Cigna, or otherwise indicated that the acquisition itself had presented any materially adverse effects.

> **F.   Defendants Knew that CMS Rules Require a Robust
> Compliance Program Including Communication of
> All Noncompliance to Senior Management**

55.    In addition to establishing the regulations governing Medicare Advantage and Part D plans, CMS establishes the requirements and standards for insurers' compliance programs.  Specifically, CMS requires that all insurers providing Medicare Advantage and/or Part D coverage,[4] including Cigna-HealthSpring, have an officer charged with ensuring it complies with CMS regulations.  Pursuant to CMS requirements, Cigna-HealthSpring's compliance officer (as with any Medicare compliance officer) is responsible for:

> Ensuring that Medicare compliance reports are provided
> regularly to the sponsor's corporate compliance officer
> (if any), governing body, CEO, and
> compliance committee.  Reports should include the
> status of the sponsor's Medicare compliance program
> implementation, **_the identification and resolution of
> suspected, detected or reported instances of
> noncompliance_** . . . .

56.    CMS also requires that sponsors such as Cigna-HealthSpring have a compliance committee in place to oversee the Medicare compliance program.

---

[4] CMS also uses the term "sponsor" to refer to an insurer with Medicare Advantage and/or Part D coverage.

The compliance committee "is accountable to, and *__must provide regular__* *__compliance reports to, the sponsor's senior-most leader and governing body__*." Thus, not only is an insurer that offers Medicare Advantage and Part D plans subject to regulation, CMS also requires that a sponsor's senior-most leaders, specifically including the CEO and directors, be intimately involved in the status of the organization's compliance with CMS regulations, and the status of any deficiencies.

57.     CMS requires such high-level involvement in *__all__* compliance issues because it recognizes that "[a]n effective compliance program cannot be achieved unless the CEO (or senior-most leader) and other senior management, as appropriate, are engaged in the compliance program." Accordingly, CMS regulations say that "*__[t]he CEO must also be advised of all governmental__* *__compliance enforcement activity, from Notices of Non-compliance to formal__* *__enforcement actions.__*" In fact, although not required by CMS, Defendant Fritch himself was a member of the Compliance Committee during CW 1 time at HealthSpring, and would have been kept intimately aware of any and all compliance problems at the time they were initially raised by CMS.

58.     Thus, one of the key requirements for compliance with CMS regulations is a set of policies and procedures that ensure any and all compliance problems, concerns, and/or *__any__* governmental action (including notices of non-compliance and warning letters) are fully understood by senior management (specifically including the CEO) and communicated upward, so that those charged with making the primary strategic decisions for an insurer such as Cigna

19

are also responsible for allocating funds to ensure that compliance programs are robust and ensure that Medicare patients receive the benefits to which they are legally entitled, and which are medically necessary.

59.     If such compliance policies were in place and actively followed, then they were designed to, and did, inform senior management, including the Individual Defendants, of the numerous instances of non-compliance that were eventually identified in the CMS Letter, thereby rendering their statements suggesting that Cigna was in compliance with relevant CMS regulations knowingly false when made.

60.     Alternatively, if such compliance policies were not actually in place at Cigna, such that the Individual Defendants were not actually notified of the Company's non-compliance prior to receiving the CMS Letter, then their statements suggesting that Cigna was in compliance with relevant CMS regulations were made with reckless disregard as to their truthfulness.

G.     **Defendants Immediately Began Undermining the Effectiveness of HealthSpring's Compliance Systems and Management By Putting Inexperienced Cigna Insiders in Charge of Relevant Operations**

61.     One of the specific integration risks identified by Cigna in its 2011 Form 10-K was "retaining key personnel."[5]  Cigna and the Individual Defendants (each of whom were responsible for some element of the merger) understood that retaining HealthSpring employees with institutional knowledge of its Medicare

---

[5] Notwithstanding this risk, which was disclosed in 2012, the Company explicitly claimed that the integration was not problematic, boasting of Defendant Cordani that he "[s]uccessfully integrated a series of significant global acquisitions, including the $3.8 billion purchase of HealthSpring . . . , which gave Cigna *one million new customer relationships in the growing seniors segment*."

offerings (including the requisite regulations and compliance requirements) was one of the fundamental issues that could impact the merger's ultimate success, and that such issues were ultimately a potential risk to Cigna's financial performance.

62.     Notwithstanding this acknowledgement that HealthSpring employees were essential to the ultimate successful integration of the two companies (and that _not_ retaining them presented a financial risk to the Company), shortly after the acquisition, Defendants systematically engaged in a pattern of conduct that would lead to the exodus of many of HealthSpring's regulatory compliance employees, including CW 1.

63.     CW 1 and CW 2 each described that following the acquisition of HealthSpring, Cigna replaced HealthSpring's previous senior, experienced leadership with Cigna's internal employees, establishing a new senior leadership team comprised of employees generally inexperienced with Medicare compliance. CW 1 and CW 2 also independently confirmed that these actions created an environment and corporate culture whereby other previous HealthSpring compliance personnel were compelled to leave.

64.     And according to another CW's allegations, the Company's ultimately decided to bring in Cigna internal employees into HealthSpring, despite their overall lack of CMS experience.  For example, CW 3, who worked in Human Resources for Cigna-HealthSpring from 2014 through 2016, observed that the post-acquisition Company had significant turn-over, and was constantly under-staffed during his tenure there.  He/she stated that the primary driver of these

21

problems was Cigna's unwillingness to pay HealthSpring employees and medical providers market value.  He/she also noted that this employee turn-over and the resulting staff shortages required the expenditure of excessive time, energy, and money in training costs.

65.     As a result, CW 3 raised his/her concerns about under-staffing to his/her superiors.  Indeed, CW 3 explained that management held conference calls and meetings to address his concerns (attended by 80-90 other employees, including members of executive leadership), but Defendants remained unwilling to change Cigna's culture.

66.     CW 3 recalls that, as a result of this unwillingness to hire truly qualified new employees at market rates, approximately 90% of the employees brought into HealthSpring following the acquisition by Cigna were internal Cigna employees, and therefore, had little or no experience in CMS regulations or compliance.  Moreover, as CW 3 explained, Cigna prided itself on using internal staff to fill employment vacancies at HealthSpring, rather than hiring external candidates.

