# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JYOTINDRA PATEL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 3:16-cv-00182-VLB |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | November 30, 2016 |
| CIGNA CORP., DAVID M. CORDANI, THOMAS A. MCCARTHY, HERBERT A. FRITCH, and RICHARD APPEL, | ) ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

### TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................. 2

II.  JURISDICTION AND VENUE ......................................................... 13

III.  PARTIES ...................................................................................... 13

    A.  Relevant Non-Parties ........................................................... 15

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ................. 19

    A.  Medicare Became a Key Component of Cigna's Long-Term
        Strategy .................................................................................. 19

    B.  HealthSpring Emerged as an Attractive Target for Acquisition ........ 20

    C.  Cigna Bet Big on the Medicare Segment and Acquired
        HealthSpring .......................................................................... 22

    D.  Defendants Achieved the Increased Revenue They Hoped for
        After Cigna Acquired HealthSpring ........................................ 24

    E.  Defendants Knew Compliance with CMS Rules Was Essential ........ 25

    F.  Defendants Knew that CMS Rules Require a Robust
        Compliance Program Including Communication of All
        Violations to Senior Management ........................................... 26

    G.  Defendants Immediately Began Undermining the Effectiveness
        of HealthSpring's Compliance Systems and Management By
        Putting Inexperienced Cigna Insiders in Charge of Relevant
        Operations ............................................................................. 28

    H.  Improper Integration of Data Systems Further Contributes to
        Regulatory Violations ............................................................ 34

    I.  CMS Sanctioned Cigna for Compliance Violations Dating Back
        to At Least 2013 ..................................................................... 36

    J.  Defendant Appel and Cigna Received More Than Seventy-Five
        Notices Identifying Compliance Violations During the Class
        Period, Prior to Cigna's Receipt of the CMS Letter ............................ 41

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
    STATEMENTS AND OMISSIONS ..................................................... 44

    A.  The 2013 Form 10-K .............................................................. 44

B.     December 2014 Code of Ethics and Principles of Conduct ............... 47

C.     The 2014 Form 10-K ....................................................................... 49

VI.     THE TRUTH EMERGES ......................................................................... 51

A.     The January 22, 2016 Announcement ........................................... 51

B.     The July 29, 2016 Announcement ................................................. 53

VII.     DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MADE
KNOWINGLY, OR WITH RECKLESS DISREGARD .............................. 57

A.     Defendant Fritch's January 22, 2016 Statement Demonstrates
Actual Knowledge .......................................................................... 58

B.     As Cigna's Medicare Compliance Officer, Defendant Appel's
Knowledge of Cigna's Compliance Failures Binds the
Company .......................................................................................... 58

C.     CMS Regulations Further Support a Strong Inference of
Scienter ........................................................................................... 59

D.     Defendants' Statements Concerning Compliance Support a
Strong Inference of Scienter ........................................................ 61

E.     HealthSpring, and Its Compliance Systems, Were a Core
Operation of Cigna's Overall Business, and Therefore the
Most Plausible Inference Is That Defendants Knew the
Relevant Details of HealthSpring's Compliance Problems ............... 63

VIII.     DEFENDANTS CORDANI AND FRITCH'S SUSPICIOUS STOCK SALES
DURING THE CLASS PERIOD ARE FURTHER EVIDENCE OF THEIR
SCIENTER ............................................................................................. 63

IX.     LOSS CAUSATION AND ECONOMIC LOSS .................................... 67

X.     INDIVIDUAL DEFENDANT AND CONTROLLING PERSON
ALLEGATIONS ...................................................................................... 68

XI.     CLASS ACTION ALLEGATIONS ........................................................ 70

XII.     LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A
PRESUMPTION OF RELIANCE ............................................................ 72

XIII.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE ARE INAPPLICABLE ........................................................ 75

XIV.     CAUSES OF ACTION ............................................................................ 76

**A.** **COUNT I: Asserted Against Defendants Cigna, Cordani, McCarthy, and Fritch for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder** ..................................................... 76

**B.** **COUNT II: Asserted against Defendants Cordani, McCarthy, and Appel for Violations of Section 20(a) of the Securities Exchange Act of 1934** ........................................................... 79

**XV.** **PRAYER FOR RELIEF** ................................................... 81

**XVI.** **JURY DEMAND** ................................................... 81

iii

Court-appointed Lead Plaintiff Minohor Singh ("Lead Plaintiff"), individually and on behalf of all persons and entities that, between February 27, 2014 and August 2, 2016, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock of Cigna and were damaged thereby (the "Class"),[1] by and through his attorneys, as and for his Second Amended Class Action Complaint ("Complaint") asserting claims against Cigna Corporation ("Cigna" or the "Company") and the individual defendants named below (together with Cigna, the "Defendants"), alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

The allegations of Lead Plaintiff are based upon the investigation of his counsel, which included a review of reports filed by Cigna with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Cigna; securities analysts' reports about Cigna; media and news reports concerning Cigna; data and other information concerning Cigna securities; other publicly available information concerning the Company and the Individual Defendants (as defined below); interviews with former employees of Cigna and Cigna-HealthSpring ("HealthSpring"); materials produced by Centers for Medicare and Medicaid Services ("CMS") in response to requests made

---

[1] Excluded from the Class are Defendants; present and former executive officers of Cigna; members of Cigna's Board of Directors; and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); the legal representatives, heirs, successors, or assigns of any of these individuals and entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of Cigna, including Cigna's employee retirement and benefit plan(s).

pursuant to the Freedom of Information Act; and a review of federal regulations governing Defendants' business conduct.

I.    **NATURE OF THE ACTION**

1.    This Action concerns Cigna, a large, multi-national insurance company, and its senior-most officers, that wanted to bring Cigna into the fast-growing—and immensely profitable—Medicare provider segment, an area in which specialized (and often smaller) insurers had already seen the profit potential of an aging population of "Baby Boomers" in need of greater amounts of health care.

2.    Unfortunately, from Defendants' perspective—and ultimately, for investors in Cigna' stock—Cigna's business was centered primarily on its commercial health offerings and, therefore, the Company prior to 2012 had very little experience offering private Medicare insurance.  Thus, before 2012, Cigna had minimal experience in navigating or complying with applicable Medicare regulations.

3.    In stark contrast to Cigna's minimal experience with regulatory Medicare compliance, by 2012, HealthSpring, a regional, Nashville-based health insurance company that Cigna would target for acquisition, had more than a decade of experience in marketing and administering private Medicare plans, and had acquired extensive institutional knowledge of the substantial regulatory requirements with which it was required to comply.

4.    Thus, Cigna made the decision to acquire HealthSpring for $3.8 billion, primarily because of HealthSpring's long-standing reputation for success in marketing and administering private Medicare plans, both in terms of

2

profitability (due to a large base of beneficiaries and a unique physician engagement model), and for complying with strict regulations enacted and enforced by CMS, an agency within the Department of Health and Human Services that administers Medicare, including Medicare Advantage and Part D.[2] In fact, _HealthSpring had never been cited or sanctioned by CMS for non-compliance_, and had _never previously been prohibited by CMS from marketing or selling its Medicare policies to new customers._

5.      As relevant here, CMS is also the agency that regulates, monitors, and governs (and has jurisdiction to level sanctions against) insurance companies, including Cigna, that offer private Medicare plans.  CMS also pays premiums to such insurance companies, which typically cover all or a majority of the cost of such plans.

6.      In the wake of the acquisition, Defendants highlighted HealthSpring's well-established reputation for compliance by touting the new, integrated Company's adherence to CMS's regulatory and compliance requirements.  At the start of the Class Period, in 2014, Defendants told investors that Cigna "_ha[s] established policies and procedures to comply with applicable regulations._"[3]

7.      Throughout the Class Period, Defendants also expressly referenced HealthSpring's longstanding reputation for CMS compliance, announcing publicly

_____

[2] Medicare Advantage (also known as Medicare Part C) is a health insurance program offered by commercial insurance companies that serves as a substitute for traditional Medicare.  Medicare Advantage plans are typically managed care plans (such as an HMO or PPO) that offer more benefits than traditional Medicare while limiting the network of providers that patients may use.  Medicare Part D ("Part D" or "PDP") is a federal program to subsidize the cost of prescription drugs, which commonly is operated by commercial insurers such as Cigna.

[3] All emphases added unless otherwise noted.

3

that Cigna would "*continue to allocate significant resources to our compliance*, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs," and would "*continue to allocate significant resources to comply with these regulations and requirements* . . . ."

8.     The effect of the HealthSpring acquisition on Cigna's financial results was substantial and immediate—within one year CMS' Medicare premiums became the Company's largest single source of revenues, accounting for 21.9% of Company revenues in 2012 alone.  That trend would continue, with CMS premiums accounting for approximately 21-22% of Cigna's overall 2013 and 2014 revenues.  Prior to and throughout the Class Period, CMS was Cigna's only client that accounted for more than 10% of Company revenues.

9.     As Cigna began managing the operations of HealthSpring, its only subsidiary offering private Medicare coverage, Defendants intentionally took several steps to maximize Cigna's profitability at the expense of compliance, including by: (i) failing to allocate the necessary money, time, and staffing that had allowed HealthSpring—until it was acquired by Cigna in 2012—successfully to navigate the minefield of CMS regulations and possible sanctions; (ii) engaging in a pattern of conduct that all but ensured that HealthSpring employees (including compliance employees) left the Company; (iii) replacing those employees with Cigna commercial health employees who had little or no background with CMS regulations or compliance therewith; and (iv) allowing internal data processing systems—necessary to ensure compliance with CMS

4

directives—to remain uncoordinated and incapable of properly processing necessary data.  In effectuating these steps, non-compliance with CMS regulations became the Company's cultural norm.

10.     For example, Cigna appointed Defendant Richard Appel, a legacy Cigna employee,[4] to head up HealthSpring's compliance group in the aftermath of the acquisition, despite the fact that he had _less than two years of experience with Medicare_ at the time.  Notwithstanding such minimal CMS experience, Mr. Appel was placed in a supervisory compliance role over HealthSpring's senior-most compliance employees, including the erstwhile head of the group, who had _seventeen years of Medicare experience_.

11.     As confirmed by several former HealthSpring employees who worked in compliance, the steps taken by Cigna in the wake of the acquisition (primarily (i) the appointment of Mr. Appel as the Company's head of Medicare compliance, and (ii) ongoing reliance on uncoordinated and disparate data processing systems) resulted in a leadership vacuum when it came to compliance.

12.     Indeed, by the beginning of 2014, it was clear that Cigna's control of HealthSpring was causing the Company regularly to violate CMS regulations. Notably, starting in early 2014, Mr. Appel, Cigna's chief Medicare Compliance Officer, began regularly receiving from CMS notices identifying specific compliance violations.

---

[4] Throughout the Complaint, any reference to a "legacy" employee relates to the entity (_i.e._, Cigna or HealthSpring) for which that employee worked _prior_ to Cigna's acquisition of HealthSpring in 2012.

13.     In total, Mr. Appel and Cigna received _more than 75 such notices_ _from CMS_ during the Class Period, each identifying a specific instance where the Company's practices were not compliant with CMS requirements.  These violations extended back as far as October 2013.  By way of example only, specific compliance violations cited by CMS in these notices included:

- in October 2014, Cigna was cited in two separate notices for failure to provide records, and for improper payments to approximately 410 medical service providers;

- in December 2014, Cigna received five separate Notices of Non-Compliance for improper pharmacy coverage;

- in February 2015, Cigna was cited for inadequate claims processing systems that "were not accurately configured to capture and track the [maximum-out-of-pocket] amounts and ensure appropriate payment"; and

- in April 2015, Cigna was cited in two Notices of Non-Compliance for wrongly discontinuing coverage for 433 members and improperly denying more than 1,700 pharmacy claims.

14.     As discussed in greater detail below, CMS regulations make Defendant Appel, as Cigna's Medicare Compliance Officer, the executive responsible for ensuring that any Medicare compliance violations (such as those identified in the dozens of notices sent by CMS during the Class Period) are promptly escalated to senior corporate management, including but not limited to

6

the other Individual Defendants and the Board of Directors, so that any violations can be properly resolved by those corporate officers with authority to truly effectuate change when any violation is found.

15.     Indeed, CMS requires private Medicare insurers such as Cigna to implement and follow internal policies directing these issues to be escalated to senior management (including the other Individual Defendants), so that such officers are intimately aware of the status of their organization's compliance with CMS regulations, and the status of any violations.

16.     As would subsequently become apparent, the negative effects of the Company's policy of promoting legacy Cigna employees into key positions at HealthSpring (particularly in compliance) at the expense of decades of legacy HealthSpring Medicare experience were further aggravated by the Company's disconnected and uncoordinated data processing systems.  This lack of data processing integration eventually rendered the Company's various departments incapable of processing customer appeals and grievances within requisite timeframes.

17.     Moreover, the problems in integrating the Company's disparate and uncoordinated systems were well-known among HealthSpring employees throughout the Class Period, specifically among those employees charged with regulatory compliance.  Indeed, these specific integration concerns were identified by the Company itself in SEC filings as a risk of the acquisition, meaning that Defendants Cordani and McCarthy (who signed those SEC filings)

7

knew of a material risk that they recklessly disregarded in the years following the 2012 acquisition.