67.     Two other confidential witnesses also independently confirmed that Defendants' policy of placing Cigna's own employees in positions of prominence within Cigna-HealthSpring had a significantly negative effect on the CMS-related compliance programs.  For example, CW 1 noted that soon after the finalization of the acquisition, Cigna began bringing in people from its corporate offices to work at HealthSpring, even though "Cigna did not have any expertise in Medicare Advantage Part C and D, while HealthSpring had years of expertise [and presence

in the segment]." He/she noted that, although he/she had generally been responsible for HealthSpring's compliance for 17 years, immediately following the acquisition, Cigna appointed Richard Appel, a Cigna employee who had minimal experience with Medicare, to be his/her supervisor. Eventually, CW 1 decided to pursue external job opportunities with employers who would leverage the full scope of his/her expertise.

68.     CW 2, whose job functions included monitoring HealthSpring's policies and procedures for addressing customer and medical provider complaints—also known as appeals and grievances—for adverse claims determinations (one of the primary subjects of the CMS sanctions), also noted the addition of Mr. Appel as a Senior Vice President of Medicare Compliance, and emphasized that while he/she had met regularly with Mr. Appel's predecessor and saw her frequently, he/she met Mr. Appel only once.

69.     Furthermore, just as Cigna brought in Mr. Appel to head compliance, CW 2 was replaced (after resigning—her colleagues having already left HealthSpring) by another Cigna corporate employee, Kristin Neal, who likewise had no significant experience with CMS or Medicare Advantage.

70.     CW 4, who was intimately familiar with HealthSpring's IT systems (which were central to the functioning of HealthSpring's compliance regime), personally observed an ushering out of HealthSpring employees in favor of those who had, prior to the acquisition, been working for Cigna's corporate offices. Although Cigna generally retained some HealthSpring employees, CW 4 stated

that Cigna replaced vital HealthSpring personnel with young and inexperienced Cigna corporate employees.

71.     CW 4 specifically noted that although Cigna appointed David Crocker to replace CW 4 previous supervisor, Crocker was ignorant of all aspects of CMS and Medicare.  Likewise, CW 4 noted the appointment of Mr. Appel as a "joke." He stated that "Cigna fired or changed-out all the original HealthSpring Operations Management team."

72.     CW 1, CW 2, CW 3, and CW 4 each independently confirm an understanding that the Company's decision to slowly push out former HealthSpring compliance employees in favor of those Cigna employees who had worked for its corporate parent (without significant experience with or exposure to CMS regulations) was one of the fundamental causes of the Company's eventual inability to abide by CMS regulations.

### H.     CMS Sanctioned Cigna for Consistent Compliance Violations Dating Back to At Least 2013

73.     On January 22, 2016, Cigna filed with the SEC a Form 8-K which disclosed:

> On January 21, 2016, Cigna Corporation [ ] was notified by [CMS] of its intent to impose intermediate sanctions suspending the enrollment of and marketing to new customers of all Cigna Medicare Advantage and Standalone Prescription Drug Plan Contracts, effective at 11:59 p.m. on January 21, 2016.

Thus, as of January 22, 2016, Cigna was not permitted to market any of its Medicare Advantage or Part D offerings anywhere in the United States, and remains in that status.

74.     The Company announced that the sanctions had been imposed because of "deficiencies discovered with Cigna's operations of its Parts C and D appeals and grievances, Part D formulary and benefit administration, and compliance program."

75.     Although the Company acknowledged the sanctions imposed by CMS, and that they could have some material impact on its business, it failed to fully acknowledge the severity of CMS' findings, specifically that "Cigna's conduct poses a serious threat to the health and safety of Medicare beneficiaries," and that the "violations resulted in enrollees experiencing delays or denials in receiving medical services and prescription drugs, and increased out of pocket costs for medical services and prescription drugs."

76.     Additional effects of Cigna's non-compliance on HealthSpring's Medicare customers included:

- delays in resolution of requests for coverage and grievances concerning coverage determinations;

- patient requests for coverage being processed at the incorrect level of appeal, leading to denial of second-level review and an independent review if requests for medical services had been denied;

- letters containing inaccurate denial of claims;

- failure to pay medical providers within specified timeframes;

- delayed notice of coverage determinations leading directly to delays in receiving medical services;

25

- delay or denial of an independent review,  which had the potential to lead to lapses in coverage or delayed access to necessary medications; and

- improper denial of claims.

77.    The CMS Letter to Defendant Fritch (which contained the findings quoted in Paragraphs 75-76) highlighted that the Company's failures were "widespread and systemic."[6]

78.    CMS identified the post-acquisition transition and the resulting fundamental changes to HealthSpring as primary contributing factors to the compliance issues CMS eventually identified in the January 21, 2016 letter to Mr. Fritch.  CMS specifically noted that "Cigna's acquisition of HealthSpring, Inc. in 2012, which expanded its presence in the Medicare segment and added more than 1 million beneficiaries to Cigna's existing operations, contributed to creating *an organizational structure that is decentralized and fragmented*."[7]  CMS characterized this as a "[b]reakdown in operations [that] has made it difficult for Cigna to adequately monitor and oversee whether it is in compliance with Medicare Parts C and D requirements and *has resulted in substantial failures that require considerable correction* in order for Cigna to return to a state of compliance with CMS."

79.    The CMS Letter also noted a December 9, 2015 meeting between *Cigna's senior leadership* and CMS "to discuss the serious nature of the

---

[6] A copy of the January 21, 2016 letter is attached hereto as Ex. 2.

[7] Given Defendant Cordani's involvement in the integration of HealthSpring's operations into Cigna, he certainly would have known of such complications and their impact on compliance.

deficiencies discovered during the audit."  Ultimately CMS described this as a "breakdown in its operations" that rendered the Company incapable of even determining whether it was in compliance with the applicable standards, and which had "resulted in substantial failures."  Moreover, CMS noted that Cigna's senior leadership was apparently aware of the issues that ultimately caused the Company to be found non-compliant, and that at the December 2015 meeting, "Cigna discussed with CMS that an integration of operations among its various legal entities is necessary to run an effective organization."

80.    Another major concern was Cigna's inability to provide CMS auditors with the paperwork and records which it requested to facilitate its audit.  Noting that "Cigna failed to provide complete and accurate data for 12 . . . data requests," and as a result, "auditors were unable to evaluate whether Cigna was processing certain requests for Part D medications, Part C medical services and appeals correctly and within requested timeframes."