18.     The material negative effect of these developments on Cigna was understood by Defendants, who noted after the acquisition that if they were "unable effectively to integrate the HealthSpring business successfully . . . it could have material adverse effects on Cigna's business."  The Individual Defendants (two of whom signed the SEC filing setting forth this risk disclosure) understood that improper network integration posed a material risk to the Company and its investors, but recklessly disregarded this risk following the 2012 acquisition.

19.     Moreover, Defendants also knew or recklessly disregarded that CMS regulations specify that companies offering Medicare Advantage and Part D coverage, including Cigna after its acquisition of HealthSpring, must appoint a compliance officer and maintain a compliance committee, both of which are responsible for reporting to senior management details regarding the status of the Company's compliance program, and identifying and resolving any instances of compliance violations.

20.     Unfortunately for Cigna's shareholders, the pattern of conduct which focused only on profits at the expense of compliance with CMS regulations would have devastating consequences.  And despite having previously received more than 75 letters identifying specific instances of Cigna's non-compliant conduct, Defendants told the truth to investors only when they could no longer hide it.

21.     On January 22, 2016, Defendants finally and belatedly disclosed to the investing public that Cigna had been violating CMS regulations, and that as a result of those violations, the Company had received a letter from CMS (the "CMS Letter") the prior day, highlighting Cigna's "*longstanding history of non-compliance* with CMS requirements" dating back to at least 2013.  Specifically, CMS noted that "*Cigna's conduct poses a serious threat to the health and safety of Medicare beneficiaries*," and that the "violations resulted in enrollees experiencing delays or denials in receiving medical services and prescription drugs, and increased out of pocket costs for medical services and prescription drugs."

22.     The CMS Letter confirmed and corroborated the partial materialization of a foreseeable risk of which Defendants had known or recklessly disregarded since at least 2013, namely that "Cigna's acquisition of HealthSpring, Inc. in 2012, which expanded its presence in the Medicare segment and added more than 1 million beneficiaries to Cigna's existing operations, contributed to creating *an organizational structure that is decentralized and fragmented*." Indeed, CMS characterized this as a "[b]reakdown in operations [that] has made it difficult for Cigna to adequately monitor and oversee whether it is in compliance with Medicare Parts C and D requirements and *has resulted in substantial failures that require considerable correction* in order for Cigna to return to a state of compliance with CMS."  The CMS Letter also confirmed that the Company had received notice of compliance violations "in 2013."

23.     As a consequence, CMS imposed harsh sanctions prohibiting Cigna from enrolling any new members in any of its private Medicare plans.  Thus, as of January 22, 2016, Cigna was not permitted to market any of its Medicare Advantage or Part D offerings anywhere in the United States, and Cigna remains in that status.

24.     The announcement of the CMS Letter disclosed that, almost immediately upon the 2012 acquisition of HealthSpring by Cigna, the Company demonstrated a failure to comply with CMS regulations, and had been notified of such non-compliance throughout the Class Period.  Ultimately, these compliance problems were so severe that CMS was concerned that Medicare patients were receiving inadequate care that represented a risk to their safety and health, and sanctioned the Company on January 21, 2016—prohibiting them from selling or marketing its Medicare offerings until compliance violations had been fully remediated.

25.     As a result of the disclosure of CMS's actions and the underlying compliance violations, Cigna stock fell from its $140.13 closing price on January 21, 2016, to close at $135.85 on January 25, 2016, a market cap loss of approximately *$1.1 billion*.

26.     Notwithstanding the notification of sanctions and receipt of the CMS Letter, which specifically identified system integration issues as a source of the Company's compliance violations, the Company had not even begun planning the integration of their varied systems one month after the sanctions were imposed, according to one former employee.

10

27.     Even after CMS imposed sanctions prohibiting Cigna from marketing or selling its Medicare offerings, the market remained uncertain as to the likelihood that the Company would remediate all of the compliance violations noted in the CMS Letter.  But the market also universally understood that, unless Cigna was able to fully remediate issues and have the sanctions lifted before October 15, the beginning of the limited Medicare Annual Enrollment Period ("AEP"),[5] Cigna would not be able to participate in another AEP until October 2017.

28.     As 2016 proceeded, the market became increasingly skeptical that the sanctions would be remedied in sufficient time to permit Cigna to participate in Medicare AEP.  On July 29, 2016, Cigna disclosed that it still had yet to remedy the compliance violations noted in the CMS Letter, even though it had spent approximately $30 Million during the Company's second quarter in costs associated with remediating those issues.  The Company also disclosed on July 29, 2016 that it "may not be able to address matters arising from the [CMS Sanctions] Notice in a timely and satisfactory manner," leading analysts to understand that it was highly unlikely the Company would have sanctions lifted in sufficient time to sell its Medicare plans in 2016.

---

[5] The AEP  which runs from October 15 through December 7 of each year, is the *only* time during a calendar year when Medicare patients can enroll with and purchase plans sold by Cigna and other Medicare insurers.  The only exception to this rule is for those members that become initially eligible for Medicare during the course of a calendar year.  For example, if a customer first becomes eligible for Medicare in May, that customer may enroll in a Medicare plan at that time.  In subsequent years, however, that customer will only be allowed to change Medicare insurance providers during the AEP.

29.     As a result of this news, the price of Cigna stock fell from its $135.99 closing price on Thursday, July 28, 2016 to $128.96 at the close of trading on Friday, July 29, 2016, a loss of $7.03 per share, and continued falling over the course of the following two trading days.  On Monday, August 1, 2016, the price of Cigna common stock fell an additional $2.17 per share on this news; and on August 2, 2016, the price fell an additional $2.66 to close at $124.13.  Thus, over the course of three consecutive trading days Cigna's share price fell $11.86 per share, or approximately 8.8% from its July 28, 2016 closing price.

30.     Notably, during the Class Period, but after the Company received the first notices of compliance violations from CMS, Defendants Cordani and Fritch engaged in suspiciously timed stock sales that were dramatically out of line with their prior trading practices.  Specifically, although Mr. Cordani (CEO of Cigna) had sold nearly 138,000 shares in the two years prior to the Class Period, with proceeds of $8.6 million, during the Class Period, he sold nearly 670,000 shares, with proceeds of _nearly $72 million_.  Likewise, Mr. Fritch (President of HealthSpring, a wholly owned subsidiary of Cigna after the 2012 acquisition), had sold no shares in the two years prior to the Class Period, but sold more than 450,000 shares for proceeds of _nearly $60 million_ during the Class Period.

31.     In light of their knowledge or reckless disregard of the Company's compliance violations throughout the Class Period, and/or in light of their knowledge or reckless disregard that the Company's policies and practices were inadequate to ensure Medicare regulatory compliance, Defendants' statements

about compliance throughout the Class Period were knowingly false and misleading when made.

## II.   <u>JURISDICTION AND VENUE</u>

32.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

33.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

34.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Defendant Cigna maintains its principal executive offices in this District at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

35.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to: the mails; interstate telephone communications; and the facilities of the national securities markets.

## III.   <u>PARTIES</u>

36.   Lead Plaintiff Minohor Singh purchased shares of Cigna common stock during the Class Period, as set forth in the certification previously filed with the Court (*see* Ex. 1 hereto), and suffered damages as a result of the federal securities law violations alleged herein.  By order dated May 17, 2016 (*see* ECF No. 34), the Court appointed Mr. Singh as the Lead Plaintiff in this action.

37.     Defendant Cigna Corporation ("Cigna" or the "Company") is a health services organization that, through its subsidiaries (including HealthSpring, a wholly owned subsidiary), provides medical, dental, disability, life and accident insurance and related products and services in the United States and internationally.  The Company was incorporated in Delaware in 1981 upon the merger of Connecticut General Life Insurance Company and INA Corporation. Since at least 2012, the Company has provided private Medicare coverage through HealthSpring in pursuit of its corporate strategy to "treat individuals through all stages of their lives."

38.     Defendant David M. Cordani ("Cordani") served throughout the Class Period as the Company's Chief Executive Officer ("CEO"), President, and Director.  According to the Company's public website, Cordani was charged with responsibilities for the integration of HealthSpring into Cigna's operations following the 2012 acquisition.  Prior to his promotion to CEO in December 2009, Cordani was Cigna's Chief Operating Officer from June 2008 through December 2009, and has held various other positions within Cigna since 1999.

39.     Defendant Thomas A. McCarthy ("McCarthy") served throughout the Class Period as the Company's Chief Financial Officer ("CFO") and Executive Vice President.   In this role, he is responsible for all of Cigna's financial operations and functions, including investment management, strategic planning, and allocation of funds for payment of operational and compliance costs.  Prior to being named CFO, McCarthy served as Vice President of Finance, in which capacity he was charged with leading the acquisition of HealthSpring (according

14

to the Company's public website).  McCarthy has more than 31 years of experience in health care and insurance services, including more than 26 years with Cigna.

40.    Defendant Herbert A. Fritch ("Fritch") served throughout the Class Period as President of HealthSpring, a wholly owned subsidiary of Cigna, throughout the Class Period, following Cigna's acquisition of HealthSpring.  Prior to the acquisition, Fritch founded HealthSpring, and served as its CEO and Chairman of the Board of Directors.  Originally an actuary by training, Defendant Fritch has more than 40 years of experience in the health care field.

41.    Defendant Richard A. Appel ("Appel", together with Defendants Cordani, McCarthy, and Fritch, the "Individual Defendants") was Cigna's Medicare Compliance Officer at all times during the Class Period, and has been employed by Cigna for more than 19 years.  Prior to his role as Cigna's Medicare Compliance Officer, Appel was a Director in the Company's Special Investigation Unit.  As relevant here, Mr. Appel was promoted to his current position as Medicare Compliance Officer shortly after Cigna acquired HealthSpring in 2012. In his capacity as Medicare Compliance Officer for Cigna and HealthSpring, Appel was the primary contact for communications with CMS regulators, and indeed received more than 75 different notices and/or warning letters from CMS throughout the Class Period identifying specific instances where the Company had been found non-compliant with applicable regulations.

A.    <u>Relevant Non-Parties</u>

42.    CW 1 was employed by HealthSpring from March 1996 until March 2012 and last held the position of the Senior Vice President of Government

15

Programs/Medicare Compliance.  In this role, CW 1 was in a position to know and did know HealthSpring's compliance policies and procedures, and was HealthSpring's primary contact with CMS.  Upon Cigna's acquisition of HealthSpring in 2012, the Company brought in Richard Appel to supervise CW 1.

43.     CW 2 was employed by HealthSpring from 2010 until April 2013.  CW 2 last held the position of Director of Enterprise Star Rating Operations Group and reported directly to Ashok Sudarshan, who reported to HealthSpring's (now former) Chief Operating Officer, Mark Tulloch.  CW 2 worked closely with the compliance department, specifically interacting with Dana Fields, the Vice President of Internal Audit & Risk Management, and met with Cordani and other high-ranking Cigna senior executives on a monthly basis.

44.     CW 3 was employed by HealthSpring from July 2014 until March 2016 and last held the position of Human Resources Clinical HealthCare Consultant.  CW 3 routinely interacted with Kila Sweeney,  Director of Human Resources at HealthSpring since May 2011.  CW 3 was aware that Cigna executives regularly sent out surveys, as well as held conference calls and meetings, regarding personnel shortages.

45.     CW 4 was employed by HealthSpring from October 2006 until March 2016.  CW 4 last held the position of Vice President of IT-Software Development, Infrastructure, and Architecture.  During CW 4's employment at HealthSpring, CW 4 reported to Andy Flatt, HealthSpring's Senior Vice President and Chief Information Officer, and David Crocker, who was the Senior Vice President of IT/Head of IT for HealthSpring since 2014.

16

46.     CW 5 was employed by HealthSpring from March 2013 through March 2014 as a Manager of Provider Education.  During his/her tenure, CW 5 reported to BethAnne Lewis (Director of Coding Performance).  CW 5 has more than twenty years of experience in risk adjustment, billing, coding, and regulatory compliance, and is a certified medical coder.  In his/her role as a Manager of Provider Education, CW 5 was responsible for managing a team of eight HealthSpring employees who trained clinical medical providers about CMS risk-adjustment methods and proper documentation and coding; he/she also tracked internal risk assessments for HealthSpring providers, arranged for physician training or retraining (based on those internal risk assessments), and taught Cigna internal staff.

47.     CW 6 was employed by HealthSpring from April 2003 through January 2015.  From the time Cigna acquired HealthSpring through January 2015, CW 6 acted as Senior Vice President of Operations, and reported to Pat Brown, President of Shared Services.  In this role, CW 6 was responsible for all issues related to customer service, claims, and systems configurations for approximately 700 employees, and managed essential customer service functions such as addressing member claim issues and data system configurations.

48.     CW 7 was employed by HealthSpring from 2005 through December 2014.  From 2010 through 2014, CW 7 held the position of Grievance Director for the Company's Medicare offerings, and reported to Wendy Wetzel (Vice President of Customer Service), who in turn reported to Richard Appel.  Processing of

17

grievances was a responsibility associated with regulatory compliance, and was managed by Mr. Appel.  As a Grievance Director, CW 7 was responsible for receiving and resolving grievances or complaints the Company received with respect to its Medicare products.