81.    The CMS Letter also specified that these compliance issues had been long-standing:

> Cigna has had a _history of non-compliance_ with processing these requests timely.  In 2013, Cigna received a notice of non-compliance for failing to process Part D coverage determinations and redeterminations within the required timeframes and failing to auto-forward those untimely decisions to the independent review entity [].

The CMS Letter also noted that Cigna had received a non-public warning letter from CMS in 2015 for the same violations, and that in light of that history, CMS also had "significant concerns that additional failures in these areas exist beyond those that the auditors were able to identify."

27

82.     Ultimately, CMS enacted the sanctions because of its concerns

about "enrollees' ability to access medical services and prescription

medications," especially in light of:

> numerous complaints from enrollees demonstrating that
> enrollees are having difficulties accessing medications
> and services.  Enrollee access to services and
> prescribed medications is the most fundamental aspect
> of the Part C and Part D programs because it most
> directly affects clinical care.  The lack of a compliance
> infrastructure, coupled with *serious deficiencies* of
> Cigna's administration of the Medicare Part C and D
> requirements, resulted in enrollees being denied access
> to the medical services and drugs that they are entitled
> to receive.

The specific compliance deficiencies set forth in Paragraph 76 above further

confirm that HealthSpring's failure to comply with CMS regulations were directly

related to its patients' ability to obtain the medical care they needed and to which

they were entitled.

83.     Thus, the CMS Letter makes clear that since the 2012 acquisition of

HealthSpring by Cigna, the Company had demonstrated a failure to comply with

CMS regulations, and had been notified of such non-compliance no later than

2013.  Ultimately, these compliance problems were so disconcerting that CMS

was concerned that Medicare patients were receiving such inadequate care that it

represented a risk to their safety and health.

84.     Notably, as HealthSpring's compliance program began to be affected

by Cigna's post-acquisition strategy, the Company removed a key provision from

its SEC filings.  Whereas, in its 2013 Form 10-K, Cigna stated that "*[w]e have

established policies and procedures to comply with applicable requirements*," the

Company's 2014 Form 10-K made no such statement, indicating Defendants'

knowledge that, during 2014, either: (i) any established policies did not actually ensure Company compliance with applicable regulations; or (ii) there were no such policies.

85.    Further demonstrating that these non-compliance problems had been known to Defendants prior to the Company's receipt of the CMS Letter, Defendant Fritch, in a media interview, stated that the Company "[had] internal quality review processes in place *that identified some of the areas in advance of the audit findings*."  In the same article, Marianne Udow-Phillips, director of the University of Michigan Center for Healthcare Research and Transformation stated that the non-compliance issues "must be complex enough to require some substantial operational changes that cannot be done simply and probably *did reflect some prior warnings from CMS that were not heeded*."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    The 2013 Form 10-K

86.    The Class Period begins on February 27, 2014.  On that day, Cigna filed with the SEC its financial results for fiscal year 2013 on Form 10-K (the "2013 Form 10-K"), which was signed by Defendants Cordani and McCarthy.

87.    Under the heading "Regulation," the 2013 Form 10-K stated:

> The laws and regulations governing our business continue to increase each year and are subject to frequent change.  *We have established policies and procedures to comply with applicable requirements*.[8]

\*       \*       \*

---

[8] All emphases set forth in Paragraphs 87-102 are added, and indicate the specific portion of each statement alleged to have been false and/or misleading, whether by reason of affirmative misstatement or omission.

> Our operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including . . . [CMS] to assess compliance with applicable laws and regulations.

88.    The 2013 Form 10-K also stated, under the subheading "Medicare Regulations":

> In our Medicare Advantage business, we contract with CMS to provide services to Medicare beneficiaries pursuant to the Medicare program.  As a result, our right to obtain payment (and the determination of the amount of such payments), enroll and retain members and expand into new service areas is subject to compliance with CMS' numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion.  The marketing and sales activities (including those of third-party brokers and agents) are also heavily regulated by CMS and other governmental agencies, including applicable state departments of insurance.  *We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs.*

89.    The 2013 Form 10-K also stated, under the subheading "Federal Audits of Government Sponsored Health Care Programs":

> The Federal government has made investigating and prosecuting health care fraud and abuse a priority. Fraud and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of customers, billing for unnecessary medical services, improper marketing, and violation of patient privacy rights.  The regulations and contractual requirements in this area are complex, are frequently modified, and are subject to administrative discretion.  *We expect to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness.*

90.     The 2013 Form 10-K also included a Sarbanes-Oxley ("SOX")
certification signed by Defendant Cordani, incorporated therein as Exhibit 31.1,
which stated:

>    I, DAVID M. CORDANI, certify that:
>
>    1.  I have reviewed this Annual Report on Form 10-K of
>        Cigna Corporation; [and]
>
>    2.  *__Based on my knowledge, this report does not contain__*
>        *__any untrue statement of a material fact or omit to__*
>        *__state a material fact necessary to make the__*
>        *__statements made, in light of the circumstances under__*
>        *__which such statements were made, not misleading__*
>        *__with respect to the period covered by this report . . . .__*

91.     The 2013 Form 10-K also included a substantially similar SOX
certification signed by Defendant McCarthy, as Exhibit 31.2.

92.     The statements set forth above in Paragraphs 87-91 were false and
misleading when made, or were rendered misleading by omitting material
information necessary to make the statements _not_ false and/or misleading,
because:  i) Defendants knew at the time the statements were made that the
Company's policies and procedures were insufficient to ensure regulatory
compliance; ii) Defendants knew at that time that the Company was allocating
fewer resources to compliance than it previously had and was not, and would not
*continue* to allocate resources to compliance as it had in the past; iii) CMS had
previously issued notices of non-compliance and at least one warning letter that,
left unaddressed, were likely to have a material impact in the Company's
operations and finances; iv) the integration of Cigna with HealthSpring's
operations had already caused complications with respect to the Company's
ability to comply with CMS regulations; and v) CMS had found Cigna to be non-

compliant as early as 2013, and that those findings could have a material impact to the Company.  While Defendants were extolling compliance with CMS regulations, they knew at that time but failed to disclose, or recklessly disregarded, as alleged in greater detail in Section IV.H above, that they had already received notice from CMS (prior to the CMS Letter) of non-compliance with Medicare Advantage and Part D regulations, and that such non-compliance could cause immediate material adverse consequences to the Company.