49.     CW 8 was employed by HealthSpring from June 2012 through February 2016 as a Manager for Medicare Claim Operations.  CW 8 reported to Rebecca Lindy, Market Manager and Chief Operations Officer for Cigna Healthcare of Arizona – Medicare Advantage.  During his/her tenure with the Company, CW 8 managed data and information related to CMS compliance, and was responsible for ensuring that grievances received by Cigna were being processed properly.

50.     HealthSpring is a wholly owned subsidiary of Cigna, founded by Defendant Fritch in 1996, whose principal offices are located at 530 Great Circle Road, Nashville, Tennessee 37228.  It describes itself as "a leading health services company committed to helping [ ] Medicare and Medicaid beneficiaries live healthier, more active lives through personalized, affordable and easy-to-use health care solutions."  Cigna acquired HealthSpring in 2012, and operates HealthSpring within its Global Health Care business segment.

51.     Prior to its acquisition by Cigna in 2012, HealthSpring was an independently owned and operated managed health care organization that focused primarily on providing Medicare Advantage and Part D.  Prior to and during the Class Period, Medicare premiums were the source of substantially all of HealthSpring's revenue.

18

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

    A.     Medicare Became a Key Component
        of Cigna's Long-Term Strategy

52.     By the early 2010s, private Medicare offerings emerged as a tremendous growth opportunity for insurance companies such as Cigna, primarily because they serve an older patient population than do traditional commercial health insurance plans.  These older (and generally more ill) patients bring in approximately ***three times as much revenue per customer*** than do patients in traditional commercial plans, and the vast majority of this revenue is derived from premiums paid by the U.S. government on behalf of Medicare-eligible beneficiaries.

53.     Indeed, Medicare Advantage and Part D generate higher revenue than traditional commercial health insurance offerings precisely because the senior patient population typically seeks medical services much more regularly, and generally do not have alternative insurance available to them through employers.  As Chris Rigg, analyst for Susquehanna Financial Group has noted, "[t]he person who is 70 years old uses a lot more healthcare.  It's lower margins, but higher overall dollars."

54.     This trend has not gone unnoticed.  Reuters has noted that, "the entry of the postwar baby boom generation into retirement is expected to swell the ranks of privately run Medicare Advantage Plans, which [as of 2011] account for 25 percent of Medicare enrollment." Moreover, it is widely understood that this percentage will increase as the segment of the population eligible for Medicare coverage increases at even greater rates in the coming years.

19

55.     There was one large problem that prevented Cigna and from reaping the potential benefits of this expanding, and profitable space—the Company had very limited experience in offering Medicare Advantage or Part D plans.  Thus, from Defendants' perspective, an acquisition of a private Medicare insurer (like HealthSpring) provided an opportunity for Cigna to offer new products to an entirely new (and growing) pool of potential customers that they knew would generate significantly more revenue than Cigna's traditional commercial health customers.

56.     Such an acquisition would provide the added benefit of matching the competitive offerings of other large national health insurance companies such as UnitedHealth and Humana, who at the time were the largest private Medicare insurers, as well as WellPoint and Aetna, who had engaged in similar mergers to expand their Medicare offerings.

B.     HealthSpring Emerged as an Attractive Target for Acquisition

57.     By 2010, HealthSpring had grown to one of the largest private Medicare insurers in the U.S., offering Medicare Advantage plans in 11 states and the District of Columbia and Part D plans in all 50 states and the District of Columbia.  Both offerings are and were subject to CMS regulations, which require insurers to establish stringent internal policies and procedures intended to ensure compliance with federal standards requiring that Medicare patients receive the benefits to which they are entitled.

58.     HealthSpring's model of providing Medicare coverage is (and has been historically) somewhat different from the traditional fee-for-service model of Medicare and other types of health insurance in that it offers patients

20

"coordinated care structures of comprehensive networks of local hospitals and physicians," and focuses heavily on engaging medical providers who are "experienced and effective in managing the healthcare needs of the Medicare population and align[s HealthSpring's] incentives with those of the [medical providers] through a payment structure that rewards cost-effective care and improved outcomes."  Under this model, physicians that are in-network with HealthSpring share in the risks and cost savings associated with each HealthSpring patient.

59.    This unique model was one key factor in Defendants' decision to acquire HealthSpring.  They believed that HealthSpring's model would reduce treatment costs substantially through its focus on preventative medicine, and would allow medical providers to share in financial risks and rewards of patient treatment.  It also provided patients with proactive and preventative medical advice to address medical needs before they become more severe (and costlier to treat).[6]

60.    Prior to its acquisition by Cigna, compliance was one of the HealthSpring's strong suits.  In fact, _HealthSpring had never been cited or sanctioned by CMS for non-compliance_, and had _never previously been prohibited by CMS from marketing or selling its Medicare policies to new customers_ (the sanctions eventually levied against the Company by CMS).  CW 1, who worked in compliance with HealthSpring from 1996 until just after the 2012

---

[6] Further proof of the centrality of the HealthSpring model to Cigna's long term strategy can be found from the Company's aggressive expansion of that cooperative risk-sharing model to its non-Medicare offerings.

acquisition (and who was primarily responsible for HealthSpring's relationship with CMS by the time of his/her departure), stated that "in 17 years there was not one serious problem with CMS, not one significant issue raised by CMS in all that time."

61.     Accordingly, HealthSpring's employees and senior leadership fully understood the necessity for a heavy focus on regulatory compliance prior to its acquisition by Cigna.  Defendant Fritch, in his capacity as CEO and Chairman of HealthSpring, told *Managed Healthcare Executive*, an industry publication, in November 2010 that "[t]here's no question that [HealthSpring] spend[s] a lot of time and effort on compliance."  Indeed, foreshadowing the very compliance breakdown that would soon be cited against Cigna in the CMS Letter, Fritch emphasized in that same article that "[i]t would be really hard to have Medicare Advantage as a sideline business and not really focus on it and dedicate the resources to things like compliance."  CW 6, who worked at HealthSpring for nearly 12 years, rising to become the Senior Vice President of Operations, stated that throughout his/her time at the Company, he/she observed that Fritch had a "passion for Medicare and compliance," and noted that he understood compliance better than most.

C.     **Cigna Bet Big on the Medicare Segment and Acquired HealthSpring**

62.     In October 2011, Cigna announced that it had reached an agreement to acquire HealthSpring for $3.8 billion in cash, its largest ever acquisition. *Forbes Magazine* described the deal as "a big bet on the seniors and Medicare

segment."  Ultimately, as *Forbes* explained, "Cigna [was] buying HealthSpring's

customers, in particular those subscribed to its Medicare Advantage programs."

63.    Cigna and HealthSpring issued a joint press release lauding the

benefits of the merger, noting the "opportunities to further expand upon its

successful growth strategy," including:

> Scaled presence in the highly-attractive Seniors segment, with a highly differentiated Medicare Advantage business that currently has approximately 340,000 Medicare Advantage members in 11 states and Washington, D.C., as well as a large, national stand-alone Medicare prescription drug business with over 800,000 customers; [and]
>
> *      *      *
>
> Future growth opportunities to expand HealthSpring's customer base by leveraging Cigna's current client relationships and to further the expansion of HealthSpring into new geographic regions, leveraging Cigna's nationwide presence, customer base and distribution capabilities.

64.    Defendant Cordani commented that Cigna pursued HealthSpring

because senior care is "a fast-growing space, and the demographics are there."

He also acknowledged that "Cigna had long identified HealthSpring's specialty—

providing a private insurance plan that combines traditional Medicare coverage

with additional services—as an important area for [Cigna's] growth."  Following

this announcement, Defendants regularly reiterated the fact that the Medicare

plans that Cigna was or would be able to offer through HealthSpring represented

a primary avenue for the Company's Medicare Advantage and Part D growth over

the coming years.

65.     Only a few months later, in its 2011 Form 10-K, Defendants specifically noted that they considered the acquisition a "milestone" to "the Company's strategy [of] effectively deploying capital in pursuing additional opportunities in high-growth markets."  The acquisition "strengthen[ed] Cigna's ability to serve individuals across their life stages . . . [and] deepen[ed its] presence in a number of geographic markets."

66.     Similarly, in April 2012, only months following the formal finalization of the acquisition, Defendants noted in a publicly available newsletter to medical providers that this was part of the Cigna's much larger strategic vision: "[HealthSpring will] be able to offer Cigna's current individual [commercial, non-government] customers consistency as they transition to Medicare, and offer enhanced specialty and clinical capabilities to HealthSpring customers."  The HealthSpring acquisition was intended to create synergies across Cigna's health insurance offerings, and was meant to complement its commercial health business.

### D.     Defendants Achieved the Increased Revenue They Hoped for After Cigna Acquired HealthSpring

67.     Although Cigna had extremely limited offerings and revenues from Medicare Advantage prior to 2012, with the addition of HealthSpring's one million Medicare customers, the Company instantly gained a vast geographic network of insureds and providers, and obtained the benefits of CMS-paid premiums.

68.     The dramatic effect of HealthSpring's Medicare income on Cigna's overall revenues became apparent almost immediately.  Within one year, HealthSpring became Cigna's single largest source of revenue.  In 2012,

approximately 21.9% of Cigna's overall revenues (not just for the Global Health segment) came exclusively from Medicare Advantage and Part D plans, nearly all of which were offered only because the Company had acquired HealthSpring in 2012.

69.     This trend continued: by the end of 2013, Defendants acknowledged that these private Medicare plans accounted for 22% of its consolidated revenues for 2013.  In fact, no single income source *other than CMS* accounted for more than 10% of Company revenues during that year.  In 2014, CMS remained Cigna's single most significant source of income, bringing in 21% of the Company's total consolidated revenues.  As with 2013, no other single income source accounted for more than 10% of the Company's revenues in 2014.

E.     Defendants Knew Compliance with CMS Rules Was Essential

70.     Defendants Cordani and McCarthy acknowledged in the Company's 2011 Form 10-K that regulatory reviews by CMS (and/or other federal/state regulatory agencies) could ultimately result in sanctions being imposed on Cigna:

> Cigna's operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including . . . [CMS] to assess compliance with applicable laws and regulations. . . . These examinations, reviews, subpoenas and requests may result in changes to or clarifications of Cigna's business practices, as well as fines, penalties or other sanctions.

71.     Further, Defendants acknowledged early in 2012 that there were "potential difficulties" in integrating its operations with HealthSpring, and that if it was "unable to integrate the HealthSpring business successfully . . . it could have

[a] material adverse effect on Cigna's business."  Notwithstanding this acknowledgement of "potential difficulties," from the time of the acquisition until the end of the Class Period, Defendants never specified publicly that there _were_ any such problems with integrating the operations of HealthSpring into Cigna, or otherwise indicated that the acquisition itself had presented any materially adverse effects on the Company's ability to comply with CMS regulations.

> F.      **Defendants Knew that CMS Rules Require a Robust Compliance Program Including Communication of <u>All Violations to Senior Management</u>**

72.      In addition to establishing the regulations governing Medicare Advantage and Part D plans, CMS establishes the requirements and standards for insurers' compliance programs.  Specifically, CMS requires that all insurers providing Medicare Advantage and/or Part D coverage,[7] including Cigna have an officer charged with ensuring it complies with CMS regulations.  Pursuant to CMS requirements, Cigna's Medicare compliance officer (as with any Medicare compliance officer) is responsible for:

> Ensuring that Medicare compliance reports are provided regularly to the sponsor's corporate compliance officer (if any), governing body, CEO, and compliance committee.  Reports should include the status of the sponsor's Medicare compliance program implementation, **_the identification and resolution of suspected, detected or reported instances of noncompliance_** . . . .

73.      CMS also requires that such insurers also have a compliance committee in place to oversee the Medicare compliance program.  The compliance committee "is accountable to, and **_must provide regular compliance_**

---

[7] **CMS also uses the term "sponsor" to refer to an insurer with Medicare Advantage and/or Part D coverage.**

*reports to, the sponsor's senior-most leader and governing body*.**"  Thus, not only is an insurer that offers Medicare Advantage and Part D plans subject to regulation, CMS also requires that an insurer's senior-most leaders, specifically including the CEO and directors, be intimately involved in the status of the organization's compliance with CMS regulations, and must be notified of any deficiencies.**

74.     CMS requires such high-level involvement in *all compliance issues* because it recognizes that "[a]n effective compliance program cannot be achieved unless the CEO (or senior-most leader) and other senior management, as appropriate, are engaged in the compliance program."  Accordingly, CMS regulations say that "*[t]he CEO must also be advised of all governmental compliance enforcement activity, from Notices of Non-compliance to formal enforcement actions.*"  In fact, Defendant Fritch himself was a member of the Compliance Committee during CW 1's time at HealthSpring, and, in such a role was required to have been kept intimately aware of any and all compliance problems at the time they were initially raised by CMS.