93.     Defendants Cordani and McCarthy's representations in the SOX Certifications that the 2013 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" was materially false and misleading when made because at that time, as Defendants Cordani and McCarthy knew but failed to disclose, or recklessly disregarded, that the Company had been found non-compliant with CMS regulations as early as 2013. Effective controls allow for, among other things, detection of potential material misstatements, such as those alleged herein.

### B.     December 2014 Code of Ethics and Principles of Conduct

94.     In or about December 2014, Cigna published and made publicly available on its website its Code of Ethics and Principles of Conduct (the "Code of Ethics"), what the Company describes as "the foundation for [its] unwavering commitment to integrity, legal compliance and ethical conduct."

95.     The Code of Ethics integrated statements from Defendant McCarthy in which he said that:

> Doing things "the right way" extends to how we manage our information.  Take our financial results, for example.  We have an obligation to make sure we're analyzing and reporting our results fairly and accurately.  The shareholders who invest in us expect it, as do the analysts who follow us.  That's why _**it's so important for every employee on the global Cigna team to handle maintain, and report on this information in compliance with all laws and regulations.**_

96.     The Code of Ethics also included  statements from Defendant Fritch in which he said that:

> As a respected health service organization, _**we have a responsibility to act with integrity in all we do, including any and all dealings with government officials**_.  This is critical to help us achieve our mission to improve the health, well-being and sense of security of those we serve.

97.     The statements set forth in Paragraphs 95-96 above were materially false and misleading when made.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: i) the Company knew no later than the end of 2013 that reports of non-compliance were not being substantively addressed by senior management, including the Individual Defendants; and (ii) Cigna's non-compliance with federal regulations and requirements for its Medicare Advantage and Medicare Part D plans posed a serious threat to the health and safety of the Company's Medicare patients and indicated a lack of integrity in its dealings with government officials.

C.     The 2014 Form 10-K

98.     On February 26, 2015, Cigna filed with the SEC its financial results for fiscal year 2014 on Form 10-K (the "2014 Form 10-K"), which was signed by Defendants Cordani and McCarthy.

33

99.     Under the heading "Regulation," the 2014 Form 10-K stated: "Our operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including state insurance and health and welfare departments, state boards of pharmacy and CMS to assess compliance with applicable laws and regulations."

100.     Under the heading "Medicare Regulations," the 2014 Form 10-K stated:

> Several of our subsidiaries engage in businesses that are subject to federal Medicare regulations, such as: those offering individual and group Medicare Advantage (HMO) coverage; those offering Medicare Pharmacy (Part D) products that are subject to federal Medicare regulations; and billing of Medicare Part B claims on behalf of providers with whom we have contractual management agreements.

> In our Medicare Advantage business, we contract with CMS to provide services to Medicare beneficiaries pursuant to the Medicare program.  As a result, our right to obtain payment (and the determination of the amount of such payments), enroll and retain members and expand into new service areas is subject to compliance with CMS' numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion.  Marketing and sales activities (including those of third-party brokers and agents) are also heavily regulated by CMS and other governmental agencies, including applicable state departments of insurance.  ***We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs***.

101.     The 2014 Form 10-K also stated, under the subheading "Federal Audits of Government Sponsored Health Care Programs":

> The Federal government has made investigating and prosecuting health care fraud and abuse a priority.

>Fraud and abuse prohibitions encompass a wide range
>of activities, including kickbacks for referral of
>customers, billing for unnecessary medical services,
>improper marketing, and violation of patient privacy
>rights.  The regulations and contractual requirements in
>this area are complex, are frequently modified, and are
>subject to administrative discretion.  ***We expect to
>continue to allocate significant resources to comply
>with these regulations and requirements and to maintain
>audit readiness.***

102.   The 2014 Form 10-K was also certified by Defendants Cordani and

McCarthy pursuant to SOX in a manner substantially similar in all material

respects to that set forth in Paragraph 90 above.

103.      The statements set forth above in Paragraphs 100-101 were false

and misleading when made, or were rendered misleading by omitting material

information necessary to make the statements *not* false and/or misleading,

because:  i) Defendants understood that the significant resources which had

previously been used to comply with CMS laws and regulations were inadequate

to ensure regulatory compliance; ii) Defendants knew at that time that the

Company was allocating fewer resources to compliance than it previously had

and was not, and would not, *continue* to allocate resources to compliance as it

had in the past; iii) the integration of Cigna with HealthSpring's operations had

already caused complications with respect to the Company's ability to comply

with CMS regulations; and iv) CMS had found Cigna to be non-compliant as early

as 2013.  While Defendants were extolling compliance with CMS regulations, they

knew at that time but failed to disclose, or recklessly disregarded, as alleged in

greater detail in Section IV.H above, that Cigna had already received notice from

CMS (prior to the CMS Letter) of non-compliance with Medicare Advantage and

Part D regulations, and that such non-compliance could cause immediate material adverse consequences to the Company.

104.    Defendants Cordani and McCarthy's representations in the SOX Certifications that the 2013 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" was materially false and misleading when made because at that time, as Defendants Cordani and McCarthy knew but failed to disclose, or recklessly disregarded, the Company had been found non-compliant with CMS regulations as early as 2013.  Effective controls allow for, among other things, detection of potential material misstatements, such as those alleged herein.

VI.    <u>THE TRUTH EMERGES</u>

105.    The relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or materialized on January 22, 2016.  On that date, before the opening of the U.S. securities markets, Cigna filed with the SEC a Form 8-K which disclosed, in relevant part:

> On January 21, 2016, Cigna Corporation ("Cigna") was notified by the Centers for Medicare & Medicaid Services ("CMS") of its intent to impose intermediate sanctions suspending the enrollment of and marketing to new customers of all Cigna Medicare Advantage and Standalone Prescription Drug Plan Contracts, effective at 11:59 p.m. on January 21, 2016.  The suspension does not impact current Cigna Medicare Advantage and Medicare Part D enrollees' benefits or plans.