75.     Thus, one of the key requirements for compliance with CMS regulations is a set of policies and procedures that ensure any and all compliance problems, concerns, and/or *any* governmental action (including Notices of Non-Compliance and warning letters) are fully understood by senior management (specifically including the CEO) and communicated upward.  This ensures that those officers charged with making the primary strategic decisions for an insurer such as Cigna are also responsible for allocating funds to ensure that compliance

27

programs are robust. Allocating responsibility in such a manner is intended to ensure that Medicare patients receive the benefits to which they are legally entitled, and which are medically necessary.

76.     Such compliance policies, if in place and actively followed, should have ensured direct communication of any compliance violations to the Individual Defendants, including those 75 specific violations of which Mr. Appel was notified of non-compliance during the Class Period, beginning in early 2014.

> **G.     Defendants Immediately Began Undermining the Effectiveness of HealthSpring's Compliance Systems and Management By Putting Inexperienced Cigna Insiders in Charge of Relevant Operations**

77.     One of the specific integration risks identified by Cigna in its 2011 Form 10-K was "retaining key personnel."[8] Notwithstanding this acknowledgement that retaining HealthSpring employees with extensive institutional knowledge was essential to the ultimate successful integration of the two companies (and that *not* retaining them presented regulatory and financial risk to the Company), Defendants systematically engaged in a pattern of conduct in the wake of the acquisition that would lead to the exodus of many of HealthSpring's regulatory compliance employees, including CW 1, the SVP of Government Programs/Medicare Compliance.

78.     CW 1 and CW 2 each stated that in the year following the Company's acquisition of HealthSpring, Cigna had replaced HealthSpring's previous senior

---

[8] Notwithstanding this risk, which was disclosed in 2012, the Company explicitly claimed that the integration was not problematic, boasting of Defendant Cordani that he "[s]uccessfully integrated a series of significant global acquisitions, including the $3.8 billion purchase of HealthSpring . . . , which gave Cigna *one million new customer relationships in the growing seniors segment*."

and experienced leadership with legacy Cigna employees, establishing a new senior leadership team that was generally inexperienced with Medicare compliance.  CW 2 stated that he/she would have remained in his/her position with Cigna had the Company respected his/her proposed changes, which he/she viewed as necessary to ensure effective management of the Company's ratings with CMS.

79.     CW 2 specifically noted the loss of two former legacy HealthSpring officers shortly after the acquisition, each of whom had significant knowledge and experience with CMS regulatory compliance requirements:  Mark Tulloch (former HealthSpring COO) and Scott Huebner (former HealthSpring President of Operations).

80.     And according to another CW's allegations, the Company ultimately decided to bring legacy Cigna employees into HealthSpring, despite Cigna's overall lack of CMS experience.  For example, CW 3, who worked in Human Resources for HealthSpring from 2014 through 2016, observed that the post-acquisition Company had significant turn-over, and was constantly under-staffed during his/her tenure there.  He/she stated that the primary driver of these problems was Cigna's unwillingness to pay HealthSpring employees and medical providers market salaries.  In fact, he/she noted that any requests to pay an employee or provider market-rate salaries (or higher than the Company pay grade) were required to be submitted directly to the CFO.  He/she also noted that this ultimately led to increased employee turn-over, and the resulting staff

29

shortages required the expenditure of excessive time, energy, and money in training costs.

81.     As a result, CW 3 raised his/her concerns about under-staffing to his/her superiors.  Indeed, CW 3 explained that management held conference calls and meetings to address his/her concerns (attended by 80-90 other employees, including members of executive leadership), but Defendants remained unwilling to change Cigna's culture in this respect.

82.     CW 3 recalls that, as a result of this unwillingness to hire truly qualified new employees at market rates, approximately 90% of the employees brought into HealthSpring following the acquisition by Cigna were legacy Cigna employees, and therefore, had little or no experience in CMS regulations or compliance.  Moreover, as CW 3 explained, Cigna prided itself on using internal staff to fill employment vacancies at HealthSpring, rather than hiring external candidates.

83.     Two other confidential witnesses also independently confirmed that Defendants' policy of placing legacy Cigna employees in positions of prominence within HealthSpring had a significantly negative effect on the CMS-related compliance programs.  For example, CW 1 noted that soon after the finalization of the acquisition, Cigna began bringing in people from its corporate offices to work at HealthSpring, even though "Cigna did not have any expertise in Medicare Advantage Part C and D, while HealthSpring had years of expertise [and presence in the segment]."  He/she noted that, although he/she had generally been responsible for HealthSpring's compliance for 17 years, immediately following

30

the acquisition, Cigna appointed Defendant Appel—a legacy Cigna executive who had minimal experience with Medicare—as its most senior Medicare Compliance Officer, and his/her supervisor.

84.     Notwithstanding his lack of substantive Medicare compliance experience, Appel chose not even to seek out those legacy HealthSpring employees who had extensive institutional knowledge of HealthSpring's compliance protocols and requirements.

85.     For example, even though CW 1 had been HealthSpring's most senior compliance employee for years, no one from Cigna ever reached out to discuss his/her job responsibilities, the current status of his/her work assignments, or anything else about the methods by which HealthSpring had, prior to the acquisition, ensured regulatory compliance.  Eventually, CW 1 decided to pursue external job opportunities with employers who would leverage the full scope of his/her expertise.

86.     CW 2, whose job functions included monitoring HealthSpring's policies and procedures for addressing customer and medical provider complaints—also known as appeals and grievances—for adverse claims determinations (one of the primary subjects of the CMS sanctions), also noted the addition of Mr. Appel as the Company's chief Medicare compliance officer, and emphasized that while he/she had met regularly with Mr. Appel's predecessor and saw him/her frequently, he/she met Mr. Appel only once.

87.     Furthermore, just as Cigna brought in Defendant Appel to head compliance, CW 2 was replaced (after resigning—his/her colleagues having

already left HealthSpring) by another legacy Cigna employee, Kristin Neal, who likewise had no significant experience with CMS or Medicare Advantage.

88.     CW 4, who was intimately familiar with HealthSpring's IT systems (central to the functioning of HealthSpring's compliance regime), personally observed an ushering out of legacy HealthSpring employees in favor of those who had, prior to the acquisition, been working in Cigna's corporate offices. Although Cigna generally retained some legacy HealthSpring employees, CW 4 stated that Cigna replaced vital HealthSpring compliance personnel with young and inexperienced legacy Cigna employees.

89.     CW 4 specifically noted that although Cigna appointed David Crocker to replace CW 4's previous supervisor, Crocker was ignorant of all aspects of CMS and Medicare.  Likewise, CW 4 noted the appointment of Mr. Appel as the Company's most senior Medicare compliance officer was a "joke."  He/she stated that "Cigna fired or changed-out all the original HealthSpring Operations Management team."

90.     Mr. Appel was acknowledged within the Company (according to CW 6) as its Medicare Compliance Officer.  CMS also used this title in correspondence addressed to Appel, including numerous Notices of Non-Compliance or warning letters, throughout the Class Period, regarding compliance issues at Cigna (including HealthSpring, HealthSpring regional branches, and Bravo, an entity acquired by HealthSpring before the Cigna acquisition.  Given that Appel was the most senior Compliance Officer at HealthSpring, and as HealthSpring was Cigna's sole Medicare provider during the

Class Period, Appel was legally _Cigna's_ most senior officer charged with ensuring CMS's Medicare regulations were followed.  And as discussed in Paragraphs 41, 75-76, _supra_, in this capacity, he was legally responsible for communicating any specific known compliance problems up through senior Cigna management, including, but not limited to Defendants Cordani, McCarthy, and Fritch.

91.    As an additional example of how Cigna began culling legacy HealthSpring employees whose roles directly impacted the Company's operations, CW 6, who was HealthSpring's SVP of Operations, noted that the number of customer service employees was reduced significantly in the two years immediately following the acquisition, which would have a direct impact on the Company's ability to timely meet the needs of its members.  Whereas HealthSpring had previously staffed customer service call centers fairly liberally, because its members are older, Cigna saw this as an unnecessary cost and reduced the number of employees handling those issues.  CW 6 specifically stated that, Cigna implemented operational effectiveness initiatives designed to reduce costs in the wake of the HealthSpring acquisition and that, ultimately, these initiatives prioritized cost savings, without consideration of regulatory compliance.

92.    CW 1, CW 2, CW 3, CW 4, and CW 6 each independently confirm an understanding that the Company's decision to slowly push out legacy HealthSpring compliance employees in favor of legacy Cigna employees (who had no significant experience with or exposure to CMS regulations) was one of

33

the fundamental causes of the Company's eventual inability to abide by CMS

regulations.

### H.   Improper Integration of Data Systems Further Contributes to Regulatory Violations

93.    The negative effects of inexperienced legacy Cigna employees being

placed in key positions of compliance responsibility (previously occupied by

highly experienced legacy HealthSpring employees) were magnified by the

Company's failure to properly integrate three disparate and incompatible data

processing systems, the proper functioning of which was necessary to ensure

proper regulatory compliance.[9]

94.    As with the retention of key HealthSpring employees, Defendants

understood that the timely and orderly integration of data processing systems

(the key components of Cigna's appeals and grievance management capabilities)

was one of the most important considerations to ensure proper regulatory

compliance following the $3.8 Billion acquisition of HealthSpring.  Yet, they failed

miserably to effectuate a proper integration of the Company's incompatible

Medicare computer systems, notwithstanding that each of the Individual

Defendants played a key role in the acquisition and/or integration of

HealthSpring's operations into Cigna.  CMS would subsequently identify this as

one of the primary reasons for the imposition of sanctions.

---

[9] One of the specific compliance issues identified in the CMS Letter is the lack of a centralized system to aggregate patient information from each of the Company's individual systems; these disparate and disconnected systems were incapable of compiling the data necessary to demonstrate that Cigna was compliant with CMS regulations.

95.     Several former HealthSpring employees noted that the Company's data processing systems were disconnected, and could not interact seamlessly long after the acquisition was implemented.  Indeed, CW 8 even noted that the systems had still not been integrated as of February 2016.  Thus, Cigna's ability to quickly and accurately access information necessary to address patient or provider concerns was severely limited prior to and throughout the Class Period.  Under these conditions, there was a state of confusion within the Company, and data inaccuracies were especially prevalent, compliance failures that would eventually be cited by CMS as a basis for its imposition of sanctions.

96.     CW 8, for example, stated that after the acquisition, the Company used three different systems, one for the Florida market, another for the Arizona market, and a third system based in Nashville that was used for Cigna's other Medicare markets.

97.     CW 5 described the process of transitioning data from one system to another as being in disarray, and stated that his/her team's job responsibilities became increasingly frustrating, since he/she and his/her team "had to deliver data results . . . [but] the data was not correct."  CW 5 also explained that data incompatibility was a continual sticking point after the acquisition, and these data inaccuracies often caused provider frustration.

98.     According to CW 4, charged with responsibility for HealthSpring's IT systems, Claudia Douds (at that time HealthSpring's VP of Health Services) developed a plan—estimated to cost less than $5 million—in direct response to findings from internal audits that Cigna was out of compliance.  He/she also

stated that Ms. Douds' plan was rejected by Cigna, and that the Company instead continued to usher out legacy HealthSpring employees with significant experience with Medicare compliance.

99.     According to CW 8 these disjointed operational systems, which are intended to ensure that the Company operates its Medicare offerings in compliance with applicable regulations, caused several problems, including complicating the Company's ability to process Part D Pharmacy coverage appeals, resulting in excessively lengthy timeframes for responding to or resolving Cigna's customer disputes.

100.    And although the Company was finally sanctioned by CMS for this and other non-compliant conduct in January 2016, even a month later, the Company had still not even developed a plan (or fully acknowledged the need) to fully integrate the three distinct systems into one.  CW 8 stated that "conversion from three to one wasn't happening when [he/she] left [in February 2016] because there didn't seem to be any interest at the senior level to commit to that."

I.      CMS Sanctioned Cigna for Compliance
        Violations Dating Back to At Least 2013

101.    On January 22, 2016, Cigna filed with the SEC a Form 8-K which disclosed:

> On January 21, 2016, Cigna Corporation [ ] was notified
> by [CMS] of its intent to impose intermediate sanctions
> suspending the enrollment of and marketing to new
> customers of all Cigna Medicare Advantage and
> Standalone Prescription Drug Plan Contracts, effective
> at 11:59 p.m. on January 21, 2016.

Thus, as of January 22, 2016, Cigna was not permitted to market any of its Medicare Advantage or Part D offerings anywhere in the United States, and remains in that status.

102.   The Company announced that the sanctions had been imposed because of "deficiencies discovered with Cigna's operations of its Parts C and D appeals and grievances, Part D formulary and benefit administration, and compliance program."

103.   Although the Company acknowledged the sanctions imposed by CMS, and that they could have some material impact on its business, it failed to fully acknowledge the severity of CMS' findings, specifically that "Cigna's conduct poses a serious threat to the health and safety of Medicare beneficiaries," and that the "violations resulted in enrollees experiencing delays or denials in receiving medical services and prescription drugs, and increased out of pocket costs for medical services and prescription drugs."