**CMS imposed sanctions due to deficiencies discovered with Cigna's operations of its Parts C and D appeals and grievances, Part D formulary and benefit administration, and compliance program.  Cigna is working to resolve these matters as quickly as possible and is cooperating fully with CMS on its review.  Cigna is committed to its customers and ensuring that its customers have access to the quality healthcare, customer service and prescription drugs that they need.**

106.   Cigna received this notification from CMS by way of the CMS Letter,

which described Cigna's "history of non-compliance" dating back to at least

2013, and stated, in relevant part:

**Pursuant to 42 C.F.R. §§ 422.756 and 423.756, [CMS] is providing notice . . . that CMS has made a determination to impose intermediate sanctions on the following Medicare Advantage-Prescription Drug and Prescription Drug Plan Contract Numbers: H0150, H0354, H0439, H1415, H2108, H2165, H2676, H3945, H3949, H4407, H4454, H4513, H4528, H5410, H6751, H6972, H7020, H7787, H8423, H9460, H9725, and S5617.[9]**

**These intermediate sanctions will consist of _suspension of enrollment of Medicare beneficiaries into Cigna contracts_ . . . and the _suspension of all marketing activities to Medicare beneficiaries_ . . . . CMS is imposing these intermediate sanctions immediately, effective January 21, 2016, at 11:59 p.m. EST, . . . because it has determined that _Cigna's conduct poses a serious threat to the health and safety of Medicare beneficiaries_.**

                        *        *        *

**A Medicare advantage organization and Prescription Drug Plan sponsor's central mission is to provide Medicare enrollees with medical services and prescription drug benefits within a framework of Medicare requirements that provide the enrollees with a**

---

**[9] The plans subject to CMS sanctions include offerings in the following states: Alabama, Arizona, Georgia, Illinois, District of Columbia, Texas, Arkansas, Indiana, Mississippi, Pennsylvania, Tennessee, Florida, North Carolina, South Carolina, Kansas, Missouri, and West Virginia.**

number of protections.  ***CMS has determined that Cigna
substantially failed to provide its enrollees with services
and benefits in accordance with CMS requirements***.

107.   As a result of this news, Cigna stock fell from its $140.13 closing

price on Thursday, January 21, 2016 (the day prior to the announcement of the

CMS Letter) to $137.90 at the close of trading on Friday, January 22, 2016, a loss

of $2.23 per share, or 1.6%.

108.   After the intervening weekend, Cigna stock continued to react

negatively to the unexpected news of the CMS sanctions, and on Monday,

January 25, 2016, fell further from the Friday close to $135.85.  Over two

consecutive trading days, Cigna's share price fell $4.28 per share, a decline of

3.05%.

109.   As a result of Defendants' wrongful acts and omissions, and the

precipitous decline in the market value of the Company's securities, Lead Plaintiff

and other Class members have suffered significant losses and damages.

## VII.   DEFENDANTS MISSTATEMENTS AND OMISSIONS WERE MADE KNOWINGLY, OR WITH INTENTIONAL RECKLESSNESS

110.   As alleged herein, Defendants had actual knowledge of the false and

misleading nature of the statements they made, or acted with reckless disregard

of the true information known to them.  In doing so, Defendants committed acts,

and practiced and participated in a course of conduct that operated as a fraud or

deceit on purchasers of common stock during the Class Period.

111.   As alleged herein, Defendants acted with scienter in that they knew

the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading, knew that these documents or

statements were issued or disseminated to the investing public, and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants likewise acted with scienter to the extent that they made such statements with reckless disregard of the facts that rendered such statements false and/or misleading.

112.    As set forth above in detail, Defendants received information reflecting that Cigna had received notification that its operations were not compliant with CMS regulations no later than December 31, 2013.  Furthermore, Defendants exercised control over the policies and procedures for CMS compliance that are enacted and executed by Cigna employees, and the participation in strategic planning for all of the Company's activities that are governed by CMS regulations.

A.    Defendant Fritch's January 22, 2016
      Statement Demonstrates Actual Knowledge

113.    As alleged in Paragraph 84 above, following the public disclosure of the CMS Letter, Defendant Fritch acknowledged that the Company had "internal quality review processes in place *that identified some of the areas in advance of the audit findings*."  This alone is an acknowledgement that the Defendants knew in advance of the CMS Letter that there were CMS compliance problems that could have a material financial impact on the Company.

114.    Further, the CMS Letter itself specifies that senior Cigna executives attended a meeting with CMS where the agency's audit findings were presented to the Company; CMS and Cigna senior executives specifically discussed "the

_**serious nature of the deficiencies**_ **discovered during the audit." Thus, the CMS**

**Letter itself confirms that Defendants were aware of the severity of Cigna's**

**compliance problems (including their potential impact on the Company's**

**financials), and that they had dated back to 2013.**

      **B.**    **CMS Regulations Further Support a Strong Inference of Scienter**

      **115.**    **As discussed in Paragraphs 55-60, CMS regulations require that all**

**insurers establish compliance programs, policies, and procedures, and specifies**

**certain standards for those compliance programs, policies, and procedures.**

**Specifically, CMS requires that all such programs have a designated Compliance**

**Officer, responsible for presenting reports to senior management, including the**

**CEO, that include "the identification and resolution of suspected, detected or**

**reported instances of noncompliance. . . ."**

      **116.**    **Likewise, CMS requires that insurers have a compliance committee**

**in place, designed to oversee the Medicare compliance program, and which**

**"must provide regular compliance reports to the [Company]'s senior-most leader**

**and governing body [**_i.e._**, Board of Directors]." Thus, CMS also requires CEOs**

**and Boards of Directors to receive from their compliance committee and**

**compliance officer regular reports of the status of the Company's compliance**

**with CMS regulations, and that they be regularly kept apprised of any changes in**

**status to the Company's compliance program.**

      **117.**    **In light of these requirements, and the CMS requirement that "[t]he**

**CEO must also be advised of all governmental compliance enforcement activity,**

**from Notices of Non-Compliance to formal enforcement actions," the Individual**

**Defendants, each a senior executive within Cigna either knew of the notices of**

non-compliance issued by CMS no later than December 31, 2013, or recklessly
disregarded Cigna's compliance protocols during the Class Period by not
ensuring that the Company's compliance program actually provided them with
accurate information on essential governmental compliance issues that
presented the possibility of materially adverse financial consequences to the
Company.  In either event, they each made the above-alleged false and
misleading statements with requisite scienter.