104.   Additional effects of Cigna's non-compliance on HealthSpring's Medicare customers included:

- delays in resolution of requests for coverage and grievances concerning coverage determinations;

- patient requests for coverage being processed at the incorrect level of appeal, leading to denial of second-level review and an independent review if requests for medical services had been denied;

- letters containing inaccurate denial of claims;

- **failure to pay medical providers within specified timeframes;**

- **delayed notice of coverage determinations leading directly to delays in receiving medical services;**

- **delay or denial of an independent review,  which had the potential to lead to lapses in coverage or delayed access to necessary medications; and**

- **improper denial of claims.**

105.   **The CMS Letter, which was addressed directly to Defendant Fritch, (which contained the findings quoted in Paragraphs 103-104) highlighted that the Company's failures were "widespread and systemic."[10]**

106.   **CMS identified the post-acquisition transition and the resulting fundamental changes to HealthSpring as primary contributing factors to the decision to impose sanctions.  CMS specifically noted that "Cigna's acquisition of HealthSpring, Inc. in 2012, which expanded its presence in the Medicare segment and added more than 1 million beneficiaries to Cigna's existing operations, contributed to creating _an organizational structure that is decentralized and fragmented_."[11]**

107.   **CMS had observed this prior to and throughout the Class Period. CW 7 described a breakdown in operations that has made it difficult for Cigna to adequately monitor and oversee whether it was in compliance with Medicare requirements.**

---

**[10] A copy of the January 21, 2016 letter is attached hereto as Ex. 2.**

**[11] Given Defendant Cordani's involvement in the integration of HealthSpring's operations into Cigna, he certainly would have known of such complications and their impact on compliance.  _See_ Paragraph 38.**

108.   The CMS Letter also noted a December 9, 2015 meeting between *Cigna's senior leadership* and CMS "to discuss the serious nature of the deficiencies discovered during the audit."  Cigna's senior leadership was apparently aware of the issues that ultimately caused the Company to be sanctioned, and at the December 2015 meeting, "Cigna discussed with CMS that an integration of operations among its various legal entities is necessary to run an effective organization."

109.   Another major concern was Cigna's inability to provide CMS auditors with the paperwork and records which it requested to facilitate its audit.  Noting that "Cigna failed to provide complete and accurate data for 12 . . . data requests," and as a result, "auditors were unable to evaluate whether Cigna was processing certain requests for Part D medications, Part C medical services and appeals correctly and within requested timeframes."

110.   The CMS Letter also specified that these compliance issues had been long-standing:

> Cigna has had a *history of non-compliance* with processing these requests timely.  In 2013, Cigna received a notice of non-compliance for failing to process Part D coverage determinations and redeterminations within the required timeframes and failing to auto-forward those untimely decisions to the independent review entity [].

The CMS Letter also noted that Cigna had received a non-public warning letter from CMS in 2015 for the same violations, and that in light of that history, CMS also had "significant concerns that additional failures in these areas exist beyond those that the auditors were able to identify."

111.   Ultimately, CMS enacted the sanctions because of its concerns about "enrollees' ability to access medical services and prescription medications," especially in light of:

> numerous complaints from enrollees demonstrating that enrollees are having difficulties accessing medications and services.  Enrollee access to services and prescribed medications is the most fundamental aspect of the Part C and Part D programs because it most directly affects clinical care.  The lack of a compliance infrastructure, coupled with *serious deficiencies* of Cigna's administration of the Medicare Part C and D requirements, resulted in enrollees being denied access to the medical services and drugs that they are entitled to receive.

The specific compliance deficiencies set forth in Paragraph 104 above further confirm that HealthSpring's failure to comply with CMS regulations were directly related to its patients' ability to obtain the medical care they needed and to which they were entitled.

112.   Thus, the CMS Letter makes clear that since the 2012 acquisition of HealthSpring by Cigna, the Company had demonstrated a failure to comply with CMS regulations, and had been notified of such non-compliance no later than 2013.  Ultimately, these compliance problems were so disconcerting that CMS was concerned that Medicare patients were receiving such inadequate care that it represented a risk to their safety and health.

113.   Notably, as HealthSpring's compliance program began to be affected by Cigna's post-acquisition strategy, the Company removed a key provision from its SEC filings.  Whereas, in its 2013 Form 10-K, Cigna stated that "*[w]e have established policies and procedures to comply with applicable requirements*," the Company's 2014 Form 10-K made no such statement, indicating Defendants'

**40**

knowledge that, during 2014, either: (i) any established policies did not actually ensure Company compliance with applicable regulations; or (ii) there were no such policies.

114.   Further demonstrating that these non-compliance problems had been known to Defendants prior to the Company's receipt of the CMS Letter, Defendant Fritch, in a media interview after the Company announced the sanctions, stated that the Company "[had] internal quality review processes in place *that identified some of the areas in advance of the audit findings*."  In the same article, Marianne Udow-Phillips, director of the University of Michigan Center for Healthcare Research and Transformation, stated that the non-compliance issues "must be complex enough to require some substantial operational changes that cannot be done simply and probably *did reflect some prior warnings from CMS that were not heeded*."

J.   **Defendant Appel and Cigna Received More Than Seventy-Five Notices Identifying Compliance Violations During the Class Period, Prior to Cigna's Receipt of the CMS Letter**

115.   Although the Company's announcement may have been surprising to the market, it was anything but a surprise to Defendants.  The Individual Defendants, who were each legally responsible for ensuring the proper communication of all compliance violations, had never publicly reported that the Company had received from CMS more than 75 Notices of Non-Compliance, warning letters, and/or requests for corrective action plans, between April 28, 2014 and December 18, 2015.  The CMS Letter also confirms that the Company had received additional notice identifying compliance violations "in 2013."

41

116.    These notices identified numerous compliance violations by Cigna's Medicare plans, and each was addressed to Mr. Appel, Cigna's and HealthSpring's Medicare Compliance Officer.  Cigna's compliance violations were numerous and wide-spread: the Company received notices of more than 75 individual compliance violations in 2014 and 2015 alone.  These same types of compliance failures were cited by CMS as the basis for imposing sanctions.

117.    Many of these notices identifying compliance failures highlight the very issues that relate directly to the Company's difficulty in integrating the operations of Cigna with HealthSpring.  For example, the Company was cited:

- in April 2014 for misleading advertising in October and November 2013 relating to its Florida MA and PDP offerings;

- in October 2014 (in two separate Notices of Non-Compliance) for failure to provide required medical records and improper payments to approximately 410 non-eligible medical service providers;

- in December 2014 (in five separate Notices of Non-Compliance) for improper pharmacy coverage;

- in February 2015 for inadequate claims processing systems that "were not accurately configured to capture and track the [maximum-out-of-pocket] amounts and ensure appropriate payment"[12];

---

[12] This specific violation was noted to have caused members to be subject to "erroneous provider bills due to [Cigna]'s failure to accurately recognize that the [maximum-out-of-pocket] limits had been met."

- **in March 2015 for (in five separate Notices of Non-Compliance) for failure to provide required certifications and failure to send members required timely explanations of benefits;**

- **in April 2015 (in two separate notices) for wrongly discontinuing coverage for 433 members and improper denial of prescription coverage for more than 1,700 claims;**

- **in May 2015 (in two separate notices) for inaccurately describing benefits and failing to inform more than 500 physicians of their appeal rights who had been terminated by HealthSpring;**

- **in June 2015 (in at least twenty-one separate notices or warning letters) for failing to add a requisite class of pharmaceuticals to its plan formulary and for failure to meet call center timeliness requirements;**

- **in July 2015 (in at least twenty separate notices, warning letters and a Corrective Action Plan Request) for failure to timely process enrollment applications, double billing, submission of incorrect and unreadable data for audit purposes, failure to submit required plans to regulatory agencies, untimely processing of approximately 1,600 appeals or redetermination requests, improper and untimely call center service, and failure to maintain an adequate network;**

- **in August 2015 for failure to comply with pharmacy formulary submission and review requirements;**

- **in October 2015 for directing customer coverage determination requests to a voicemail line; and**

- **in December 2015 (in sixteen separate notices or warning letters) for improper and untimely call center service and failure to ensure the accurate entry of Notice of Change/ Evidence of Coverage documents.**

118.   These were among the very violations which would subsequently form the basis of CMS's decision to impose sanctions that would prohibit Cigna from marketing or selling any of its Medicare offerings during nearly all of 2016. Cigna's inability to timely correct the violations identified in these multiple Notices of Non-Compliance and warning letters, of which Defendants were directly aware (or recklessly disregarded), halted any immediate growth prospects Cigna may have had for HealthSpring and ultimately caused financial losses to Lead Plaintiff and other members of the Class.

**V.   DEFENDANTS' MATERIALLY FALSE AND**
**MISLEADING STATEMENTS AND OMISSIONS**

   **A.   The 2013 Form 10-K**

119.   The Class Period begins on February 27, 2014.  On that day, Cigna filed with the SEC its financial results for fiscal year 2013 on Form 10-K (the "2013 Form 10-K"), which was signed by Defendants Cordani and McCarthy.

120.   Under the heading "Regulation," the 2013 Form 10-K stated:

   The laws and regulations governing our business
   continue to increase each year and are subject to

frequent change.  ***We have established policies and procedures to comply with applicable requirements.***[13]

\*        \*        \*

Our operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including . . . [CMS] to assess compliance with applicable laws and regulations.

121.    The 2013 Form 10-K also stated, under the subheading "Medicare Regulations":

In our Medicare Advantage business, we contract with CMS to provide services to Medicare beneficiaries pursuant to the Medicare program.  As a result, our right to obtain payment (and the determination of the amount of such payments), enroll and retain members and expand into new service areas is subject to compliance with CMS' numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion.  The marketing and sales activities (including those of third-party brokers and agents) are also heavily regulated by CMS and other governmental agencies, including applicable state departments of insurance.  ***We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs.***

122.    The 2013 Form 10-K also stated, under the subheading "Federal Audits of Government Sponsored Health Care Programs":

The Federal government has made investigating and prosecuting health care fraud and abuse a priority. Fraud and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of customers, billing for unnecessary medical services, improper marketing, and violation of patient privacy rights.  The regulations and contractual requirements in

---

[13] All emphases set forth in Paragraphs 120-135 are added, and indicate the specific portion of each statement alleged to have been false and/or misleading, whether by reason of affirmative misstatement or omission.

45

this area are complex, are frequently modified, and are
subject to administrative discretion.  ***We expect to
continue to allocate significant resources to comply
with these regulations and requirements and to maintain
audit readiness.***

123.    The 2013 Form 10-K also included a Sarbanes-Oxley ("SOX")

certification signed by Defendant Cordani, incorporated therein as Exhibit 31.1,

which stated:

> I, DAVID M. CORDANI, certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K of
>    Cigna Corporation; [and]
>
> 2. ***Based on my knowledge, this report does not contain
>    any untrue statement of a material fact or omit to
>    state a material fact necessary to make the
>    statements made, in light of the circumstances under
>    which such statements were made, not misleading
>    with respect to the period covered by this report . . . .***

124.    The 2013 Form 10-K also included a substantially similar SOX

certification signed by Defendant McCarthy, as Exhibit 31.2.

125.    The statements set forth above in Paragraphs 120-124 were false and

misleading when made, or were rendered misleading by omitting material

information necessary to make the statements ***not*** false and/or misleading,

because:  (i) Defendants knew at the time the statements were made that the

Company's policies and procedures were insufficient to ensure regulatory

compliance; (ii) Defendants knew at that time that the Company was allocating

fewer resources to compliance than it previously had and was not, and would not

***continue*** to allocate resources to compliance as it had in the past; (iii) the

integration of Cigna with HealthSpring's operations had already caused

complications with respect to the Company's ability to comply with CMS

46

regulations; and (iv) CMS found Cigna to be non-compliant as early as 2013, and that those findings could have a material impact to the Company.  While Defendants were extolling compliance with CMS regulations, they knew at that time but failed to disclose, or recklessly disregarded, as alleged in greater detail in Section IV.H above, that they had already received notice from CMS (prior to the CMS Letter) of non-compliance with Medicare Advantage and Part D regulations, and that such non-compliance could cause immediate material adverse consequences to the Company.

126.    Defendants Cordani and McCarthy's representations in the SOX Certifications that the 2013 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" was materially false and misleading when made because at that time, as Defendants Cordani and McCarthy knew but failed to disclose, or recklessly disregarded, that the Company had been found non-compliant with CMS regulations as early as 2013. Effective controls allow for, among other things, detection of potential material misstatements, such as those alleged herein.

B.    <u>December 2014 Code of Ethics and Principles of Conduct</u>

127.    In or about December 2014, Cigna published and made publicly available on its website its Code of Ethics and Principles of Conduct (the "Code of Ethics"), what the Company describes as "the foundation for [its] unwavering commitment to integrity, legal compliance and ethical conduct."

47

128.    The Code of Ethics integrated statements from Defendant McCarthy in which he said that:

> Doing things "the right way" extends to how we manage our information.  Take our financial results, for example.  We have an obligation to make sure we're analyzing and reporting our results fairly and accurately.  The shareholders who invest in us expect it, as do the analysts who follow us.  That's why *it's so important for every employee on the global Cigna team to handle maintain, and report on this information in compliance with all laws and regulations.*

129.    The Code of Ethics also included  statements from Defendant Fritch in which he said that:

> As a respected health service organization, *we have a responsibility to act with integrity in all we do, including any and all dealings with government officials*.  This is critical to help us achieve our mission to improve the health, well-being and sense of security of those we serve.