118.    Further, in light of Defendant Cordani's role in integrating
HealthSpring's operations into Cigna (*see* Paragraph 26, *supra*), he either knew or
recklessly disregarded the fact that the Company was so decentralized and
fragmented that it either could not comply with CMS regulations or could not
determine whether it was compliant with CMS regulations.

C.    **Defendants' Statements Concerning Compliance**
      **Supports a Strong Inference of Scienter**

119.    Notwithstanding Cigna's move to usher out HealthSpring personnel,
Defendants' statements indicate that they understood that non-compliance with
CMS regulations presented a material adverse risk to the Company.

120.    For example, Cigna's 2013 and 2014 Forms 10-K stated that the
Company faced "risks related to litigation, regulatory audits, and investigations."
The Company specifically noted in its 2014 Form 10-K that:

> These regulatory audits or reviews or actions by []
> governmental agencies could result in changes to or
> clarifications of our business practices, retroactive
> adjustments to certain premiums, significant fines
> penalties, civil liabilities, criminal liabilities or other
> sanctions, including restrictions on our ability to
> operate, that could have a material adverse effect on our

> business, results of operations, financial condition and
> liquidity.

Cigna's 2013 Form 10-K contained a substantially similar disclosure.

121.    Likewise, Cigna warned investors in its 2013 and 2014 Forms 10-K of

"risks associated with participating in government-sponsored programs, such as

Medicare, including dependence upon government funding . . . compliance with

government contracts and increased regulatory oversight."  The Company noted

specifically in its 2014 Form 10-K that:

> [A]ny failure to comply with various . . . federal health
> care laws and regulations, including those directed at
> preventing fraud and abuse in government funded
> programs, could result in investigations or litigation, . . .
> with the imposition of fines, limits on expansion,
> restrictions or exclusions from programs or other
> agreements with a federal or state governmental
> agencies that could adversely impact our business,
> cash flows, financial condition and results of
> operations.

Cigna's 2013 Form 10-K contained a substantially similar disclosure.

122.    Further, the Company also warned investors in its 2013 and 2014

Forms 10-K that "[e]ffective prevention, detection and control systems are *critical*

*to maintain regulatory compliance* and prevent fraud and failure of these systems

could adversely affect [it]." This risk disclosure, as well as those set forth above

in Paragraphs 120-121, indicates that the Cigna and Defendants Cordani and

McCarthy (each of whom executed the 2013 and 2014 Forms 10-K) fully

understood that the Company's non-compliance with CMS regulations could have

a material adverse impact on financial results and that CMS regulatory

compliance was an essential element of the Company's core functions.

123.    Finally, as noted above, the absence of a statement in the Company's 2014 Form 10-K that it had policies and procedures established to comply with federal regulations (given that Cigna had made an affirmative representation concerning such policies and procedures in its immediately preceding 2013 Form 10-K) demonstrates the most-plausible inference here—that the drafters and signers of the 2013 and 2014 Forms 10-K knew that such policies and procedures either were not in place, or did not ensure that the Company actually complied with federal regulations.

> **D.    HealthSpring, and Its Compliance Systems, Were a Core Operation of Cigna's Overall Business, and Therefore the Most Plausible Inference Is That Defendants Knew the Relevant Details of <u>Cigna-HealthSpring's Compliance Problems</u>**

124.    In addition, a strong inference of scienter arises based on the very nature of the issues about which Defendants are alleged to have misled the investing public.  Cigna specifically acquired HealthSpring in 2012 in a strategic move to broaden its customer base, and to significantly increase its revenues.

125.    The fact that the premiums received from CMS as a result of Cigna's Medicare offerings through HealthSpring accounted for the largest single source of revenue for the Company, and that CMS was Cigna's *only* customer whose payments accounted for more than 10% of the Company's revenue, further demonstrate that HealthSpring's continued viability (and its continued ability to obtain new customers) was an essential component of Cigna's corporate strategy, and HealthSpring's viability depended critically on the Company's ability to abide by CMS regulations.

## VIII.  DEFENDANTS CORDANI AND FRITCH'S SUSPICIOUS STOCK SALES DURING THE CLASS PERIOD ARE FURTHER EVIDENCE OF THEIR SCIENTER

126.   In addition, Defendants Cordani and Fritch engaged in stock sales during the Class Period that were suspiciously timed and dramatically out of line with their prior trading practices.  As a result of these Class Period trades, Cordani and Fritch profited from the artificial inflation embedded in the trading price of Cigna stock caused by their false and misleading statements and omissions to investors during the Class period.  The Class Period sales of stock by Cordani and Fritch were highly unusual and suspicious as measured by (i) the total amount and percentage of shares sold; (ii) the contrast with Cordani and Fritch's own prior trading history; and (iii) the timing of the sales.  Cordani and Fritch's sales therefore raise a strong inference of scienter.

127.   To evaluate Cordani and Fritch's selling activity, Lead Plaintiff used publicly available trading data that Cordani and Fritch were required to report to the SEC on Form 4.  Lead Plaintiff analyzed the trading by Cordani and Fritch during the Class Period and then compared that to the approximately two-year period immediately preceding the Class Period, beginning on February 28, 2012 and January 21, 2014 (the "Control Period").

128.   To analyze Cordani and Fritch's stock sales, Lead Plaintiff calculated the total sales by each, together with the cash proceeds from such sales, during the Control Period and Class Period.  Those totals were then compared.  This analysis revealed that Cordani and Fritch's Class Period sales were extremely large, highly unusual, and suspicious.

129.   The number of shares sold and the net proceeds from such sales during the Class Period by Cordani and Fritch were extraordinarily large compared to the Control Period:

| PERSON | CONTROL PERIOD | | CLASS PERIOD | |
|---|---|---|---|---|
| | Number of Shares Sold | Net Proceeds | Number of Shares Sold | Net Proceeds |
| Cordani | 137,621[10] | $8,622,160 | 597,523[11] | $62,111,278 |
| Fritch | 0[12] | $0 | 455,180[13] | $59,835,369 |
| Total | 137,621 | $8,622,160 | 1,052,703 | $121,946,647 |

130.   Cordani and Fritch's Class Period stock sales were not only large in absolute terms, but also inconsistent with Cordani and Fritch's own prior selling activity during the control period.