130.    The statements set forth in Paragraphs 128-129 above were materially false and misleading when made.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: i) the Company knew no later than the end of 2013 that reports of non-compliance were not being substantively addressed by senior management, including the Individual Defendants; (ii) Cigna's non-compliance with federal regulations and requirements for its Medicare Advantage and Medicare Part D plans posed a serious threat to the health and safety of the Company's Medicare patients and indicated a lack of integrity in its dealings with government officials; and (iii) CMS had issued several Notices of Non-Compliance that, left unaddressed, were likely to have a material impact on the Company's operations and finances.

48

C.    The 2014 Form 10-K

131.    On February 26, 2015, Cigna filed with the SEC its financial results for fiscal year 2014 on Form 10-K (the "2014 Form 10-K"), which was signed by Defendants Cordani and McCarthy.

132.    Under the heading "Regulation," the 2014 Form 10-K stated: "Our operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including state insurance and health and welfare departments, state boards of pharmacy and CMS to assess compliance with applicable laws and regulations."

133.    Under the heading "Medicare Regulations," the 2014 Form 10-K stated:

> Several of our subsidiaries engage in businesses that are subject to federal Medicare regulations, such as: those offering individual and group Medicare Advantage (HMO) coverage; those offering Medicare Pharmacy (Part D) products that are subject to federal Medicare regulations; and billing of Medicare Part B claims on behalf of providers with whom we have contractual management agreements.
>
> In our Medicare Advantage business, we contract with CMS to provide services to Medicare beneficiaries pursuant to the Medicare program.  As a result, our right to obtain payment (and the determination of the amount of such payments), enroll and retain members and expand into new service areas is subject to compliance with CMS' numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion.  Marketing and sales activities (including those of third-party brokers and agents) are also heavily regulated by CMS and other governmental agencies, including applicable state departments of insurance.  *__We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and__*

*regulations governing Medicare Advantage and
prescription drug plan programs*.

134.   The 2014 Form 10-K also stated, under the subheading "Federal

Audits of Government Sponsored Health Care Programs":

> The Federal government has made investigating and
> prosecuting health care fraud and abuse a priority.
> Fraud and abuse prohibitions encompass a wide range
> of activities, including kickbacks for referral of
> customers, billing for unnecessary medical services,
> improper marketing, and violation of patient privacy
> rights.  The regulations and contractual requirements in
> this area are complex, are frequently modified, and are
> subject to administrative discretion.  *We expect to
> continue to allocate significant resources to comply
> with these regulations and requirements and to maintain
> audit readiness.*

135.   The 2014 Form 10-K was also certified by Defendants Cordani and

McCarthy pursuant to SOX in a manner substantially similar in all material

respects to that set forth in Paragraph 123 above.

136.      The statements set forth above in Paragraphs 133-135 were false

and misleading when made, or were rendered misleading by omitting material

information necessary to make the statements *not* false and/or misleading,

because:  (i) Defendants understood that the significant resources which had

previously been used to comply with CMS laws and regulations were inadequate

to ensure regulatory compliance; (ii) Defendants knew at that time that the

Company was allocating fewer resources to compliance than it previously had

and was not, and would not, *continue* to allocate resources to compliance as it

had in the past; (iii) the integration of Cigna with HealthSpring's operations had

already caused complications with respect to the Company's ability to comply

with CMS regulations; and (iv) CMS had found Cigna to be non-compliant as early

50

as 2013.  While Defendants were extolling compliance with CMS regulations, they knew at that time but failed to disclose, or recklessly disregarded, as alleged in greater detail in Section IV.H above, that Cigna had already received at least ten notices from CMS (prior to the CMS Letter) of non-compliance with Medicare Advantage and Part D regulations, and that such non-compliance could cause immediate material adverse consequences to the Company.

137.   Defendants Cordani and McCarthy's representations in the SOX Certifications that the 2013 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" was materially false and misleading when made because at that time, as Defendants Cordani and McCarthy knew but failed to disclose, or recklessly disregarded, the Company had been found non-compliant with CMS regulations as early as 2013.  Effective controls allow for, among other things, detection of potential material misstatements, such as those alleged herein.

VI.   **THE TRUTH EMERGES**

A.   **The January 22, 2016 Announcement**

138.   The relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or materialized on January 22, 2016.  On that date, before the opening of the U.S. securities markets, Cigna filed with the SEC a Form 8-K which disclosed, in relevant part:

51

On January 21, 2016, Cigna Corporation ("Cigna") was notified by the Centers for Medicare & Medicaid Services ("CMS") of its intent to impose intermediate sanctions suspending the enrollment of and marketing to new customers of all Cigna Medicare Advantage and Standalone Prescription Drug Plan Contracts, effective at 11:59 p.m. on January 21, 2016.  The suspension does not impact current Cigna Medicare Advantage and Medicare Part D enrollees' benefits or plans.

CMS imposed sanctions due to deficiencies discovered with Cigna's operations of its Parts C and D appeals and grievances, Part D formulary and benefit administration, and compliance program.  Cigna is working to resolve these matters as quickly as possible and is cooperating fully with CMS on its review.  Cigna is committed to its customers and ensuring that its customers have access to the quality healthcare, customer service and prescription drugs that they need.

139.   Cigna received this notification from CMS by way of the CMS Letter,

which described Cigna's "history of non-compliance" dating back to at least

2013, and stated, in relevant part:

Pursuant to 42 C.F.R. §§ 422.756 and 423.756, [CMS] is providing notice . . . that CMS has made a determination to impose intermediate sanctions on the following Medicare Advantage-Prescription Drug and Prescription Drug Plan Contract Numbers: H0150, H0354, H0439, H1415, H2108, H2165, H2676, H3945, H3949, H4407, H4454, H4513, H4528, H5410, H6751, H6972, H7020, H7787, H8423, H9460, H9725, and S5617.[14]

These intermediate sanctions will consist of *suspension of enrollment of Medicare beneficiaries into Cigna contracts* . . . and the *suspension of all marketing activities to Medicare beneficiaries* . . . . CMS is imposing these intermediate sanctions immediately, effective January 21, 2016, at 11:59 p.m. EST, . . . because it has determined that *Cigna's conduct poses a*

_____

[14] The plans subject to CMS sanctions include offerings in the following states: Alabama, Arizona, Georgia, Illinois, District of Columbia, Texas, Arkansas, Indiana, Mississippi, Pennsylvania, Tennessee, Florida, North Carolina, South Carolina, Kansas, Missouri, and West Virginia.

> **_serious threat to the health and safety of Medicare_**
> **_beneficiaries_**.
>
> *        *        *
>
> **A Medicare advantage organization and Prescription
> Drug Plan sponsor's central mission is to provide
> Medicare enrollees with medical services and
> prescription drug benefits within a framework of
> Medicare requirements that provide the enrollees with a
> number of protections. _CMS has determined that Cigna_
> _substantially failed to provide its enrollees with services_
> _and benefits in accordance with CMS requirements_.**

140.    As a result of this news, Cigna stock fell from its $140.13 closing

price on Thursday, January 21, 2016 (the day prior to the announcement of the

CMS Letter) to $137.90 at the close of trading on Friday, January 22, 2016, a loss

of $2.23 per share, or 1.6%.

141.    After the intervening weekend, Cigna stock continued to react

negatively to the unexpected news of the CMS Letter and consequent sanctions,

and on Monday, January 25, 2016, fell further from the Friday close to $135.85.

Over two consecutive trading days, Cigna's share price fell $4.28 per share, a

decline of 3.05%.

B.    The July 29, 2016 Announcement

142.    The relevant truth and foreseeable risks concealed by Defendants'

misconduct and their false representations and omissions during the Class

Period were ultimately revealed and/or materialized on July 29, 2016.

143.    On that date, Cigna filed with the SEC a Form 10-Q for the period

ending June 30, 2016, in which the Company disclosed that it was reducing its

2016 financial outlook.  Therein, Cigna acknowledged that a substantial portion of

this reduced guidance was related to the approximately $30 million costs

incurred in the second quarter of 2016 to remediate the compliance violations that resulted in the imposition of the CMS sanctions.

144.    The Company also noted on July 29, 2016 that it expected to continue to incur similar costs until the sanctions had been fully remediated, and that it was possible that Cigna may "not be able to address matters arising from the [CMS Sanctions] Notice in a timely and satisfactory manner . . . ."

145.    Also on July 29, 2016, during an earnings conference call with analysts, Defendants Cordani and McCarthy discussed in further detail Cigna's failure to comply with CMS regulations, as well as the timing and costs of the Company's efforts to remediate those violations.  Analysts were particularly interested in whether the remediation costs were one-time expenses, how long those costs would be incurred, and whether they were ongoing costs associated with *maintaining* an adequate compliance regime.

146.    Defendant McCarthy responded to these concerns by acknowledging that Cigna was "spending more than expected on CMS audit remediation costs," and that the overall remediation costs would be a "sizeable amount" that would continue at approximately the same pace ($30 million per quarter) until the violations were fully redressed.[15]

147.    Another major concern raised by analysts during the July 29, 2016 earnings call was whether Cigna would fully resolve its compliance failures—and have the CMS sanctions lifted—in sufficient time for the Company to market and

---

[15] Cigna's lowered guidance was even more surprising in light of the Company's decision to raise its guidance on May 6, 2016 – just three months earlier.

sell its Medicare offerings during the crucial annual enrollment period ("AEP").
The AEP, which runs from October 15 through December 7 each year, is the _only_
time of year when Cigna (or any Medicare plan provider) may sell its plans and
enroll new customers.[16]

148.    Analysts and the market understood that unless Cigna fully
remediated the compliance violations, and CMS therefore lifted its sanctions
before the beginning of the 2016 AEP, Cigna would be unable to sell and market
its Medicare plans for most customers until October 2017.[17]

149.    Many analysts understood even then that it was highly unlikely that
the Company would resolve the sanctions in time to participate in the AEP that
runs from October 15, 2016 through December 7, 2016, and that this would likely
cause a significant reduction in the number of Cigna Medicare Advantage and
Part D members in 2017.  For example, a report from Barclays explained that:

> Cigna's Medicare Advantage plans will remain under
> sanctions through the 2017 open enrollment period . . . .
> The CMS sanctions will clearly act as a headwind [] for
> membership, revenue and earnings contributions,

---

[16] Cigna may only sell Medicare offerings outside the AEP for members that become eligible for coverage during the course of the calendar year.  For example, if a customer first becomes eligible for Medicare in May, that customer may enroll in a Medicare plan at that time.  In subsequent years, however, that customer will only be allowed to change insurance providers during the AEP.

[17] Indeed, just over one month later, on September 6, 2016, in a Form 8-K filed with the SEC, Cigna confirmed what the market largely understood as of the July 29, 2016 SEC filing and earnings call—that the compliance violations and CMS sanctions "will not be resolved in time to participate in the 2017 Medicare Advantage and Part D annual enrollment period that begins in October 2016 and ends on December 7, 2016."  Although the market had largely already reacted to its expectations that the CMS sanctions would ultimately prevent Cigna from participating in Medicare AEP during 2016, this was the first time the Company fully acknowledged that sanctions would remain in place throughout the remainder of 2016, prohibiting it from selling to eligible customers.

> though the magnitude is more difficult to estimate.
> First, we begin with the most obvious point which is the
> loss of membership.

150. Other analysts expressed concerns about how the sanctions would affect Cigna's strategy for marketing its Medicare offerings to eligible seniors, because the Company's marketing and sales strategy would have to be solidified well in advance of the October 15, 2016 commencement of the AEP.  For example, during the July 29, 2016 earnings call, Peter Costa from Wells Fargo asked:

> [R]elative to the CMS audit, have you started to change
> your marketing plans at this point?  If you are not yet
> approved, there's going to be a point where you have to
> start marketing and we are getting towards that.  So is
> there any impact at this point in terms of your marketing
> plans for seniors?

151. As a result of this news, Cigna stock fell from its $135.99 closing price on Thursday, July 28, 2016 to $128.96 at the close of trading on Friday, July 29, 2016, a loss of $7.03 per share, or approximately 5.2%.

152. After the intervening weekend, the market continued to react negatively to the unexpected news of the CMS audit remediation costs, and the expectation that the Company simply could not fully resolve those sanctions before the AEP that was to begin on October 15, 2016.  On Monday, August 1, 2016, the price of Cigna common stock fell an additional $2.17 per share to close at $126.79, a drop of approximately 1.7%.  This freefall continued on Tuesday, August 2, 2016, with the price of Cigna common stock falling an additional $2.66 to close at $124.13, a drop of approximately 2.1%.  Thus, over the course of three consecutive trading days, Cigna's share price fell $11.86 per share, or approximately 8.8% from its July 28, 2016 closing price.

56

153.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VII.    DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MADE <ins>KNOWINGLY, OR WITH RECKLESS DISREGARD</ins>

154.    As alleged herein, Defendants had actual knowledge of the false and misleading nature of the statements they made, or acted with reckless disregard of the true information known to them.  In doing so, Defendants committed acts, and practiced and participated in a course of conduct that operated as a fraud or deceit on purchasers of common stock during the Class Period.