131.   Collectively, Cordani and Fritch increased their stock sales from 137,621 shares during the Control Period to more than 1,052,703 shares during the Class Period – a startling increase of more than 750%.  Taken individually, Cordani and Fritch's sales both increased sharply.  Cordani increased his sales from 137,621 shares sold during the Control Period to 597,523 shares sold during the Class Period.  Fritch's sold share volume also increased significantly, from

[10] Excludes a February 28, 2013 withholding of 90,173 shares used to satisfy taxes or exercise price payment.

[11] Excludes a February 28, 2014 withholding of 102,506 shares, and a February 27, 2015 withholding of 96,771 shares used to satisfy taxes or exercise price payment

[12] Excludes a February 11, 2013 withholding of 2,533 shares, and a February 28, 2013 withholding of 15,109 shares used to satisfy taxes of exercise price.

[13] Excludes a February 11, 2014 withholding of 2,592 shares, and a February 28, 2014 withholding of 16,825 shares, and a February 27, 2015 withholding of 15,336 shares used to satisfy taxes of exercise price.

zero shares during the Control Period to 455,180 shares sold during the Class Period.

132.    The contrast between Cordani and Fritch's sales during the Control Period and the Class Period is even more striking when measured in dollars. Collectively, Cordani and Fritch's sales increased more than 1400%—a *fourteen-fold increase*—from the Control Period to the Class Period, from approximately $8,622,160 during the Control Period to over $121,946,647 during the Class Period.  While Fritch had no relevant Control Period stock sales, Cordani's individual sales increased more than 700% during the Class Period.

133.    Cordani and Fritch's sales of stock were even more suspiciously timed when considering that CMS had provided notices of non-compliance to Cigna no later than December 31, 2013, and that all of the Class Period sales were made prior to the public disclosures of the Company's substantial non-compliance with CMS regulations and the ensuing sanctions.

134.    Thus, while some of Cordani and Fritch's stock sales were made pursuant to Company trading plans, this does nothing to rebut any inference of scienter derived from the sales that were extreme departures from their previous stock sales, and suspicious with respect to both timing and total proceeds.

135.    Throughout the Class Period, Cordani and Fritch were able to, and did, control the contents of the Company's SEC filings, reports press releases, and other public statements.  Defendant Cordani also signed certifications pursuant to SOX in Cigna's annual and quarterly reports filed throughout the Class Period, which contained false and misleading statements of material fact,

and omitted material facts necessary to make the statements not false and misleading.  Cordani and Fritch knew that the adverse facts alleged herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

136.    The market prices of Cigna's common stock were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions regarding Cigna's compliance with CMS regulations.

137.    The artificial inflation in Cigna's common stock was removed after the Company filed the January 22, 2016 8-K with the SEC, which disclosed that CMS was imposing sanctions on the Company and revealed the false and misleading nature of the statements alleged herein.  Such sanctions also revealed the materialization of the risk that Cigna's Medicare Advantage and Medicare Part D offerings were non-compliant with CMS regulations.  This January 22, 2016 news, more fully described above, caused the prices of Cigna common stock to decline by material and statistically significant amounts, resulting in economic injury to Lead Plaintiff and other members of the Class.

## X.    INDIVIDUAL DEFENDANT AND CONTROLLING PERSON ALLEGATIONS

138.    During the Class Period, Defendants Cordani and McCarthy, as senior executives and/or directors of Cigna, were privy to confidential and proprietary information concerning the Company, its operations, its compliance with federal regulations, and the effects that non-compliance would have on the Company's current and future business prospects.  Defendants Cordani and

47

McCarthy similarly had access to undisclosed information about, among other things Cigna's failure to comply with CMS regulations.  Defendants Cordani and McCarthy ascertained such information through Cigna's internal corporate documents, conversations, and connection with each other and with corporate officers, employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Cigna officers and directors.

139.   Defendants Cordani and McCarthy participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein.  As a result of their executive or managerial positions within Cigna, Defendants Cordani and McCarthy, no later than February 26, 2014, had access to adverse undisclosed facts that Cigna was not in compliance with CMS regulations, and knew that these adverse undisclosed facts rendered the positive representations made by or about Cigna and its business, or adopted by the Company, materially false and misleading.

140.   Defendants Cordani and McCarthy, because of their positions of authority and control as officers or directors of the Company, and Cigna, as the corporate parent of HealthSpring, were able to, and did in fact, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Defendants Cordani and McCarthy were each provided with copies of the documents alleged herein to be misleading

before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, Defendants Cordani and McCarthy are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations alleged herein.

141.   As senior executive officers and/or directors and as controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Cordani and McCarthy each had a duty to promptly disseminate accurate and truthful information with respect to, among other things, Cigna's compliance with CMS regulations. Defendants Cordani and McCarthy had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based on truthful and accurate information.  Defendants Cordani and McCarthy's material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XI.   <u>CLASS ACTION ALLEGATIONS</u>

142.   Lead Plaintiff brings this action on behalf of himself and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Cigna during the Class Period and were damaged thereby.  Excluded from the Class are Defendants; present and former executive officers of Cigna, members of Cigna's Board of Directors, and members

of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions 1(a)(iii) and (1)(b)(ii)); the legal representatives, heirs, successors, or assigns of any of these individuals and entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of Cigna, including Cigna's employee retirement and benefit plan(s).

143.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and to the Court.  Throughout the Class Period, Cigna common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be obtained through appropriate discovery, Lead Plaintiff believes that there are thousands members of the proposed Class.  As of July 26, 2016, Cigna had more than 256 million common shares outstanding, owned by thousands of persons.  Record owners and other members of the Class may be identified from records maintained by Cigna or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144.    There is a well-defined commonality of interest in the questions of law and fact involved in this action.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

- **Whether Defendants violated the Exchange Act;**

- **Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;**

- **Whether Defendants statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;**

- **Whether Defendants knew that the statements were false or misleading or acted with conscious misbehavior or reckless disregard as to the falsity or misleading nature of the statements made;**

- **Whether the prices of Cigna's common stock were artificially inflated due to the misrepresentations and omissions of material fact alleged herein; and**

- **Whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measures of damages.**

**145.   Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired Cigna common stock during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein.**

**146.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in**

class action securities litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

147.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

## XII.   LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

148.   Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- Cigna common stock traded in efficient markets;

- The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Cigna common stock; and

- Lead Plaintiff and other members of the Class purchased Cigna common stock between the time Defendants misrepresented or failed to disclose material facts relating and the time the true facts were disclosed or the concealed risks

> materialized, without knowledge of the misrepresented or
> omitted facts.