155.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that these documents or statements were issued or disseminated to the investing public, and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants likewise acted with scienter to the extent that they made such statements with reckless disregard of the facts that rendered such statements false and/or misleading.

156.    As set forth above in detail, Defendants received information reflecting that Cigna had received notification that its operations were not compliant with CMS regulations no later than December 31, 2013.  Furthermore, Defendants exercised control over the policies and procedures for CMS compliance that are enacted and executed by Cigna employees, and the

57

participation in strategic planning for all of the Company's activities that are governed by CMS regulations.

### A. Defendant Fritch's January 22, 2016 Statement Demonstrates Actual Knowledge

157.    As alleged in Paragraph 113 above, following the public disclosure of the CMS Letter, Defendant Fritch acknowledged that the Company had "internal quality review processes in place *that identified some of the areas in advance of the audit findings*."  This alone is an acknowledgement that the Defendants knew in advance of the CMS Letter that there were CMS compliance problems that could have a material financial impact on the Company.

158.    Further, the CMS Letter itself specifies that senior Cigna executives attended a meeting with CMS where the agency's audit findings were presented to the Company; CMS and Cigna senior executives specifically discussed "the *serious nature of the deficiencies* discovered during the audit."  Thus, the CMS Letter itself confirms that Defendants were aware of the severity of Cigna's compliance problems (including their potential impact on the Company's financials), and that they had dated back to 2013.

### B. As Cigna's Medicare Compliance Officer, Defendant Appel's Knowledge of Cigna's Compliance Failures Binds the Company

159.    Cigna acted with corporate scienter such that material misrepresentations about the Company's compliance with CMS and other regulations were so important to the success of its Medicare insurance offerings and the Company's ongoing business operations that the statements cited above in Paragraphs 120-135 were approved by the Defendants, including the Individual Defendants, upon consultation with Richard Appel (or subordinate employees

reporting to Mr. Appel).  Mr. Appel, Cigna's Medicare Compliance Officer, although not a speaker of any of the false and misleading statements alleged herein, was sufficiently knowledgeable about the status of Cigna's compliance with CMS regulations to know that the statements were false and misleading.

160.   Richard Appel was the sole officer at Cigna responsible for ensuring the Company's Medicare offerings (and other offerings subject to CMS regulations) complied with governmental requirements.  It was Appel, in his capacity as Medicare Compliance Officer, to whom CMS addressed the more than 75 notices of compliance violations it directed to HealthSpring during the Class Period.

161.   In the course of his responsibilities, as set forth above, Mr. Appel was required by CMS regulations to ensure that all appropriate information concerning Cigna's Medicare compliance were raised to senior management, including Defendants Fritch, Cordani and McCarthy, as well as HealthSpring's Compliance Committee, Cigna's Compliance Committee, the CEO, and any other applicable Cigna governing bodies.  If he failed to make the extensively documented compliance violations known to Cigna corporate officers, he performed his duties recklessly, and any statements made by the Individual Defendants concerning compliance (without first verifying their accuracy with Mr. Appel) were made with reckless disregard as to their truth or falsity.

C.   **CMS Regulations Further Support a Strong Inference of Scienter**

162.   As discussed in Paragraphs 72-76, CMS regulations require that all insurers establish compliance programs, policies, and procedures, and specifies certain standards for those compliance programs, policies, and procedures.

Specifically, CMS requires that all such programs have a designated Compliance Officer, responsible for presenting reports to senior management, including the CEO, that include "the identification and resolution of suspected, detected or reported instances of noncompliance. . . ."

163.    Likewise, CMS requires that insurers have a compliance committee in place, designed to oversee the Medicare compliance program, and which "must provide regular compliance reports to the [Company]'s senior-most leader and governing body [*i.e.*, Board of Directors]."  Thus, CMS also requires CEOs and Boards of Directors to receive from their compliance committee and compliance officer regular reports of the status of the Company's compliance with CMS regulations, and that they be regularly kept apprised of any changes in status to the Company's compliance program.

164.    In light of these requirements, and the CMS requirement that "[t]he CEO must also be advised of all governmental compliance enforcement activity, from Notices of Non-Compliance to formal enforcement actions," the Individual Defendants, each a senior executive within Cigna either knew of the notices of non-compliance issued by CMS no later than December 31, 2013, or recklessly disregarded Cigna's compliance protocols during the Class Period by not ensuring that the Company's compliance program actually provided them with accurate information on essential governmental compliance issues that presented the possibility of materially adverse financial consequences to the Company.  In either event, they each made the above-alleged false and misleading statements with requisite scienter.

165.   Further, in light of Defendant Cordani's role in integrating HealthSpring's operations into Cigna (*see* Paragraph 38, *supra*), he either knew or recklessly disregarded the fact that the Company was so decentralized and fragmented that it either could not comply with CMS regulations or could not determine whether it was compliant with CMS regulations.

D.   **Defendants' Statements Concerning Compliance Support a Strong Inference of Scienter**

166.   Notwithstanding Cigna's move to usher out HealthSpring personnel, Defendants' statements indicate that they understood that non-compliance with CMS regulations presented a material adverse risk to the Company.

167.   For example, Cigna's 2013 and 2014 Forms 10-K stated that the Company faced "risks related to litigation, regulatory audits, and investigations." The Company specifically noted in its 2014 Form 10-K that:

> These regulatory audits or reviews or actions by [] governmental agencies could result in changes to or clarifications of our business practices, retroactive adjustments to certain premiums, significant fines penalties, civil liabilities, criminal liabilities or other sanctions, including restrictions on our ability to operate, that could have a material adverse effect on our business, results of operations, financial condition and liquidity.

Cigna's 2013 Form 10-K contained a substantially similar disclosure.

168.   Likewise, Cigna warned investors in its 2013 and 2014 Forms 10-K of "risks associated with participating in government-sponsored programs, such as Medicare, including dependence upon government funding . . . compliance with government contracts and increased regulatory oversight."  The Company noted specifically in its 2014 Form 10-K that:

61

> **[A]ny failure to comply with various . . . federal health care laws and regulations, including those directed at preventing fraud and abuse in government funded programs, could result in investigations or litigation, . . . with the imposition of fines, limits on expansion, restrictions or exclusions from programs or other agreements with a federal or state governmental agencies that could adversely impact our business, cash flows, financial condition and results of operations.**

Cigna's 2013 Form 10-K contained a substantially similar disclosure.

169.   Further, the Company also warned investors in its 2013 and 2014 Forms 10-K that "[e]ffective prevention, detection and control systems are *critical to maintain regulatory compliance* and prevent fraud and failure of these systems could adversely affect [it]." This risk disclosure, as well as those set forth above in Paragraphs 167-168, indicates that the Cigna and Defendants Cordani and McCarthy (each of whom executed the 2013 and 2014 Forms 10-K) fully understood that the Company's non-compliance with CMS regulations could have a material adverse impact on financial results and that CMS regulatory compliance was an essential element of the Company's core functions.

170.   Finally, as noted above, the absence of a statement in the Company's 2014 Form 10-K that it had policies and procedures established to comply with federal regulations (given that Cigna had made an affirmative representation concerning such policies and procedures in its immediately preceding 2013 Form 10-K) demonstrates the most-plausible inference here—that the drafters and signers of the 2013 and 2014 Forms 10-K knew that such policies and procedures either were not in place, or did not ensure that the Company actually complied with federal regulations.

E.   **HealthSpring, and Its Compliance Systems, Were a Core Operation of Cigna's Overall Business, and Therefore the Most Plausible Inference Is That Defendants Knew the Relevant Details of HealthSpring's Compliance Problems**

171.   In addition, a strong inference of scienter arises based on the very nature of the issues about which Defendants are alleged to have misled the investing public.  Cigna specifically acquired HealthSpring in 2012 in a strategic move to broaden its customer base, and to significantly increase its revenues.

172.   The fact that the premiums received from CMS as a result of Cigna's Medicare offerings through HealthSpring accounted for the largest single source of revenue for the Company, and that CMS was Cigna's *only* customer whose payments accounted for more than 10% of the Company's revenue, further demonstrate that HealthSpring's continued viability (and its continued ability to obtain new customers) was an essential component of Cigna's corporate strategy, and HealthSpring's viability depended critically on the Company's ability to abide by CMS regulations.

VIII.   **DEFENDANTS CORDANI AND FRITCH'S SUSPICIOUS STOCK SALES DURING THE CLASS PERIOD ARE FURTHER EVIDENCE OF THEIR SCIENTER**

173.   In addition, Defendants Cordani and Fritch engaged in stock sales during the Class Period that were suspiciously timed and dramatically out of line with their prior trading practices.  As a result of these Class Period trades, Cordani and Fritch profited from the artificial inflation embedded in the trading price of Cigna stock caused by their false and misleading statements and omissions to investors during the Class period.  The Class Period sales of stock by Cordani and Fritch were highly unusual and suspicious as measured by (i) the

63

total amount and percentage of shares sold; (ii) the contrast with Cordani and
Fritch's own prior trading history; and (iii) the timing of the sales.  Cordani and
Fritch's sales therefore raise a strong inference of scienter.

174.   To evaluate Cordani and Fritch's selling activity, Lead Plaintiff used
publicly available trading data that Cordani and Fritch were required to report to
the SEC on Form 4.  Lead Plaintiff analyzed the trading by Cordani and Fritch
during the Class Period and then compared that to the approximately two-year
period immediately preceding the Class Period, beginning on February 28, 2012
and January 21, 2014 (the "Control Period").

175.   To analyze Cordani and Fritch's stock sales, Lead Plaintiff calculated
the total sales by each, together with the cash proceeds from such sales, during
the Control Period and Class Period.  Those totals were then compared.  This
analysis revealed that Cordani and Fritch's Class Period sales were extremely
large, highly unusual, and suspicious.

176.   The number of shares sold and the net proceeds from such sales
during the Class Period by Cordani and Fritch were extraordinarily large
compared to the Control Period:

|  | CONTROL PERIOD | | CLASS PERIOD | |
|---|---|---|---|---|
| **PERSON** | **Number of Shares Sold** | **Net Proceeds** | **Number of Shares Sold** | **Net Proceeds** |
| Cordani | 137,621[18] | $8,622,160 | 668,529[19] | $71,942,705 |
| Fritch | 0[20] | $0 | 455,180[21] | $59,835,369 |
| Total | 137,621 | $8,622,160 | 1,052,703 | $131,778,074 |

177.   Cordani and Fritch's Class Period stock sales were not only large in absolute terms, but also inconsistent with Cordani and Fritch's own prior selling activity during the control period.

178.   Collectively, Cordani and Fritch increased their stock sales from 137,621 shares during the Control Period to more than 1,052,703 shares during the Class Period – a startling increase of *more than 750%*.  Taken individually, Cordani and Fritch's sales both increased sharply.  Cordani increased his sales from 137,621 shares sold during the Control Period to 597,523 shares sold during the Class Period.  Fritch's sold share volume also increased significantly, from zero shares during the Control Period to 455,180 shares sold during the Class Period.

---

[18] Excludes a February 28, 2013 withholding of 90,173 shares used to satisfy taxes or exercise price payment.

[19] Excludes a February 28, 2014 withholding of 102,506 shares; a February 27, 2015 withholding of 96,771 shares; a February 26, 2016 withholding of 66,014 shares used to satisfy taxes or exercise price payment

[20] Excludes a February 11, 2013 withholding of 2,533 shares, and a February 28, 2013 withholding of 15,109 shares used to satisfy taxes of exercise price.

[21] Excludes a February 11, 2014 withholding of 2,592 shares; a February 28, 2014 withholding of 16,825 shares; a February 27, 2015 withholding of 15,336 shares; a January 29, 2016 withholding of 18,086 shares; and a February 26, 2016 withholding of 11,846 shares used to satisfy taxes of exercise price.

179.   The contrast between Cordani and Fritch's sales during the Control Period and the Class Period is even more striking when measured in dollars. Collectively, Cordani and Fritch's sales increased more than 1400%—a *fourteen-fold increase*—from the Control Period to the Class Period, from approximately $8,622,160 during the Control Period to over $121,946,647 during the Class Period.  While Fritch had no relevant Control Period stock sales, Cordani's individual sales increased more than 700% during the Class Period.

180.   Cordani and Fritch's sales of stock were even more suspiciously timed when considering that CMS had provided notices of compliance violations to Cigna no later than December 31, 2013, and that all of the Class Period sales were made prior to the public disclosures of the Company's substantial non-compliance with CMS regulations and the ensuing sanctions.

181.   Thus, while some of Cordani and Fritch's stock sales were made pursuant to Company trading plans, this does nothing to rebut any inference of scienter derived from the sales that were extreme departures from their previous stock sales, and suspicious with respect to both timing and total proceeds.

182.   Throughout the Class Period, Cordani and Fritch were able to, and did, control the contents of the Company's SEC filings, reports press releases, and other public statements.  Defendant Cordani also signed certifications pursuant to SOX in Cigna's annual and quarterly reports filed throughout the Class Period, which contained false and misleading statements of material fact, and omitted material facts necessary to make the statements not false and misleading.  Cordani and Fritch knew that the adverse facts alleged herein had

not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading.