149.    At all relevant times, the markets for Cigna's common stock were efficient for the following reasons:

- As a registered issuer, Cigna filed periodic public reports with the SEC;

- Cigna regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

- Cigna was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

- Cigna common stock was actively traded in an efficient market, namely the New York Stock Exchange, under the ticker symbol "CI."

150.    As a result of the foregoing, the markets for Cigna common stock promptly digested new material information regarding Cigna from all publicly

available sources and reflected such price information in the price of those securities.

151.    Under these circumstances, all persons and entities that purchased Cigna common stock during the Class Period suffered similar injury through their purchase of Cigna securities at artificially inflated prices, and the presumption of reliance applies.

152.    Further, to the extent Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

153.    Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market prices for Cigna common stock and to a presumption of reliance on Defendants' material misstatements and omissions during the Class Period.

XIII.    THE STATUTORY SAFE HARBOR AND BESPEAKS
         CAUTION DOCTRINE ARE INAPPLICABLE

154.    The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

155.    None of the Defendants' historic or present-tense statements alleged herein was a forward-looking statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the

projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

156.   To the extent that any of the materially false and misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

157.   Defendants are also liable for any false or misleading statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew that the forward-looking statement was false or misleading, and Defendants had no reasonable basis to make such statements, or the forward-looking statement was authorized and approved by an executive officer of Cigna who knew that the forward-looking statement was false.

## XIV.   CAUSES OF ACTION

### A.   COUNT I: Asserted Against All Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

158.   Lead Plaintiff repeats and alleges each and every allegation above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Defendant Cigna.

159.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, regarding Cigna's compliance with CMS regulations.

160.    Defendants directly and indirectly, through the use of means and instrumentalities of interstate commerce, the mails and/or the use of a national securities exchange: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to conceal the Company's non-compliance with CMS regulations, and to maintain the Company's common stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

161.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that Cigna was compliant with CMS regulations, which included making untrue statements of material facts and omitting facts necessary in order to make the statements about the Company's compliance protocols, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  Officers, management, and agents of Cigna did not have a reasonable basis for their alleged false statements and engaged in transactions,

practices, and a course of business which operated as a fraud and deceit upon purchasers of Cigna common stock during the Class Period.

162.   Cigna is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, as the maker of the statements and under the principle of *respondeat superior*.

163.   In addition to the duties of full disclosure Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 201.1-01 *et seq.*) and S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations including truthful, complete and accurate information with respect to the Company's compliance with CMS regulations, and the intrinsic value of Cigna's common stock, so that the Company's common stock prices would be based on truthful, complete, and accurate information.

164.   The allegations above establish a strong inference that Cigna, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of misrepresentations and omissions of material facts, as set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the fact that Cigna was not compliant with CMS regulations.  By

concealing these facts from investors, Cigna maintained its artificially inflated securities price throughout the Class Period.

165.   In ignorance of the fact that Cigna's common stock prices were artificially inflated, and relying directly and indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the markets in which Cigna common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in any public statement by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired Cigna common stock at artificially high prices, and were damaged when that artificial inflation was removed from the price of Cigna securities on and after January 22, 2016.

166.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff known of the truth concerning the Company's non-compliance with CMS regulations, Lead Plaintiff and other members of the Class would not have purchased or acquired their Cigna common stock, or if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

167.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection

with their purchases and acquisitions of Cigna common stock during the Class Period.

B.   **COUNT II: Asserted against Defendants Cordani and McCarthy for Violations of Section 20(a) of the Securities Exchange Act of 1934**

169.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), in behalf of Lead Plaintiff and all other members of the Class against  Defendants Cordani and McCarthy.

170.   Through their positions of control and authority as officers and directors of the Company, Defendants Cordani and McCarthy were able to and did control, directly or indirectly, the content of the public statements made by the Company.  With knowledge of the falsity of the statements contained therein, and in reckless disregard for the truth of the statements, Defendants Cordani and McCarthy caused the false and misleading statements of material fact as alleged herein.

171.   Defendants Cordani and McCarthy had direct involvement in the day-to-day operations of the Company and HealthSpring and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations alleged herein, and exercised the same.

172.   By reason of their management positions and/or stock ownership and control of the Board of Directors, Defendants Cordani and McCarthy were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power to direct the management and activities of the Company, HealthSpring, and their respective employees, and to cause the Company to make the false and

misleading statements complained of herein.  Because of their executive positions within the Company, Defendants Cordani and McCarthy had access to adverse non-public material information about non-compliance with CMS regulations, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

173.   By virtue of the foregoing, Defendants Cordani and McCarthy have violated § 20(a) of the Exchange Act .

174.   As a direct and proximate result of Defendants' Cordani and McCarthy's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Cigna common stock during the Class Period.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Lead Plaintiff and members of the Class damages and pre-judgment interest;

C.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees, litigation expenses and expert fees; and

D.    Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XVI.   <u>JURY DEMAND</u>

Lead Plaintiff demands a trial by jury of all issues so triable.

60

Respectfully submitted,

By:    */s/ David C. Shufrin*
David C. Shufrin (CT Bar No. 29230)
David A. Slossberg (CT Bar No. 13116)
HURWITZ SAGARIN SLOSSBERG
        & KNUFF, LLC
147 North Broad Street
Milford, Connecticut 06460
(203) 877-8000
(203) 878-9800 (facsimile)
dslossberg@hssklaw.com
dshufrin@hssklaw.com

*Liaison Counsel for Lead Plaintiff and the
Proposed Class*

James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Matthew J. Hrutkay (*pro hac vice*)
James T. Christie (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700
(212) 818-0477 (facsimile)
jjohnson@labaton.com
mrogers@labaton.com
mhrutkay@labaton.com
jchristie@labaton.com

*Counsel for the Lead Plaintiff and Lead
Counsel for the Proposed Class*

61

**CERTIFICATE OF SERVICE**

**This is to certify that on August 1, 2016, a copy of the foregoing Consolidated Amended Class Action Complaint was filed electronically with this Court. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.**

**/s/ David C. Shufrin**