IX.   **LOSS CAUSATION AND ECONOMIC LOSS**

183.   The market prices of Cigna's common stock were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions regarding Cigna's compliance with CMS regulations.

184.   The artificial inflation in Cigna's common stock was partially removed after the Company filed the January 22, 2016 8-K with the SEC, which disclosed that CMS was imposing sanctions on the Company and revealed the false and misleading nature of the statements alleged herein.  Such sanctions also revealed the materialization of the risk that Cigna's Medicare Advantage and Medicare Part D offerings were non-compliant with CMS regulations.  This January 22, 2016 news, more fully described above, caused the prices of Cigna common stock to decline by material and statistically significant amounts, resulting in economic injury to Lead Plaintiff and other members of the Class.

185.   The artificial inflation in Cigna's common stock was fully removed after the Company filed with the SEC its Form 10-Q on July 29, 2016, which disclosed approximately $30 million costs of remediating the compliance failures underlying the CMS sanctions, and further signaled to the market that sanctions were unlikely to be lifted before the AEP that began in October 2016.  This July 29, 2016 news, described more fully above, caused the price of Cigna common stock to decline, resulting in economic injury to Lead Plaintiff and other members of the Class.

## X.   INDIVIDUAL DEFENDANT AND CONTROLLING PERSON ALLEGATIONS

186.   During the Class Period, Defendants Cordani, McCarthy, and Appel, as senior executives and/or directors of Cigna, were privy to confidential and proprietary information concerning the Company, its operations, its compliance with federal regulations, and the effects that non-compliance would have on the Company's current and future business prospects.  Defendants Cordani, McCarthy, and Appel similarly had access to undisclosed information about, among other things Cigna's failure to comply with CMS regulations.  Defendants Cordani, McCarthy, and Appel ascertained such information through more than 75 notices of compliance violations sent to the Company throughout the Class Period, Cigna's internal corporate documents, conversations, and connection with each other and with corporate officers, employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Cigna officers and directors.

187.   Defendants Cordani, McCarthy, and Appel participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein.  As a result of their executive or managerial positions within Cigna, Defendants Cordani, McCarthy, and Appel, no later than February 26, 2014, had access to adverse undisclosed facts that Cigna was not in compliance with CMS regulations, and knew that these adverse undisclosed facts rendered the

positive representations made by or about Cigna and its business, or adopted by the Company, materially false and misleading.

188.    Defendants Cordani, McCarthy, and Appel because of their positions of authority and control as officers or directors of the Company, and Cigna, as the corporate parent of HealthSpring, were able to, and did in fact, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Defendants Cordani and McCarthy were each provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Accordingly, Defendants Cordani, McCarthy, and Appel are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations alleged herein.

189.    As senior executive officers and/or directors and as controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Cordani, McCarthy, and Appel each had a duty to promptly disseminate accurate and truthful information with respect to, among other things, Cigna's compliance with CMS regulations. Defendants Cordani, McCarthy, and Appel had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based on truthful and accurate information.  Defendants Cordani, McCarthy, and Appel's

material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XI.   CLASS ACTION ALLEGATIONS

190.   Lead Plaintiff brings this action on behalf of himself and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Cigna during the Class Period and were damaged thereby.  Excluded from the Class are Defendants; present and former executive officers of Cigna, members of Cigna's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions 1(a)(iii) and (1)(b)(ii)); the legal representatives, heirs, successors, or assigns of any of these individuals and entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of Cigna, including Cigna's employee retirement and benefit plan(s).

191.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and to the Court.  Throughout the Class Period, Cigna common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be obtained through appropriate discovery, Lead Plaintiff believes that there are thousands members of the proposed Class.  As of July 26, 2016, Cigna had more than 256 million common shares outstanding, owned by thousands of persons.  Record owners and other members of the Class may be identified from records maintained by Cigna or its transfer agent, and may be notified of the

70

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

192.   There is a well-defined commonality of interest in the questions of law and fact involved in this action.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

- Whether Defendants statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew that the statements were false or misleading or acted with conscious misbehvior or reckless disregard as to the falsity or misleading nature of the statements made;

- Whether the prices of Cigna's common stock were artificially inflated due to the misrepresentations and omissions of material fact alleged herein; and

- Whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measures of damages.

193.    Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired Cigna common stock during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein.

194.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action securities litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

195.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

## XII.    LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

196.    Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- Cigna common stock traded in efficient markets;

- **The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Cigna common stock; and**

- **Lead Plaintiff and other members of the Class purchased Cigna common stock between the time Defendants misrepresented or failed to disclose material facts relating and the time the true facts were disclosed or the concealed risks materialized, without knowledge of the misrepresented or omitted facts.**

197.   **At all relevant times, the markets for Cigna's common stock were efficient for the following reasons:**

- **As a registered issuer, Cigna filed periodic public reports with the SEC;**

- **Cigna regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;**

- **Cigna was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of**

> their respective brokerage firms and that were publicly
> available and entered the public marketplace; and
>
> - Cigna common stock was actively traded in an efficient
>   market, namely the New York Stock Exchange, under the ticker
>   symbol "CI."

198.    As a result of the foregoing, the markets for Cigna common stock promptly digested new material information regarding Cigna from all publicly available sources and reflected such price information in the price of those securities.

199.    Under these circumstances, all persons and entities that purchased Cigna common stock during the Class Period suffered similar injury through their purchase of Cigna securities at artificially inflated prices, and the presumption of reliance applies.

200.    Further, to the extent Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

201.    Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market prices for Cigna common stock and to a presumption of reliance on Defendants' material misstatements and omissions during the Class Period.

**XIII.   THE STATUTORY SAFE HARBOR AND BESPEAKS**
**CAUTION DOCTRINE ARE INAPPLICABLE**

202.   The statutory safe harbor and the bespeaks caution doctrine

applicable to forward-looking statements under the Private Securities Litigation

Reform Act of 1995 do not apply to the misrepresentations and omissions alleged

in this Complaint.

203.   None of the Defendants' historic or present-tense statements alleged

herein was a forward-looking statement of future economic performance, as they

were not stated to be such assumptions underlying or relating to any projection

or statement of future economic performance when made, nor were any of the

projections or forecasts made by Defendants expressly related to, or stated to be

dependent on, those historic or present-tense statements when made.

204.   To the extent that any of the materially false and misleading

statements alleged herein, or any portions thereof, can be construed as forward-

looking, these statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ

materially from those in the statements.  As set forth above in detail, given the

then-existing facts contradicting Defendants' statements, the generalized risk

disclosures made by Defendants were not sufficient to insulate Defendants from

liability for their materially false and misleading statements.

205.   Defendants are also liable for any false or misleading statement

alleged herein, or portion thereof, because at the time each forward-looking

statement was made, the speaker knew that the forward-looking statement was

false or misleading, and Defendants had no reasonable basis to make such

statements, or the forward-looking statement was authorized and approved by an executive officer of Cigna who knew that the forward-looking statement was false.

XIV.   <u>CAUSES OF ACTION</u>

    A.    **COUNT I: Asserted Against Defendants Cigna, Cordani, McCarthy, and Fritch for Violations of Section 10(b) of the Securities <u>Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder</u>**

206.    Lead Plaintiff repeats and alleges each and every allegation above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Defendants Cigna, Cordani, McCarthy, and Fritch.

207.    During the Class Period, Defendants Cigna, Cordani, McCarthy, and Fritch carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, regarding Cigna's compliance with CMS regulations.

208.    Defendants Cigna, Cordani, McCarthy, and Fritch directly and indirectly, through the use of means and instrumentalities of interstate commerce, the mails and/or the use of a national securities exchange: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to conceal the Company's non-compliance with CMS regulations, and to maintain the Company's common stock at artificially inflated

prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

209.     Defendants Cigna, Cordani, McCarthy, and Fritch employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that Cigna was compliant with CMS regulations, which included making untrue statements of material facts and omitting facts necessary in order to make the statements about the Company's compliance protocols, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  Officers, management, and agents of Cigna did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon purchasers of Cigna common stock during the Class Period.

210.     Cigna is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, as the maker of the statements and under the principle of *respondeat superior*.

211.     In addition to the duties of full disclosure Defendants Cigna, Cordani, McCarthy, and Fritch had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 201.1-01 *et seq.*) and S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations including truthful, complete and accurate information with respect to the Company's

compliance with CMS regulations, and the intrinsic value of Cigna's common stock, so that the Company's common stock prices would be based on truthful, complete, and accurate information.

212.   The allegations above establish a strong inference that Cigna, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents (including, but not limited to the Individual Defendants) had actual knowledge of misrepresentations and omissions of material facts, as set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made and/or omitted knowingly or with reckless disregard of the true facts, and without a reasonable basis, for the purpose and effect of concealing from the investing public the fact that Cigna was not compliant with CMS regulations.  By concealing these facts from investors, Cigna maintained its artificially inflated securities price throughout the Class Period.

213.   In ignorance of the fact that Cigna's common stock prices were artificially inflated, and relying directly and indirectly on the false and misleading statements and omissions made by Defendants Cigna, Cordani, McCarthy, and Fritch, or upon the integrity of the markets in which Cigna common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants Cigna, Cordani, McCarthy, and Fritch, but not disclosed in any public statement by Defendants Cigna, Cordani, McCarthy, and Fritch during the Class Period, Lead Plaintiff and the other members of the

Class purchased or acquired Cigna common stock at artificially high prices, and were damaged when that artificial inflation was removed from the price of Cigna securities on and after January 22, 2016.

214.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class known of the truth concerning the Company's non-compliance with CMS regulations, Lead Plaintiff and other members of the Class would not have purchased or acquired their Cigna common stock, or if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

215.    By virtue of the foregoing, Defendants Cigna, Cordani, McCarthy, and Fritch have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

216.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Cigna common stock during the Class Period.

B.    COUNT II: Asserted against Defendants
      Cordani, McCarthy, and Appel for Violations of
      Section 20(a) of the Securities Exchange Act of 1934

217.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), in behalf of Lead Plaintiff

and all other members of the Class against Defendants Cordani, McCarthy, and
Appel.

218.   Through their positions of control and authority as officers and
directors of the Company, Defendants Cordani, McCarthy, and Appel were able to
and did control, directly or indirectly, the content of the public statements made
by the Company and the other Individual Defendants concerning its compliance
with applicable regulations.  With knowledge of the falsity of the statements
contained therein, and in reckless disregard for the truth of the statements,
Defendants Cordani, McCarthy, and Appel caused the false and misleading
statements of material fact as alleged herein.

219.   Defendants Cordani, McCarthy, and Appel had direct involvement in
the day-to-day operations of the Company and HealthSpring and were legally
responsible for understanding the status of the Company's compliance with
applicable regulations, and are therefore presumed to have had the power to
control or influence the particular statements giving rise to the securities
violations alleged herein, and exercised the same.

220.   By reason of their management positions and/or stock ownership
and control of the Board of Directors, Defendants Cordani, McCarthy, and Appel
were "controlling persons" within the meaning of § 20(a) of the Exchange Act and
had the power to direct the management and activities of the Company,
HealthSpring, and their respective employees, and to cause the Company to
make the false and misleading statements complained of herein.  Because of their
executive positions within the Company, Defendants Cordani, McCarthy, and

Appel had access to adverse non-public material information about non-compliance with CMS regulations, including but not limited to the Notices of Non-Compliance and/or warning letters received by the Company throughout the Class Period, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

221.   By virtue of the foregoing, Defendants Cordani, McCarthy, and Appel have violated § 20(a) of the Exchange Act .

222.   As a direct and proximate result of Defendants' Cordani, McCarthy, and Appel's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Cigna common stock during the Class Period.

XV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding Lead Plaintiff and members of the Class damages and pre-judgment interest;

C.   Awarding Lead Plaintiff reasonable costs, including attorneys' fees, litigation expenses and expert fees; and

D.   Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

XVI.   **JURY DEMAND**

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: November 30, 2016

Respectfully submitted,

By:     */s/ James W. Johnson*
James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Matthew J. Hrutkay (*pro hac vice*)
James T. Christie (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700
(212) 818-0477 (facsimile)
jjohnson@labaton.com
mrogers@labaton.com
mhrutkay@labaton.com
jchristie@labaton.com

*Counsel for the Lead Plaintiff and Lead
Counsel for the Proposed Class*

David C. Shufrin (CT Bar No. 29230)
David A. Slossberg (CT Bar No. 13116)
HURWITZ SAGARIN SLOSSBERG
       & KNUFF, LLC
147 North Broad Street
Milford, Connecticut 06460
(203) 877-8000
(203) 878-9800 (facsimile)
dslossberg@hssklaw.com
dshufrin@hssklaw.com

*Liaison Counsel for Lead Plaintiff and the
Proposed Class*

**CERTIFICATE OF SERVICE**

**This is to certify that on November 30, 2016, a copy of the foregoing Second Amended Class Action Complaint was filed electronically with this Court. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.**

**/s/ James W. Johnson**