## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JYOTINDRA PATEL, Individually and on Behalf of All Others Similarly Situated, | : : : | CIVIL ACTION NO.: 3:16 CV 00182 (VLB) |
| Plaintiff, | : : | |
| v. | : : | CLASS ACTION |
| CIGNA CORP., DAVID M. CORDANI, THOMAS A. MCCARTHY, HERBERT A. FRITCH, and RICHARD APPEL, | : : : : | |
| Defendants. | : | FEBRUARY 13, 2017 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

**McCARTER & ENGLISH LLP**

**Thomas J. Finn (CT20929)**
**Paula Cruz Cedillo (CT23485)**
**CityPlace I, 36th Floor**
**185 Asylum Street**
**Hartford, Connecticut 06103**
**(860) 275-6700**

**SIDLEY AUSTIN LLP**

**Andrew W. Stern**
**Dorothy J. Spenner**
**James O. Heyworth**
**787 Seventh Avenue**
**New York, New York 10019**
**(212) 839-5300**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................................1

STATEMENT OF FACTS ...........................................................................4

ARGUMENT ..........................................................................................17

    I.     PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED..............18

         A.    The SAC Fails To Plead A Material Misstatement Or
               Omission..................................................................................18

             1.    Plaintiff Does Not Plead With Particularity That
                   Any Alleged Misstatement Was False When Made
                   Or Why It Was False. ......................................................19

                   a.    Plaintiff mischaracterizes the alleged
                         misstatements...........................................20

                   b.    Plaintiff's allegations about CMS
                         correspondence are misleading and do not
                         support a conclusion that Cigna's
                         statements were false. ..........................21

                   c.    Plaintiff's allegations based on confidential
                           witnesses ("CWs") do not plead falsity. ..............24

             2.    The Alleged Misstatements Are Inactionable
                   Puffery. ........................................................................27

                     a.    The challenged statements are too general
                         to cause a reasonable investor to rely on
                         them. .......................................................27

                   b.    Because the only statement  attributed to
                         Fritch is classic puffery, the SAC fails to
                         state any claim against him. ..................30

               3.    The Alleged Omissions Are Immaterial And Need
                   Not Have Been Disclosed. ..............................................30

         B.    The SAC Fails to Adequately Plead Scienter...........................32

             1.    The SAC Does Not Allege Facts Showing That
                   Defendants Had Motive To Commit Fraud. ....................33

2.  The SAC Does Not Allege Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness.......................................... 36

3.  The Allegations Based On CWs Do Not Plead A Strong Inference Of Scienter........................................... 41

4.  The Only Compelling Inference Is That The Acquisition, and Integration, of HealthSpring Was Difficult. ........................................................................ 44

C.  The SAC Fails to Plead Loss Causation .................................. 45

II.  PLAINTIFF'S SECTION 20(a) CLAIM AGAINST DEFENDANTS CORDANI, MCCARTHY, AND APPEL MUST BE DISMISSED. ............ 47

III.  PLAINTIFF SHOULD NOT BE PERMITTED TO REPLEAD. .................. 49

CONCLUSION .......................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.,*
9 F. Supp. 3d 175 (D. Conn. 2014)....................................................... 45, 47

*Acito v. IMCERA Grp.,*
47 F.3d 47 (2d Cir. 1995) ...................................................................... 32

*In re Am. Express Co. Sec. Litig.,*
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) .......................................... 43

*Andropolis v. Red Robin Gourmet Burgers, Inc.,*
505 F. Supp. 2d 662 (D. Colo. 2007)...................................................... 29

*Anschutz Corp. v. Merrill Lynch & Co., Inc.,*
690 F.3d 98 (2d Cir. 2012) .................................................................... 18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................. 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) ..................................................................... 4

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.,*
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)................................. 21, 28, 46

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
980 F. Supp. 2d 564 (S.D.N.Y. 2013) .................................................... 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)............................................................................. 17

*Boca Raton Firefighters & Police Pension Fund v. Bahash,*
506 F. App'x 32 (2d Cir. 2012) ....................................................... 29, 44

*Boguslavsky v. Kaplan,*
159 F.3d 715 (2d Cir. 1998) ................................................................. 47

*In re Bristol-Myers Squibb Sec. Litig.,*
312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................................................... 34

*Brodzinsky v. FrontPoint Partner LLC,*
2012 WL 1468507 (D. Conn. Apr. 26, 2012) ........................................... 48

iii

*C.D.T.S. v. UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013)................................................. 23, 29, 44

*Chien v. Skystar Bio Pharm. Co.*,
    566 F. Supp. 2d 108 (D. Conn. 2008).................................................... 4, 47

*City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*,
    2015 WL 5311196 (S.D.N.Y. Sept. 11, 2015) .......................................... 32

*Collier v. Aksys Ltd.*,
    2005 WL 1949868 (D. Conn. Aug. 15, 2005) .......................................... 47

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000) ..................................................................... 50

*Desai v. General Growth Props., Inc.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ...................................................... 29

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................... 30

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) .................................................... 41

*Epstein v. Haas Sec. Corp.*,
    731 F. Supp. 1166 (S.D.N.Y. 1990)........................................................ 49

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) .................................................... 21

*In re Federated Dep't Stores, Inc., Sec. Litig.*,
    2004 WL 444559 (S.D.N.Y. Mar. 11, 2004)............................................ 38

*Fila v. Pingtan Marine Enter. Ltd.*,
    2016 WL 3962015 (S.D.N.Y. July 19, 2016) ........................................... 45

*First N.Y. Sec., L.L.C. v. United Rentals, Inc.*,
    648 F. Supp. 2d 256 (D. Conn. 2009)..........................................*passim*

*Freedman v. Value Health, Inc.*,
    2000 WL 630916 (D. Conn. Mar. 24, 2000) ........................................... 31

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) .................................................... 35

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................... 22, 34

*Hensley v. IEC Elecs. Corp.*,
2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ........................................ 40

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
159 F.3d 723 (2d Cir. 1998) ................................................................. 49

*In re Hunter Envtl. Servs. Inc. Sec. Litig.*,
921 F. Supp. 914 (D. Conn. 1996) ....................................................... 31

*In re IAC/InterActiveCorp*,
695 F. Supp. 2d at 119 ....................................................................... 41

*In re IAC/InterActiveCorp Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007) .................................................. 35

*Janbay v. Canadian Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .................................. 45, 47

*Kalin v. Xanboo, Inc.*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007) .................................................. 48

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ........................................................... 32, 33

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................. 34

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ................................................................ 45

*In re Lihua Int'l, Inc. Sec. Litig.*,
2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ........................................ 23

*In re Lions Gate Entm't Corp. Sec. Litig.*,
2016 WL 297722 (S.D.N.Y. Jan. 22, 2016) .......................................... 30

*Lopez v. Ctpartners Exec. Search Inc.*,
2016 WL 1276457 (S.D.N.Y. Mar. 29, 2016) .................................... 28, 29

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................ 22, 35

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007) ...................................... 17, 25, 33, 34

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
2013 WL 1188050 (D. Conn. Mar. 23, 2013) ................................. *passim*

*In re New Energy Sys. Sec. Litig.,*
    66 F. Supp. 3d 401 (S.D.N.Y. 2014) ................................................... 45, 46

*In re NQ Mobile, Inc. Sec. Litig.,*
    2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ........................................... 48

*In re Omnicom Group, Inc. Sec. Litig.,*
    597 F.3d 501 (2d Cir. 2010) ............................................................ 46, 47

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v.*
    *Fairfax Fin. Holdings Ltd.,* 886 F. Supp. 2d 328 (S.D.N.Y. 2012) ........................ 31

*Pollio v. MF Glob., Ltd.,*
    608 F. Supp. 2d 564 (S.D.N.Y. 2009) ..................................................... 48

*Ressler v. Liz Claiborne, Inc.,*
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ......................................................... 35

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-*
    *Packard Co.,* --- F.3d ---, 2017 WL 218026 (9th Cir. Jan. 19, 2017) ...................... 29

*Richman v. Goldman Sachs Grp., Inc.,*
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ..................................................... 31

*Rocco v. Painewebber, Inc.,*
    739 F. Supp. 83 (D. Conn. 1990)............................................................ 50

*Rombach v. Chang,*
    355 F. 3d 164 (2d Cir. 2004) ............................................................... 27

*In re SAIC, Inc. Sec. Litig.,*
    2013 WL 5462289 (S.D.N.Y. Sept. 30, 2013) .......................................... 49

*In re Sanofi Sec. Litig.,*
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................... 28, 29

*Santa Fe Indus. v. Green,*
    430 U.S. 462 (1977)............................................................................ 2

*Slayton v. Am. Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010) ............................................................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)........................................................... 17, 32, 44

*Treppel v. Biovail Corp.,*
    2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005) .......................................... 50

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011) .............................................................. 40, 41

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .................................................... 21, 31

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ........................................................ 25, 42, 43

*Waterford Twp. Police & Fire Ret. Sys. v. Regional Mgmt. Corp.*,
   2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) ........................................................... 23

*In re World Wrestling Entm't, Inc. Sec. Litig.*,
   2016 WL 2946155 (D. Conn. Mar. 31, 2016) ......................................................... 47

Defendants Cigna Corp. ("Cigna"), David M. Cordani, Thomas A. McCarthy, Herbert A. Fritch, and Richard Appel (collectively, "Defendants")[1] respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (the "SAC"), pursuant to the Private Securities Litigation Reform Act ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

This action is a misguided attempt by an opportunistic plaintiff to parlay a short-lived stock price drop following an unexpected announcement of regulatory sanctions into securities fraud. Notwithstanding that this is the third attempt to state a claim, Plaintiff does not satisfy the stringent pleading standard for securities fraud under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's case should be dismissed with prejudice.

On January 22, 2016, Cigna, a highly-regulated health services company, promptly disclosed in a press release and SEC filing that one of its regulators, the Centers for Medicare & Medicaid Services ("CMS"), made a determination to impose intermediate sanctions on Cigna's Medicare business segment as a result of issues arising from a routine audit. As is increasingly typical following regulatory investigations or sanctions, a securities class action quickly followed. But despite nearly ten months of factual investigation, Plaintiff's third attempt still fails to allege the most basic elements of securities fraud – falsity, scienter, and loss causation.

---

[1] Cordani, McCarthy, Fritch, and Appel are referred to collectively as the "Individual Defendants."

The SAC attempts to spin a tale of corporate deceit stretching years before CMS's sanctions, but nowhere in its 222 paragraphs is there a cogent or compelling allegation that anyone actually _lied_, through either misstatements or omissions.  Even accepting Plaintiff's factual allegations as true for purposes of this motion, the worst one could conclude would be that Cigna mismanaged a corporate acquisition.  This is not securities fraud.  As the Supreme Court held nearly 40 years ago, "Congress by [§] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."  *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977) (citation omitted).  The SAC suffers from a number of fatal defects:

_First_, the SAC fails to plead with particularity any materially false or misleading statements.  Plaintiff claims that Defendants misrepresented that (i) Cigna had established policies and procedures to comply with applicable regulations; (ii) Cigna expected to continue to allocate significant resources to compliance; and (iii) pursuant to Cigna's code of ethics, it was important for Cigna's employees to comply with regulations and act with integrity.  But Plaintiff simply does not plead, let alone with particularity, that any of the general statements to which he points were actually false when made.

For instance, while Plaintiff refers to communications from CMS to Cigna up to and including the January 2016 sanctions letter, the SAC does not, and cannot, connect those allegations to _facts_ about Cigna's procedures or resources suggesting that any of the Company's statements were false or misleading.  And Plaintiff's allegations based upon information from "confidential witnesses"

likewise are vague and conclusory, as no witness alleges facts supporting falsity at the time of the alleged misrepresentations, and none alleges any relevant contact with an Individual Defendant.  Moreover, the alleged misstatements are not actionable because they are textbook corporate "puffery" and are immaterial, as they are general or aspirational statements about routine operational issues in a highly-regulated business.

_**Second**_, the SAC fails to plead scienter.  Plaintiff has offered no concrete or personal motive to deceive, nor any plausible allegations of intentional or reckless conduct by any Defendant.  Notably, Plaintiff does not allege a single fact about what any Individual Defendant did, said, or knew about the alleged misstatements at the time they were made.  While Plaintiff tries to build a speculative case for scienter by alleging "suspicious" stock sales by Defendants Cordani (the CEO) and Fritch (the president of a Cigna subsidiary), Plaintiff misleadingly omits critical, publicly-available facts about those sales that undermine any inference of scienter: in particular, that (i) all of the stock sales were made at intervals and amounts that were pre-determined by Board-approved Rule 10b5-1 trading plans; and (ii) Cordani and Fritch actually _increased_ their Cigna holdings during the putative class period.  Moreover, Plaintiff's allegations concerning CMS regulations, CMS notices, and Defendants' generic statements about compliance do not support a strong inference of conscious misbehavior or recklessness; instead, they simply confirm the obvious and uncontested fact that Cigna faced complex and ever-evolving regulations, and complying with those regulations was intricate and important.

3

___Third___, the SAC fails to plead loss causation.  In order to state his claim, Plaintiff must plausibly allege that a subsequent disclosure corrected a prior falsehood, precipitating a drop in the price of Cigna's common stock.  But here, there is no causal link between the alleged misstatements and the alleged corrective disclosures, as the purported "corrective statements" did not correct or even ___relate___ to the alleged misrepresentations.

___Finally___, Plaintiff's control person claim against Defendants Cordani (the CEO), McCarthy (the CFO), and Appel (a compliance officer within a Cigna subsidiary) must be dismissed because Plaintiff fails to plead a primary violation, culpable participation, and control.

## STATEMENT OF FACTS[2]

### Cigna's Business and History

Cigna, together with its subsidiaries, is a global health services organization.  Ex. 1 (2014 10-K) at 1.  Cigna delivers healthcare products and services to customers through employer-based, government-sponsored, and individual insurance coverage arrangements.  Ex. 1 at 1.  During the putative class period, Cigna had approximately 37,000 employees (Ex. 1 at 17) and offices

---

[2] The "facts" contained in this section are drawn primarily from the SAC's allegations, which are assumed to be true for the purposes of this motion only, the documents referenced therein, and Cigna's SEC filings.  Exhibit references ("Ex. __") are to the exhibits appended to this motion.  On this motion, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ___ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.___, 493 F.3d 87, 98 (2d Cir. 2007); ___Chien v. Skystar Bio Pharm. Co.___, 566 F. Supp. 2d 108, 110 (D. Conn. 2008) (where a complaint "relies heavily" on the terms and effect of a document, the document is "integral" to the complaint and may be considered on a motion to dismiss).

in 37 states, the District of Columbia, Puerto Rico, the Virgin Islands, and 21 foreign countries.  Ex. 1 at 27.

In January 2012, Cigna acquired Nashville-based HealthSpring Inc., significantly bolstering its Medicare Advantage and Medicare Part D business and deepening its presence in several geographic markets.  Ex. 2 (2013 10-K) at 2.

At all relevant times, Cigna's business was divided into three reportable segments:  (i) Global Health Care (encompassing two operating subsegments: Commercial and Government), (ii) Global Supplemental Benefits, and (iii) Group Disability and Life.  Ex. 1 at 1.  The "Government" subsegment of Global Health Care, namely the Cigna-HealthSpring subsidiary, offered Medicare Advantage, Medicare Part D, and Medicaid plans.  Ex. 1 at 1.[3]

<u>The Centers for Medicare & Medicaid Services</u>

CMS, a division of the U.S. Department of Health and Human Services, is Cigna's regulator for its Government operating subsegment that offers Medicare Advantage and Part D plans.  CMS's Medicare Parts C and D Oversight and Enforcement Group is responsible for conducting "rigorous auditing" of organizations (called "sponsors") that offer such services.  Ex. 3 at 2.[4]  CMS also oversees the requirements for sponsors to have an effective compliance

---

[3] "Medicare Advantage" plans are offered by companies like Cigna and provide Medicare Part A and B benefits (*i.e.*, hospital and medical insurance) to Medicare enrollees.  Medicare.gov, *Glossary*, www.medicare.gov/glossary/m.html (last accessed Feb. 13, 2017).  Medicare Part D plans provide prescription drug insurance.  Medicare.gov, *Drug Coverage (Part D)*, www.medicare.gov/part-d/index.html (last accessed Feb. 13, 2017); *see also* SAC ¶ 4 n.2.

[4] Like other Medicare providers, Cigna receives revenue from CMS for Cigna's Medicare plan customers and related to certain quality performance measures, known as "Medicare Stars."  *See* SAC ¶ 5; Ex. 2 at 4.

program.  CMS aggressively utilizes its enforcement authorities, including by imposing civil money penalties, intermediate sanctions (including suspending payment, enrollment and/or marketing activities), and for-cause contract terminations.  Ex. 3 at 4.

As Cigna consistently disclosed, CMS's regulations and requirements are "numerous and complex," are "frequently modified," and are "subject to administrative discretion."  Ex. 1 at 16.  CMS makes this clear in its own Annual Reports concerning its audit and enforcement activities.  *See* Exs. 3, 4, and 5 (CMS Annual Audit Reports).[5]  For instance, CMS's 2015 Report demonstrates that its audits routinely find compliance failures across a large percentage of the sponsors that are audited in any given that year, and many deficiencies are widespread and repeated "year after year."  *See, e.g.*, Ex. 3 at 26-29.  Accordingly, CMS enforcement actions, civil money penalties, and even suspensions of marketing and enrollment are not unusual.  *See* Ex. 3 at 30-34.  Notably, in 2015, CMS began escalating its regulatory scrutiny and increasingly sanctioning sponsors for compliance deficiencies.[6]

---

[5] CMS's Annual Audit and Enforcement Reports are publicly available on the CMS.gov website at www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/index.html.

[6] *See, e.g.*, Bob Herman, *CMS imposes record number of Medicare Advantage fines in first quarter*, Modern Healthcare, April 13, 2015, www.modernhealthcare .com/article/20150413/NEWS/150419982 ("CMS has fined Medicare Advantage plans at a record pace so far in 2015, as the agency attempts to live up to its promise of cracking down on bad practices.  Almost $2.5 million in civil money penalties have been levied on 10 Advantage plans in the first quarter of 2015, according to the latest CMS data. In comparison, there was a single $50,000 fine in the first three months of 2014."); CMS.gov, *Part C and Part D Enforcement Actions*, www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/PartCandPartDEnforcementActions-.html (showing

**CMS's Periodic Notices, October 2015 Audit, and January 2016 Sanctions Letter**

As the primary regulator of Medicare offerings, CMS continually monitors sponsors' business and operations, and it did so as to Cigna and its relevant subsidiaries during the relevant period.  CMS monitoring included correspondence with Cigna employees in compliance roles, in the form of notices of non-compliance ("NONCs"), which are "used to document small or isolated problems," and warning letters, which are typically issued when a sponsor has received a NONC yet a specific problem persists.  *See*, *e.g.*, Ex. 6 (Letter from Dir., Medicare Drug Benefit and C & D Data Grp. to All Medicare Advantage Orgs., et al. at 7 (Jan. 17, 2013)); *see also* SAC ¶¶ 115-18.

In addition to continuous supervision, between October 5, 2015 and October 20, 2015, CMS conducted a comprehensive routine audit of Cigna-HealthSpring's Medicare operation.  Ex. 7 at 2.  On December 9, 2015, CMS met with members of Cigna-HealthSpring's senior leadership to discuss the audit findings, but did not announce any penalties or sanctions.  SAC ¶ 108; Ex. 7 at 2.

Soon after, CMS sent its January 21, 2016 letter, notifying Cigna-HealthSpring that CMS was imposing intermediate sanctions.  Ex. 7 at 1.[7]  The sanctions did not impact services to Cigna's existing Medicare beneficiaries but required the suspension of Cigna-HealthSpring's enrollment of, and marketing to, new Medicare beneficiaries.  *See* Ex. 8 at 2.  The following day, prior to the opening of the stock market, Cigna promptly issued a press release and filed a

---

exponential growth in the number of CMS enforcement actions between 2010 and 2016).

[7] Departing from its customary practice (*see* Ex. 3 at 10), CMS did not provide Cigna a preliminary draft audit report before imposing sanctions.

Form 8-K, notifying the public that CMS had imposed sanctions and that Cigna was "working to resolve these matters as quickly as possible and is cooperating fully with CMS on its review." Ex. 8 at 2. CMS's sanctions letter was posted to the CMS.gov website around the same time.

Cigna's Remediation

With the imposition of sanctions on January 21, 2016, Cigna began the complex and costly task of remediating the alleged deficiencies cited by CMS. *See* Ex. 8. The remediation involves a number of steps, including securing CMS's agreement to corrective action plans, executing those plans, a "clean" period, and then a validation period. *See generally* Ex. 9 (public remarks by Cordani on September 14, 2016).

Throughout the remediation process, Cigna timely and candidly has disclosed to the market the risk that sanctions might remain in place longer than management hoped, and the effects thereof. *See* Ex. 10 (10-K filed Feb. 25, 2016) at 21 ("If [] the Company is not able to address matters arising from the [CMS Sanctions] Notice in a timely and satisfactory manner . . . the impact to our 2017 Medicare customer base and consolidated revenues, results of operations and cash flows could be material.").[8] Likewise, Cigna also plainly disclosed the

---

[8] *Accord* Ex. 11 (Form 10-Q filed May 6, 2016) at 42; Ex. 12 (Q2 2016 Earnings Call) at 8 ("[O]ur team continues to work to resolve the issues and to drive the sustainable operational improvements that are necessary. As for timing . . . [w]e can get it remediated and validated before AEP, annual enrollment period. We could get it remediated and validated during the cycle. Or thirdly, we could get it remediated and validated after the cycle. Our team clearly understands the importance of that, but our broader objective here is to ensure that we successfully remediate all the issues and create a sustainable environment on a go-forward basis.").

significant and ongoing efforts and costs of remediation.  *See, e.g.,* Ex. 12 (Q2 2016 Earnings Call) at 17, 21 ("[W]e are spending more than we expected on CMS audit remediation costs. . . . [and] it is clear that the magnitude of the impact and the timeframe to remediate is longer.").

While Cigna aspired to have sanctions lifted in time for Medicare open enrollment in Fall 2016, when it determined that it would not meet that aggressive timeframe, it promptly disclosed that fact to the market.  Ex. 9 (Cordani remarks); Ex. 13 (Form 8-K filed Sept. 6, 2016).

Plaintiff's Lawsuit

On February 4, 2016, less than two weeks after the imposition of sanctions, Jyotindra Patel, the original plaintiff, commenced this action.  Following appointment of lead plaintiff and lead counsel, the current Lead Plaintiff filed the first Amended Complaint on August 1, 2016.  (Dkt. No. 40.)  Shortly before Defendants were to file their motion to dismiss, Plaintiff requested two additional months to further "investigate" his claims and consider amending and, during an October 7, 2016 telephonic conference, the Court afforded Plaintiff an opportunity to further amend.  Plaintiff filed the SAC on November 30, 2016, alleging violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by Defendants Cigna, Cordani, and McCarthy, and violations of Section 20(a) of the Exchange Act by Defendants Cordani, McCarthy, and Appel.

Despite repleading twice, Plaintiff's theory remains the same:  he alleges that Cigna was inexperienced in the Medicare business, purchased HealthSpring to break into that business, replaced knowledgeable HealthSpring staff with

9

Cigna staff who did not know how to, and did not, comply with CMS regulations, and made misleading statements about Cigna's policies, procedures, and allocation of resources for compliance with CMS regulations.  *See generally* SAC ¶¶ 1-31.

**Alleged Misstatements and Omissions**

Plaintiff alleges misstatements in only three documents:  (1) Cigna's 2013 Form 10-K Annual Report for the fiscal year ended December 31, 2013 (the "2013 10-K"), (2) Cigna's 2014 Form 10-K Annual Report for the fiscal year ended December 31, 2014 (the "2014 10-K"), and (3) Cigna's 2014 Code of Ethics and Principles of Conduct (the "Code of Ethics").  While the SAC excerpts those documents, the fuller context is provided as follows.

*Cigna's 2013 Form 10-K*

At the outset of the putative class period, on February 27, 2014, Cigna issued its 2013 10-K.  *See* Ex. 2.  Under "Regulation," it stated:

> The laws and regulations governing our business continue to increase each year and are subject to frequent change.  *We have established policies and procedures to comply with applicable requirements.*[9]
>
> Our insurance and HMO subsidiaries must be licensed by the jurisdictions in which they conduct business. These subsidiaries are subject to numerous state, federal and international regulations related to their business operations . . . .
>
> \*   \*   \*
>
> Our operations, accounts and other books and records are subject to examination at regular intervals by regulatory agencies, including state insurance and health and welfare departments, state boards of

---

[9] Adopting the SAC's convention, underlining and italics in this section denote particular statements Plaintiff alleges are false.

> pharmacy and [CMS] to assess compliance with
> applicable laws and regulations. In addition, our current
> and past business practices are subject to review by,
> and from time to time we receive subpoenas and other
> requests of information from, various state insurance
> and health care regulatory authorities, attorneys
> general, the Office of Inspector General, and other state
> and federal authorities, including inquiries by, and
> testimony before committees and subcommittees of the
> U.S. Congress regarding certain of its business
> practices. These examinations, reviews, subpoenas and
> requests may result in changes to or clarifications of
> our business practices, as well as fines, penalties or
> other sanctions.

Ex. 2 at 12 (emphasis in SAC).  Plaintiff claims that the particular sentence

emphasized above was false and misleading, or rendered so by omitting

necessary material information, because it suggested that Cigna was fully in

compliance with all CMS regulations.  *See* SAC ¶ 125.  In truth, that passage

simply emphasized the regulatory burdens Cigna faced.

Similarly, under the subheading "Medicare Regulations," the 2013 10-K

stated:

> Several of our subsidiaries engage in businesses that
> are subject to federal Medicare regulations such as:
>
> • those offering individual and group Medicare
> Advantage (HMO) coverage . . . .
>
> *   *   *
>
> In our Medicare Advantage business, we contract with
> CMS to provide services to Medicare beneficiaries
> pursuant to the Medicare program. As a result, our right
> to obtain payment (and the determination of the amount
> of such payments), enroll and retain members and
> expand into new service areas is subject to compliance
> with CMS' numerous and complex regulations and
> requirements that are frequently modified and subject to
> administrative discretion. The marketing and sales
> activities (including those of third-party brokers and
> agents) are also heavily regulated by CMS and other

11

> governmental agencies, including applicable state departments of insurance. ***We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs***.

Ex. 2 at 15 (emphasis in SAC).  Although Plaintiff does not cite to any statement that the level of resources allocated to compliance functions guaranteed that CMS would not audit, penalize, sanction, or terminate Cigna's Medicare businesses, Plaintiff claims that the emphasized sentence was misleading because Defendants allegedly knew that Cigna "was allocating fewer resources to compliance than it previously had."  SAC ¶ 125.  Similarly, Plaintiff challenges Cigna's statements in the 2013 Form 10-K under subheading "Federal Audits of Government Sponsored Health Care Programs":

> Participation in government sponsored health care programs subjects us to a variety of federal laws and regulations and risks associated with audits conducted under these programs. These audits may occur in years subsequent to our providing the relevant services under audit. These risks may include reimbursement claims as well as potential fines and penalties. For example, with respect to our Medicare Advantage business, CMS and the Office of the Inspector General perform audits to determine a health plan's compliance with federal regulations and contractual obligations . . . .

> The Federal government has made investigating and prosecuting health care fraud and abuse a priority. Fraud and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of customers, billing for unnecessary medical services, improper marketing, and violation of patient privacy rights. The regulations and contractual requirements in this area are complex, are frequently modified, and are subject to administrative discretion. ***We expect to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness***.

Ex. 2 at 16 (emphasis in SAC).

Notably, Plaintiff ignores relevant risk factors in the 2013 Form 10-K. Cigna warned that it was "subject to substantial government regulation, as well as new laws or regulations or changes in existing laws or regulations that could have a material adverse effect on [the] business, results of operations, financial condition and liquidity." Ex. 2 at 18. Cigna also stated:

> We are frequently the subject of regulatory market conduct and other reviews, audits and investigations by state insurance and health and welfare departments, attorneys general, [CMS] and the Office of Inspector General ("OIG"). With respect to our Medicare Advantage business, CMS and OIG perform audits to determine a health plan's compliance with federal regulations and contractual obligations, including compliance with proper coding practices and fraud and abuse enforcement practices through audits designed to detect and correct improper payments. . . . These regulatory audits or reviews or actions by other governmental agencies could result in changes to or clarifications of our business practices, retroactive adjustments to certain premiums, significant fines, penalties, civil liabilities, criminal liabilities or other sanctions that could have a material adverse effect on our business, results of operation, financial condition and liquidity.

Ex. 2 at 19. Cigna further disclosed the risk of compliance failures:

> Contracts with CMS . . . contain certain provisions regarding data submission, provider network maintenance, quality measures, claims payment, continuity of care, call center performance and other requirements. If we fail to comply with these requirements, we may be subject to fines or penalties that could impact our profitability.

Ex. 2 at 20.

> In addition, any failure to comply with various state and federal health care laws and regulations, including those directed at preventing fraud and abuse in government

>funded programs, could result in investigations or
>litigation, with the imposition of fines, limitations on our
>ability to expand, restrictions or exclusions from
>program participation or other agreements with a federal
>or state governmental agency that could adversely
>impact our business, cash flows, financial condition and
>results of operations.

Ex. 2 at 20-21.

>### *Cigna's 2014 Form 10-K*

On February 26, 2015, Cigna issued its 2014 10-K, and Plaintiff again takes issue with two statements addressing the allocation of "significant" resources to Cigna's compliance functions.  *See* SAC ¶¶ 133-34.  Both statements and their surrounding context are identical to the alleged misstatements in the 2013 Form 10-K.  *See* Ex. 1 at 16 ("We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations . . . ."); *id.* ("We expect to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness.").  The 2014 10-K also includes the same discussion of risk factors and possible civil monetary penalties and other sanctions.  *See, e.g.*, Ex. 1 at 19.

Plaintiff alleges that these statements were false and misleading, or rendered so by omitting necessary material information, because Defendants knew that the allocated resources were "inadequate to ensure regulatory compliance."  SAC ¶ 136.  Plaintiff's claim is that these statements "extoll[ed] compliance with CMS regulations."  *Id.*

14

*Cigna's 2014 Code of Ethics*

Plaintiff also asserts claims based upon two excerpts from Cigna's 2014 Code of Ethics, a document directed at Cigna employees that was also posted on Cigna's website.  Ex. 14.[10]  In that document, under the heading "Integrity in protecting company assets, reputation and goodwill," the following was attributed to Defendant McCarthy:

> "Doing things 'the right way' extends to how we manage our information. Take our financial results, for example. We have an obligation to make sure we're analyzing and reporting our results fairly and accurately. The shareholders who invest in us expect it, as do the analysts who follow us. That's why *it's so important for every employee on the global Cigna team to handle, maintain, and report on this information in compliance with all laws and regulations.*"

Ex. 14 at 7 (emphasis in SAC).  Under the heading "Integrity in the public sector," Defendant Fritch was quoted:

> "As a respected health service organization, *we have a responsibility to act with integrity in all we do, including any and all dealings with government officials.* This is critical to help us achieve our mission to improve the health, well-being and sense of security of those we serve."

Ex. 14 at 13 (emphasis in SAC).  Plaintiff claims that these noncontroversial statements were false because (i) Cigna allegedly knew that "reports of non-compliance were not being substantively addressed," and (ii) noncompliance with CMS regulations "indicated a lack of integrity in its dealings with government officials."  SAC ¶ 130.

---

[10] *See also* current version, available at www.cigna.com/about-us/company-profile/corporate-governance/code-of-ethics (last visited Feb. 13, 2017).

**Alleged Corrective Disclosures**

Plaintiff claims that the "truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions" were revealed through two allegedly corrective disclosures.  SAC ¶¶ 138, 183-84.

*First*, Plaintiff asserts that the "truth" partially emerged when the CMS sanctions were announced on January 22, 2016, revealing that the above-quoted statements were fraudulent.  Plaintiff claims that between January 22 and 25, the closing price of Cigna's common stock dropped from $140.13 to $135.85, a total of $4.28, or 3.05%.  *See* SAC ¶ 140-41.  But within one month, the stock price had fully recovered, and within another month, the closing price was $5.15 higher than it had been on January 21, 2016.[11]

*Second*, Plaintiff asserts that the fraud was "ultimately revealed" on July 29, 2016, when Cigna filed its Form 10-Q and held its earnings call.  *See* SAC ¶ 142; *see also id.* ¶ 185.  According to the SAC, "unexpected news of the CMS audit remediation costs" and Cigna's stated expectations about the anticipated duration of the sanctions fully and finally exposed that Cigna's prior statements (which did not concern the audit, sanctions, or remediation) were false.  *See id.* ¶ 152.[12]  On July 29, 2016, the closing price of Cigna's common stock dropped

---

[11] *See* Cigna Corp. (CI), Yahoo! Finance, https://finance.yahoo.com/chart/CI (stock closed at $140.32 on February 25, 2016 and $145.27 on March 14, 2016).

[12] Notably, Plaintiff's prior complaint stated that the entire truth was revealed by the January 2016 announcement of CMS sanctions.  Dkt. No. 40 ¶¶ 105-09.  Plaintiff's addition of a second "corrective disclosure" six-months later, with no allegation of additional misrepresentations between the two purported corrections underscores that there is simply no connection between the statements Plaintiff claims are false and the disclosures Plaintiff claims were corrective.

from $135.99 to $128.96, a total of $7.03, or 5.2%.  Yet again, the stock drop was short-lived, as within ten trading days the closing price was back up to $133.31.[13]  On February 10, 2017, the last business day before filing of this Motion, Cigna's stock price closed at $145.75.

## ARGUMENT

The SAC does not state a claim for securities fraud and should be dismissed in its entirety and with prejudice.  Under FRCP 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *First N.Y. Sec., L.L.C. v. United Rentals, Inc.*, 648 F. Supp. 2d 256, 266 (D. Conn. 2009).  That is the case only when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555-57).

Because the SAC alleges securities fraud, it also must satisfy both FRCP 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b).  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 129, 135 (D. Conn. 2007) (discussing "exacting pleading requirements" of the PSLRA and Rule 9(b)).  To satisfy Rule 9(b), "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

---

[13] *See* **Cigna Corp. (CI), Yahoo! Finance, https://finance.yahoo.com/chart/CI (stock closed at $133.31 on August 12, 2016).**

(3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" ***Anschutz Corp. v. Merrill Lynch & Co., Inc.***, 690 F.3d 98, 108 (2d Cir. 2012) (quoting ***Rombach v. Chang***, 355 F. 3d 164, 170 (2d Cir. 2004)).  "The PSLRA expanded on [that] standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  ***Anschutz***, 690 F.3d at 108 (internal marks omitted).  The SAC fails to meet these stringent requirements.

## I.   PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED.

To state a claim for violation of Section 10(b) of the Exchange Act, "a plaintiff must plead a plausible claim that includes the action's basic elements: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  ***NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.***, 2013 WL 1188050, at *15 (D. Conn. Mar. 23, 2013) (Bryant, J.) ("***Pitney Bowes***") (quoting ***Kleinman v. Elan Corp., plc***, 706 F.3d 145, 152 (2d Cir. 2013)) (internal alterations omitted).  Here, the SAC does not sufficiently plead a material misstatement or omission, scienter, or loss causation.

### A.   The SAC Fails To Plead A Material Misstatement Or Omission.

Notwithstanding Plaintiff's attempt to tell a salacious tale about "profits at the expense of compliance" (SAC ¶ 20) and "suspiciously timed stock sales" (*id.* ¶ 30), his claim boils down to five alleged misstatements:

- **"We have established policies and procedures to comply with applicable requirements."  (SAC ¶ 120; Ex. 2 (2013 10-K) at 12.)**

- **"We expect to continue to allocate significant resources to our compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs."  (SAC ¶¶ 121 & 133; Ex. 2 (2013 10-K) at 15; Ex. 1 (2014 10-K) at 16.)**

- **"We expect to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness." (SAC ¶¶ 122 & 134; Ex. 2 (2013 10-K) at 16; Ex. 1 (2014 10-K) at 16.)[14]**

- **"it's so important for every employee on the global Cigna team to handle, maintain, and report on this information in compliance with all laws and regulations."  (SAC ¶ 128; Ex. 14 (2014 Code of Ethics) at 7.)**

- **"we have a responsibility to act with integrity in all we do, including any and all dealings with government officials."  (SAC ¶ 129; Ex. 14 (2014 Code of Ethics) at 13.)**

Plaintiff does not adequately allege that any of these statements was false when made.  Moreover, the statements are not actionable because they are corporate "puffery."  They also are not material, as they involve routine operational issues for a highly regulated company, and no rational investor would view them as significantly altering the total mix of information.

## 1. *Plaintiff Does Not Plead With Particularity That Any Alleged Misstatement Was False When Made Or Why It Was False.*

For all of its 222 paragraphs, the SAC is most notable for what it does *not* say.  While Plaintiff claims that statements about Cigna's policies and procedures were misleading, he does *not* allege that Cigna actually lacked policies and procedures to comply with CMS regulations.  Similarly, while Plaintiff claims that

---

[14] While Plaintiff also asserts that Sarbanes-Oxley ("SOX") certifications attesting to the accuracy of Cigna's 10-Ks were misleading (SAC ¶¶ 123-24, 135), those claims are wholly dependent on the purported inaccuracy of Cigna's other statements.  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 583 n.4 (S.D.N.Y. 2013) (dismissing SOX certification claims for same reasons other statements were not misleading).

statements about Cigna's expectation to continue to allocate resources to compliance were misleading, he does _not_ allege that Cigna did not have that expectation or failed to allocate significant resources.  And while Plaintiff claims that plain-vanilla statements such as "it's so important" to comply with the law and "we have a responsibility to act with integrity" were misleading, he does _not_ allege that those statements were actually false.  In fact, each of Plaintiff's alleged "misstatements" is not a misstatement at all.

a.    _Plaintiff mischaracterizes the alleged misstatements._

Plaintiff tries to plead around the central element of falsity, and capitalize on CMS's notices and sanctions, by recasting Cigna's earlier statements as affirmations that it was fully in compliance with CMS regulations, even though they do not say that at all.  _See_ SAC ¶¶ 125 ("Defendants were extolling compliance with CMS regulations"); 136 ("While Defendants were extolling compliance with CMS regulations, they knew at that time but failed to disclose" CMS noncompliance notices).

The Court should reject Plaintiff's sleight of hand.  In reality, it is clear that Cigna never communicated that it was in full compliance with every CMS regulation or was immune from audits or sanctions.  Notably, and tellingly ignored by Plaintiff, Cigna's Form 10-Ks consistently cautioned:

> We are frequently the subject of regulatory market conduct and other reviews, audits and investigations by . . . CMS . . . .  These regulatory audits . . . could result in changes to or clarifications of our business practices, retroactive adjustments to certain premiums, significant fines, penalties, civil liabilities, criminal liabilities or other sanctions . . . .

(Ex. 2 at 19; _accord_ Ex. 1 at 19.)  Moreover, the context of the alleged

misstatements reinforces that Cigna viewed CMS and other applicable regulations as "numerous and complex," "subject to frequent change," and "frequently modified and subject to administrative discretion," and that compliance would be exceedingly *difficult* in the shifting regulatory landscape. (Ex. 2 at 15; *accord* Ex. 1 at 16.)  Courts routinely dismiss complaints where, as here, a plaintiff misconstrues (or purposefully obfuscates) the content of the alleged misstatements.  *See, e.g., In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362–63 (S.D.N.Y. 2008) ("Significantly, defendants never claimed that the company was in full compliance with all regulations, or that it had no outstanding regulatory issues") (quotation omitted); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *33-37 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("UBS made no such assurances or guarantees regarding the success of its divisions."); *see also In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (dismissing complaint where "core weakness . . . [wa]s the plaintiff's failure to match its theory of fraud to the public statements made by [defendant].").

> b.   *Plaintiff's allegations about CMS correspondence are misleading and do not support a conclusion that Cigna's statements were false.*

In a failed attempt to rectify his inability to plead falsity, Plaintiff added to this third complaint several paragraphs alleging that Cigna received more than 75 CMS notices concerning issues of noncompliance.  *See* SAC ¶¶ 115-18; *see also id.* ¶¶ 13, 41, 76.  These new allegations simply highlight the weakness of his case, rather than buttress a claim of fraud.

*First*, and most fundamentally, Plaintiff does not – and cannot – plead cogently or with any specificity how a CMS notice, either by itself or in the aggregate, demonstrates that the challenged statements in Cigna's Form 10-Ks or Code of Ethics were false. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015) ("The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—'they must demonstrate with specificity why that is so'") (quoting *Rombach*, 355 F.3d at 174). As noted above, neither the existence of the CMS letters nor their specific content suggests that Cigna actually lacked compliance procedures, or did not allocate significant resources to compliance, or did not believe that integrity and compliance were important. *That* is what the challenged statements here addressed, and several repetitive and overlapping CMS regulatory notices over a 20-month span do not bear on the veracity of those statements.

*Second*, the SAC's allegations about CMS notices do not support a conclusion that Defendants' statements were false *when they were made.* The statements were made on February 27, 2014 (2013 10-K), February 26, 2015 (2014 10-K), and at some point in 2014 (undated Code of Ethics), respectively. The vast majority of the CMS notices upon which Plaintiff relies – indeed, 66 of the 75 – were sent to Cigna *after* the alleged misstatements. *See generally* Exs. 15-21. Those notices thus could not possibly demonstrate that the alleged misstatements were false when made. *See, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("The allegations must show both '(1) *specific*

contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements.'"); *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *3-5 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) ("ex post facto reports, filings, and statements criticizing [] risk controls" "[a]t most . . . amount to a later realization that risk controls were not catching certain conduct and could be improved upon").[15]   Moreover, five of the nine notices that pre-date the alleged misrepresentations concern the coverage of a single drug (Cialis) and are duplicate, near-identical notices issued to Cigna plans operating in different states.  *See*, *e.g.*, Exs. 15 and 16.  Accordingly, only <u>four</u> notices could even *possibly* support Plaintiff's asserted inference; and as discussed below, they do not actually do so.

 <u>Finally</u>, Plaintiff's repeated invocation of "notices of *more than 75* individual compliance violations" is misleading and unavailing.  *E.g.*, SAC ¶ 116 (emphasis added).  In reality, CMS issued multiple, separate letters when one

---

[15] Similarly insufficient and unspecific are Plaintiff's allegations based on CMS's characterizations in its January 2016 sanctions letter, including those about CMS's meeting with unnamed members of "Cigna's senior leadership" prior to sanctions (SAC ¶ 108), and Plaintiff's reference to an internal review that, according to Fritch, had "identified some of the areas in advance of the audit findings" (SAC ¶¶ 114, 157).  As to CMS's characterizations, Plaintiff concedes that the meeting that CMS referenced took place on December 9, 2015, about one month before the sanctions letter was issued and long after the statements at issue.  *See* SAC ¶ 108; Ex. 7 at 2; *In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at *9-10 (S.D.N.Y. Mar. 31, 2016) ("When a plaintiff fail[s] to cite any contemporaneous support [], subsequent events do not establish that a defendant failed to follow its internal control procedures.") (quotations omitted); *Waterford Twp. Police & Fire Ret. Sys. v. Regional Mgmt. Corp.*, 2016 WL 1261135, at * 11 (S.D.N.Y. Mar. 30, 2016) (finding claims about staffing to be fraud by hindsight because "Plaintiffs plead no facts demonstrating that the Company did not actually believe that it could achieve increased labor productivity . . . .").

compliance issue affected numerous healthcare plans offered throughout the country, so Plaintiff's "more than 75" letters amount to a handful of distinct issues discussed in a dozen or more duplicate letters sent to distinct entities. *See*, *e.g.*, Exs. 15-16.[16]  Tellingly, Plaintiff also ignores that CMS expressly *retracted* at least 16 notices, and simultaneously affirmed Cigna's compliance with relevant regulations.  (*See* Ex. 19 & 20 (retraction notices pertaining to letters issued in December 2015).)  Plaintiff further ignores that many letters addressed compliance issues that Cigna self-reported to CMS and subsequently corrected. (*See, e.g.*, Ex. 21 (noting correction of prior violation).)

At the end of the day, Plaintiff relies heavily upon a handful of letters, none of which supports falsity.

> **c.**   ***Plaintiff's allegations based on confidential witnesses ("CWs") do not plead falsity.***

Plaintiff's claims based on eight CWs are vague, conclusory, and do not support that any of the alleged misstatements was false.  *See* SAC ¶¶ 42-49, 60, 77-83, 85-89, 91-92, 95-100, 107.  Indeed, the CW allegations here are similar to those in *Pitney Bowes*, 2013 WL 1188050, at *35, where the Court rejected CW allegations because, among other things, the CWs alleged no contact with individual defendants, played no meaningful role in the reporting at issue, and generally lacked any specificity as to alleged fraud.  The same is true here.  As demonstrated below, nothing in any CW's assertion "provide[s] an adequate

---

[16] For example, where Plaintiff refers to "separate notices . . . [regarding] call center service" in July 2015, 13 letters addressed the same central issue affecting 13 plans.  (*Compare* Ex. 17 (July 23, 2015 Letter regarding Plan No. H0150), *with* Ex. 18 (July 23, 2015 Letter regarding Plan No. H1415).)

basis for believing that the defendants' statements were false."  *Malin*, 499 F.

Supp. 2d at 138 (citation omitted).

As an initial matter, the CW allegations amount to nothing more than a

general description of normal post-acquisition "growing pains" and are notable

for their lack of relevance and specificity.  For example:

- No CW alleges any contact, communication, or even a single
  meeting with any Individual Defendant on any compliance
  issue.  Indeed, CW 2 complains about a *lack* of contact with
  Appel.  *See* SAC ¶ 86.

- All but one CW fail to connect their allegations to any date in
  time beyond mentioning his/her dates of employment.  Indeed,
  only CW 8 attaches a month and year to any allegation,
  claiming that "systems had still not been integrated as of
  February 2016," *i.e.*, the month that he/she left Cigna (SAC ¶¶
  49, 95, 100), which is irrelevant to Cigna's statements made in
  February 2013 and 2014.[17]

- Three of the eight CWs were not even *at* Cigna for all or most
  of the relevant period, rendering their accounts largely
  irrelevant.  *See Malin*, 499 F. Supp. 2d at 141-42 (rejecting
  account of confidential witness who left prior to the beginning
  of the class period).  CWs 1 and 2 left Cigna in March 2012 and
  April 2013, respectively, well before the class period or any
  alleged misstatement, and CW 5 departed Cigna in March
  2014, just days or weeks into the two-and-a-half-year class
  period.  *See* SAC ¶¶ 42, 43, 46.

- Most fundamentally, the SAC draws no connection between
  any CW allegation about staffing or technical issues and any
  particular misstatement sufficient to support falsity.

Beyond those threshold problems, the CW allegations fall into two

categories:  (i) allegations about staffing integration (CWs 1, 2, 3, 4, and 6, *see*

---

[17] *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011)
("In addition to the missing link problem, the majority of the CW allegations are
either undated or pegged to an indefinite time period (*i.e.,* 'after the acquisition') .
. . . This omission renders the task of matching CW allegations to contrary public
statements all but impossible, since allegations about an unspecified time period
cannot supply specific contradictory facts available to Defendants *at the time* of
an alleged misstatement.").

SAC ¶¶ 78-83, 91-92); and (ii) allegations concerning technical or systems integration (CWs 4, 5, 7, and 8, *see id.* ¶¶ 95-100, 107).  Neither supports falsity.

    *First*, the staffing allegations are irrelevant to the alleged misstatements. Plaintiff speculates that those allegations reflect "an understanding [of Cigna's] decision to slowly push out legacy HealthSpring employees in favor of legacy Cigna employees (who had no significant experience with or exposure to CMS regulations)."  SAC ¶ 92.  Even if that were true, it would not plead falsity of any challenged statement because replacing employees does not equate to decreasing resources or maintaining insufficient compliance procedures.  In any event, the CW staffing allegations are conclusory.  *See, e.g.*, SAC ¶ 77 ("Defendants systematically engaged in a pattern of conduct . . . that would lead to the exodus of many of HealthSpring's regulatory compliance employees"). The SAC does not allege with any particularity what the purported staffing-related pattern of conduct was; it merely suggests that following the acquisition of HealthSpring by much larger Cigna, a few HealthSpring personnel chafed at new reporting structures and purportedly inadequate compensation.  *See, e.g.*, SAC ¶¶ 78, 80.  In sum, the CWs' allegations provide no basis to conclude that Cigna's statements about compliance resources were false.[18]

    Moreover, the systems integration allegations are so unspecific that they

---

[18] While the CWs deride the expertise of Cigna employees who were integrated into HealthSpring's Medicare business, those assertions are plainly contradicted by incontestable facts.  For example, the CWs assert that Appel had "minimal experience with Medicare" (SAC ¶¶ 83, 89), but he in fact had many years of such experience, including more than 18 years of service at Cigna and Cigna-HealthSpring.  *See, e.g.,* Ex. 22 at 9 (September 2015 presentation hosted by CMS, noting Appel's seven years as Medicare Compliance Officer for Cigna's "Senior Segment" and his role in developing Cigna's Medicare Part D anti-fraud plan).

amount to nothing.  They provide general descriptions of "computer systems" with access to "information" for "data processing," but are devoid of any meaningful detail about what those systems were or were designed and/or failed to do.  *See, e.g.,* SAC ¶ 95 (systems were to allow "access [to] information necessary to address patient or provider concerns"); ¶ 97 (CW 5 had to "deliver data results" and "the data was not correct").[19]  The CWs also take issue with the existence and integration efforts of multiple "systems," but a multinational company having multiple "systems," particularly after a significant corporate acquisition, hardly suggests that any alleged misstatement was false or indicative of securities fraud.  If anything, it demonstrates the truth of Cigna's public statements:  Cigna had established policies and procedures designed for regulatory compliance (*see* Ex. 2 (2013 10-K) at 12).  IT systems imperfection is not securities fraud.

> ## 2. *The Alleged Misstatements Are Inactionable Puffery.*
>
> ### a. *The challenged statements are too general to cause a reasonable investor to rely on them.*

As the Second Circuit has explained, "expressions of puffery and corporate optimism" do not give rise to securities violations.  *Rombach,* 355 F.3d at 174.  "'It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they

---

[19] The sole allegation from CW 7 is particularly meaningless.  Beyond describing his/her own role, the sum total of CW 7's claim is: "a breakdown in operations that has made it difficult for Cigna to adequately monitor and oversee whether it was in compliance with Medicare requirements."  SAC ¶ 107.  Such a barebones, conclusory statement provides no basis for falsity.  *Pitney Bowes*, 2013 WL 1188050, at *36 ("vague and unsubstantiated confidential witness allegations . . . fail to meet the heightened pleading standard" for securities fraud cases).

are 'too general to cause a reasonable investor to rely upon them.'"  *Lopez v. Ctpartners Exec. Search Inc.,* 2016 WL 1276457, at *10 (S.D.N.Y. Mar. 29, 2016) (quotation omitted).  Here, each alleged misstatement is inactionable puffery.

First, the general statements about Cigna's compliance procedures and resources are not actionable.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401-02 (S.D.N.Y. 2016), is instructive.  There, the court dismissed allegations concerning similar statements made by a pharmaceutical company.  The *Sanofi* plaintiffs alleged numerous misstatements concerning Sanofi's legal compliance and corporate integrity, claiming that Sanofi "did not actually maintain an effective compliance program."  *Id.* at 401.  The court held that statements of compliance and corporate integrity were "not actionable under the securities laws" because "statements about Sanofi's maintenance of an 'effective compliance organization' or Sanofi's 'efforts towards transparency, accountability, and disclosure' are too general to cause a reasonable investor to rely on them."  *Id.*  As in *Sanofi,* the alleged misstatements about compliance and resources here are "example[s] of 'corporate puffery,' which do[] not give rise to securities violations."  *Id.*; *see also In re Australia & New Zealand Banking Grp*, 2009 WL 4823923, at *11 ("general statements about [defendant's] risk management practices and controls" were non-actionable puffery).

The statements found in Cigna's 2014 Code of Ethics also are classic puffery.  As noted above, Plaintiff alleges that two statements integrated into the Code of Ethics (Ex. 14 at 7, 13), one attributed to McCarthy and the other to Fritch, were materially false and misleading because Defendants failed to disclose

Cigna's purported noncompliance with Medicare regulations.  *See* SAC ¶¶ 127-30.

But courts routinely hold that statements in codes of ethics are not actionable

"because they are quintessentially the sort of puffery about corporate 'reputation,

integrity, and compliance with ethical norms' that define the [puffery] category."

*Lopez,* 2016 WL 1276457, at *10 (dismissing 10(b) claims focused on statements

in Code of Business Conduct and Ethics concerning expectations of honesty,

integrity, and ethical conduct); *see also Retail Wholesale & Dep't Store Union

Local 338 Ret. Fund v. Hewlett-Packard Co.*, --- F.3d ---, 2017 WL 218026, at *6-7

(9th Cir. Jan. 19, 2017) (corporate code of ethics inactionable because it

"expresse[d] opinions as to what actions are preferable, as opposed to implying

that all staff, directors, and officers always adhere to its aspirations"); *id.* (noting

absence of "a case from any jurisdiction in which a court found alleged

noncompliance with an ethical code actionable").  As one court explained, "a

code of ethics is inherently aspirational; it simply cannot be that every time a

violation of that code occurs, a company is liable under federal law for having

chosen to adopt the code at all . . . ."  *Andropolis v. Red Robin Gourmet Burgers,

Inc.*, 505 F. Supp. 2d 662, 685-86 (D. Colo. 2007).[20]

---

[20] *See also*, *e.g.*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F.
App'x 32, 37 (2d Cir. 2012) (statements concerning integrity and credibility were
puffery); *Sanofi*, 155 F. Supp. 3d at 401-02 (dismissing 10(b) claims for statements
in Corporate Social Responsibility Report); *C.D.T.S. v. UBS AG*, 2013 WL 6576031,
at *5 (S.D.N.Y. Dec. 13, 2013) ("touting good risk controls is the equivalent of
positive, aspirational puffery found inactionable by courts"); *Retail Wholesale &
Dep't Store Union Local 338 Ret. Fund*, 52 F. Supp. 3d 961, 969-71 (N.D. Cal. 2014)
(discussing "a long line of decisions where violations of a company's code of
ethics were found not to be actionable under the Exchange Act"); *Desai v.
General Growth Props., Inc.*, 654 F. Supp. 2d 836, 858-59 (N.D. Ill. 2009) (rejecting

     **b.**    *Because the only statement*
            *attributed to Fritch is puffery,*
            <u>*the SAC fails to state any claim against him.*</u>

Because the second statement integrated into the Code of Ethics, a textbook example of inactionable corporate puffery, is the *only* alleged misstatement attributed to Fritch (SAC ¶ 129), the Section 10(b) claim against him must be dismissed even if any other aspect of Plaintiff's claims survive.

     **3.**    <u>*The Alleged Omissions Are Immaterial And Need Not Have Been Disclosed.*</u>

To state a 10(b) claim based on omissions, Plaintiff must establish that omitted information was material *and* that Defendants had an affirmative duty to disclose it *or* that was required to make affirmative statements not misleading. *See, e.g., Kleinman*, 706 F.3d at 152 ("§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information"); *Pitney Bowes*, 2013 WL 1188050, at *24 ("Disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading") (citations omitted); *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (materiality turns on whether "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (alterations and citation omitted).  Here, Plaintiff has pled neither materiality nor any duty to disclose the allegedly omitted information.

First, Plaintiff does not (and cannot) establish any affirmative duty to disclose the CMS correspondence upon which he so heavily relies.  *See, e.g., In*

allegation that publication of Code of Business Conduct and Ethics on website constituted a representation that Code was not being violated).

*re Lions Gate Entm't Corp. Sec. Litig.*, 2016 WL 297722, at *8-9 (S.D.N.Y. Jan. 22, 2016) ("a government investigation, without more, does not trigger a generalized duty to disclose"); *UBS AG*, 2012 WL 4471265, at *31 ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies.") (citations omitted); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2012) (disclosure not required until investigation "matures to the point where litigation is apparent and substantially certain to occur").

Moreover, the types of omitted information that the CWs recite – the functioning of data processing systems (SAC ¶¶ 93-100), employee turnover at a subsidiary (¶¶ 78-79, 88, 91-92), personality conflicts and job promotion decisions (¶¶ 80-89) – are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337 (S.D.N.Y. 2012) (citation omitted) (complaint dismissed where alleged misstatements were not material); *In re Hunter Envtl. Servs. Inc. Sec. Litig.*, 921 F. Supp. 914, 922 (D. Conn. 1996) (same). Indeed, companies are not required to disclose corporate minutiae such as staffing challenges or routine interactions with regulators.  *See, e.g.*, *Freedman v. Value Health, Inc.,* 2000 WL 630916, at *4–5 (D. Conn. Mar. 24, 2000) (rejecting argument that failure to disclose "reduced staffing" constituted "material

omission" sufficient to distinguish plaintiff's complaint from an inactionable mismanagement claim); *Acito v. IMCERA Grp.*, 47 F.3d 47, 52-53 (2d Cir. 1995) ("It would be unduly burdensome and impractical to publicly disseminate the results of every inspection . . . .").  Further, as discussed above, the alleged omissions are so unrelated to the challenged statements that they cannot reasonably be deemed to have been necessary to render Cigna's statements not misleading. *See, e.g., City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 2015 WL 5311196, at *21 (S.D.N.Y. Sept. 11, 2015) ("alleged existence of investigations into MetLife's death benefits payment practices . . . [does not] support[] inference that MetLife expected . . . that it would later incur fines or liabilities (or both) that would impact its future financial results materially").  In sum, Plaintiff fails to state a claim based on the omissions he alleges.

### B. The SAC Fails to Adequately Plead Scienter.

To plead a Section 10(b) claim, a plaintiff must allege that defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted).  A complaint must be dismissed unless it pleads with particularity a "strong inference" of scienter; it must be that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).  The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23.  Plausible opposing inferences must be taken into account.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

As this Court has explained, "[a] plaintiff may show an inference of scienter in two ways: 'by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Pitney Bowes*, 2013 WL 1188050, at *31, 32 (quoting *ATSI Commc'ns*, 493 F.3d at 99) (scienter not pled where complaint did not allege any motive to overstate financial projections or any compelling inference of conscious misbehavior, and noting that to do so would be "nigh impossible" absent allegations regarding falsity and any relationship between "problem areas" and alleged misstatements); *Malin*, 499 F. Supp. 2d at 151 (rejecting scienter allegations premised on executive stock sales over a nearly-two-year class period, which, in and of itself, weakened any inference of scienter).  Here, the SAC fails to plead either motive and opportunity or conscious misbehavior or recklessness.

        1.     *The SAC Does Not Allege Facts Showing That Defendants Had Motive To Commit Fraud.*

"In order to raise a strong inference of scienter by [motive], Plaintiff must allege that [Defendants] 'benefitted in some concrete and personal way from the purported fraud.'" *Pitney Bowes*, 2013 WL 1188050, at *32 (quoting *ECA*, 553 F.3d at 198).  Common motives held by most corporate executives are not enough.  *Id.* As the Second Circuit has emphasized, "[i]nsufficient motives . . . can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."  *Kalnit*, 264 F.3d at 139.

In this case, Plaintiff's *only* allegations concerning a motive to commit fraud are those surrounding Cordani's and Fritch's purportedly "suspicious"

stock sales during the class period.  *See* SAC ¶¶ 173-82.  Using public, SEC-reported data, Plaintiff claims to have compared sales during the putative class period to sales during a prior "control period" that he concocted.  *Id.* ¶ 174.  Plaintiff alleges that these Defendants' increased stock sales during the class period "raise a strong inference of scienter" because "Cordani and Fritch profited from the artificial inflation embedded in the trading price of Cigna stock caused by their false and misleading statements."  *Id.* ¶ 173.[21]

Plaintiff's analysis and conclusion are fatally flawed.  *First*, the SAC's myopic analysis of only sales of Cigna shares, while ignoring *acquisitions* of Cigna shares, conspicuously conceals that both Cordani and Fritch *increased* their net holdings of Cigna stock during the putative class period.  *See* Exs. 23-24 (illustrating stock transactions).  These increased investments fatally undermine any inference of scienter based on stock sales.  *See, e.g., Malin*, 499 F. Supp. 2d at 152 ("two of the defendants . . . actually *increased* their total holdings . . . 'a fact wholly inconsistent with fraudulent intent'"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561, 561 n.7 (S.D.N.Y. 2004) ("the Individual Defendants, in almost every instance, *increased* their BMS holdings during the Class Period—a fact wholly inconsistent with fraudulent intent.") (citations omitted); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ("The net acquisition of shares cuts against the notion that defendants sought to

_____

[21] Plaintiff makes no allegations of stock sales by McCarthy or Appel, which further undermines his allegations of scienter.  *See, e.g., Glaser*, 772 F. Supp. 2d at 592 (where "no other Individual Defendant [was] even alleged to have sold stock during the Class Period," stock sale allegations did not plead a strong inference of scienter).

unload their holdings); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) ("Inferences of scienter can be undermined when an insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period.").

*Second*, as shown in Exhibits 23 and 24 and the same public filings upon which Plaintiff relies, *all* – not just "some" (SAC ¶ 181) – of Cordani's and Fritch's stock sales during the class period were pursuant to Rule 10b5-1 trading plans and thus were non-discretionary and executed at predetermined periods.[22] Such "[t]rades made pursuant to a Rule 10b5–1 trading plan do not give rise to a strong inference of scienter." *Lululemon*, 14 F. Supp. 3d at 585 (lack of scienter because even where 10b5-1 plans were entered into during class period, complaint pled no facts suggesting that defendant entered into plan "strategically" so as to capitalize on insider knowledge); *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 603–05 (S.D.N.Y. 2007) ("Because [defendant]'s sales were part of a periodic divestment plan, the timing and amount of the sales do not raise a strong inference of scienter."); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009) (Rule 10b5-1 trading plan "undermines any allegation that the timing or amounts of the trades was unusual or suspicious").

---

[22] A 10b5-1 plan allows an officer to trade in company securities by entering into a "written plan for trading securities." 17 C.F.R. § 240.10b5-1(c)(1)(i). Such a plan divests the corporate insider of any "influence over 'how, when, or whether to effect purchases or sales.'" *See First N.Y. Sec.*, 648 F. Supp. 2d at 268 n.4 (quoting 17 C.F.R. § 240.10b5-1(c)(1)(i)).

Plaintiff's allegations concerning Fritch's sales are especially misleading because Plaintiff ignores that *all of* Fritch's holdings were subject to a lock-up provision until September 15, 2014, and thus he *could not have sold any stock prior to the Class Period.  See* Ex. 25 (Form 8-K explaining amendment to Retention Agreement, which previously had prohibited the sale or transfer of any Cigna stock).[23]  So, while Plaintiff seeks to plead scienter by comparing transactions during his contrived "Control Period" and the Class Period (*e.g.,* SAC ¶ 178), he overlooks the obvious, entirely innocent explanation:  Fritch's stock sales increased (from zero) because only during the Class Period, and not before, was he allowed to sell stock.

### 2.  *The SAC Does Not Allege Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness.*

Absent opportunity and motive, the SAC "may only survive if Plaintiff proffers facts lending credence to a strong inference of conscious misbehavior or recklessness, although 'the strength of the circumstantial allegations must be correspondingly greater if there is no motive.'"  *Pitney Bowes*, 2013 WL 1188050, at *33 (quoting *ECA*, 553 F.3d at 199).  As this Court has explained, the standard is "conscious recklessness – *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Id.* (quoting *S. Cherry St., LLC v.*

---

[23] On September 15, 2014, Fritch entered into the 10b5-1 trading plan that governed each of his subsequent stock sales.  *See* Ex. 25 at 2 ("Using these plans, individuals can . . . mitigate concerns about transactions occurring at a time when they might possess material non-public information.  Mr. Fritch will not have subsequent discretion over the plan trading.  Mr. Fritch's plan provides for transactions at regular, monthly intervals between December 2014 and November 2015 . . . .").

*Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  "[A] plaintiff must allege facts showing conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known [ ] or so obvious that the defendants must have been aware of it."  *Id.* (quotation omitted).

Plaintiff does not come close to meeting this standard.  He presents the following five categories of allegations that purportedly support the notion that Defendants acted intentionally or recklessly:  (1) statements made by Fritch *after* CMS imposed sanctions; (2) Appel's receipt of CMS notices and letters in his role as compliance officer; (3) the bare existence of certain CMS regulations; (4) risk factors in Cigna's 10-Ks; and (5) the contention that Cigna's Medicare subsegment was a "core operation."  *See generally* SAC ¶¶ 157-72.  But none of those allegations is sufficient and, even together, they are far less compelling than opposing, non-fraudulent inferences.

<u>*First*</u>, Plaintiff claims that because Fritch commented in January 2016 – *after* receipt of the CMS sanctions letter – that Cigna had "internal quality review processes in place that identified some of the areas in advance of the audit findings," it follows that "Defendants knew in advance of the CMS letter that there were CMS compliance problems that could have a material financial impact on the Company."  Ex. 26; SAC ¶ 157.  That is nonsense.  As an initial matter, Plaintiff's vague allegation says nothing about who knew exactly what, and when.  The identification of "some [unspecified] areas" at some unspecified time by some unspecified people does not rise to the level of strong circumstantial

evidence of either conscious misbehavior or an extreme departure from ordinary care.  *See* Ex. 26.  Moreover, the far more plausible inference from Mr. Fritch's comment is that Cigna, like other providers in the heavily-regulated healthcare insurance industry, is constantly conducting internal reviews and seeking to make improvements, particularly in response to complex, frequently-changing regulations.  Indeed, Cigna's disclosures and CMS's letters make that clear.  *See, e.g.,* Ex. 1 at 16-19 ("regulatory audits . . . could result in changes to or clarifications of our business practices"; CMS regulations are "numerous and complex" and "subject to frequent change").

*Second*, Plaintiff posits that Appel, "although not a speaker of any of the false and misleading statements alleged [in the SAC], was sufficiently knowledgeable . . . to know that the statements were false and misleading" (SAC ¶ 159) and that, because part of his job was to report up significant compliance issues, *ipso facto*, the statements were intentionally or recklessly made by Cigna, Cordani, McCarthy and/or Fritch.  That tortured logic does not plead scienter.  First, as discussed above, the oft-cited "75 notices" (SAC ¶ 160) do not suggest any misstatement or omission.  Moreover, because Plaintiff does not allege any motive for Appel himself to commit fraud, evidence of his recklessness must be correspondingly greater (*see Pitney Bowes*, 2013 WL 1188050, at *33), yet the SAC says *nothing* about what Appel actually disclosed or withheld from any 10(b) Defendant.  Plaintiff merely speculates:  "*If* [Appel] failed to make [the notices] known to Cigna corporate officers, he performed his duties recklessly . . . ." SAC ¶ 161.  That does not plead scienter.  *See In re Federated Dep't Stores, Inc., Sec.*

*Litig.*, 2004 WL 444559, at *6-7 (S.D.N.Y. Mar. 11, 2004) (complaint failed to allege scienter where it lacked "individualized allegations as to Defendants' knowledge," and "only alleges that [a vice president] received [certain] reports, not that he relayed the information to Defendants").

<u>*Third*</u>, Plaintiff claims that because CMS regulations required Cigna to establish a compliance program, with a designated compliance officer providing reports to senior management and the Board of Directors, Defendants either must have been aware of every noncompliance notice issued by CMS or recklessly disregarded them. *See* SAC ¶¶ 162-65.[24]  Again, Plaintiff's leap of logic and speculation say nothing about who knew what when.  And Plaintiff's inference is readily negated by a far more likely scenario:  that Cigna had a compliance program as mandated by relevant regulations, that Cordani, McCarthy, and Fritch had general, executive-level knowledge of ongoing CMS compliance efforts, and that when compliance issues rose to a material level that required disclosure in January 2016, Defendants acted promptly to inform investors.  *See* Ex. 8 (immediately disclosing implementation of sanctions).[25]

---

[24] To the contrary, CMS's pre-2015 enforcement history (with a focus on relatively low-dollar monetary penalties and infrequent imposition of enrollment sanctions) indicates that Cigna's sanctions were *unexpected*, particularly in 2013 and 2014, when the alleged misstatements were made.  *See* Part C and D Enforcement Actions, CMS.gov, *available at* www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/PartCandPartDEnforcement Actions-.html (last visited Feb. 13, 2017).

[25] Plaintiff also points to the absence of a sentence in Cigna's 2014 10-K that had appeared in the 2013 10-K ("we have established policies and procedures to comply with applicable requirements") and implies that this change supports a conclusion that the 2013 statement was knowingly false.  *See* SAC ¶ 113.  But even a cursory comparison of the two reports reveals that this assertion is meritless: the sentence was replaced by a paragraph that presents a more

*Fourth*, Plaintiff points to Cigna's SEC filings acknowledging that the company faced a host of risks, including regulatory audits and investigations that could have a material adverse effect on performance.  SAC ¶¶ 166-70.  But Plaintiff's claim that those disclosures evidence scienter defies logic: a warning that regulatory audits *may* lead to material adverse effects does not say anything about any Defendant's knowledge or recklessness as to specific compliance violations.[26]

*Finally*, Plaintiff posits that "the most plausible inference is that Defendants knew the relevant details of Cigna-HealthSpring's compliance problems" (SAC ¶ 171 & Heading E) because "the premiums received from CMS as a result of Cigna's Medicare offerings through HealthSpring accounted for the largest single source of revenue for the Company."  SAC ¶ 172.  This half-hearted invocation of the discredited "core operations doctrine" is insufficient to allege recklessness. To start with, "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA."  *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014); *see Tyler v. Liz Claiborne, Inc.*, 814 F.

---

nuanced and fulsome discussion of the changing regulatory environment. (*Compare* Ex. 2 at 12, *with* Ex. 1 at 12.)  The far more compelling inference is that Cigna updated and improved the clarity of its compliance-related disclosures, and the SAC alleges no facts suggesting otherwise.

[26] Similarly, Plaintiff attempts to distort a general risk disclosure provided in Cigna's 2011 10-K into an admission that Cigna withheld facts concerning "'potential difficulties' in integrating its operations with HealthSpring."  *See* SAC ¶¶ 70-71; *see also* Ex. 27 at 37 ("If Cigna is unable to integrate the HealthSpring business successfully, or if the acquired business underperforms, it could have a material adverse effect on Cigna's business, results of operations and financial condition.").  Plaintiff again ignores the most cogent and compelling inference:  Cigna did not "indicate[] that the acquisition itself had presented any materially adverse effects" (SAC ¶ 71) because, at least until sanctions were imposed, *there were no materially adverse effects*.

Supp. 2d 323, 343 (S.D.N.Y. 2011) (the "thrust of the case law indicates continued movement away from" the core operations doctrine). Even if valid, the doctrine would not support a strong inference of fraud where, as here, Plaintiff has made no showing that the business at issue "was essential" to "corporate survival." *Liz Claiborne, Inc.*, 814 F. Supp. 2d at 343-44 (business at issue "was not sufficiently 'core'" where sales represented 16% of the business because "courts have required that the operation in question constitute *nearly all of a company's business* before finding scienter based on the 'core operations doctrine'") (emphasis added). Plaintiff does not – and cannot – contend that Cigna-Healthspring's Medicare business was essential to Cigna's corporate survival.

### 3. *The Allegations Based On CWs Do Not Plead A Strong Inference Of Scienter.*

As discussed above, the CW allegations are vague and conclusory, and no CW discusses any Defendant's statements, conduct, or state of mind. Accordingly, for many of the same reasons that the CWs do not support falsity, they also do not support scienter.

Indeed, it is well established that vague and conclusory statements by CWs, even where they allege that specific defendants knew or were aware of problems, "cannot support an inference of scienter, much less a 'strong inference.'" *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (disregarding CW allegations); *see In re IAC/InterActiveCorp*, 695 F. Supp. 2d at 119 ("sketchy" and uncorroborated CW allegations "d[id] not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible").

Here, the CW allegations do not support Plaintiff's claims because they do not address Defendants' state of mind and are completely unspecific.

Among other things, the CWs refer in general terms to "the Company," "management," "members of executive leadership," and personnel at "the senior level" (SAC ¶¶ 81, 92, 98, 100) and fail to provide a time, place, or corroborating evidence of any alleged event or conduct. And perhaps most important, no CW alleges *any* contact with *anyone* responsible for the alleged misstatements or omissions. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (disregarding confidential witness allegations where those witnesses had not alleged personal contact with the defendants, noting that the "absence of such communication undermines the inference that Defendants recklessly disregarded the truth"). Indeed, no CW appears to have been in a position with access to any Individual Defendant or other senior officer such that he/she could possess information about knowledge of the alleged misstatements. In fact, the CW allegations are so general and so detached from Plaintiff's claims that they demonstrate that the CWs hardly even observed any Individual Defendant, let alone have insight into any fraudulent state of mind.

Rather than any possible inference of scienter, the CW assertions speak only to Mr. Fritch's role and, contrary to fraud, his *passion for compliance*:

- CW 1: "Fritch [] was a member of the Compliance Committee during CW 1's time at HealthSpring . . . ." (SAC ¶ 74.)
- CW 6: "throughout his/her time at the Company, he/she observed that Fritch had a 'passion for Medicare and compliance,' and noted that he understood compliance better than most." (SAC ¶ 61.)

Likewise, as to Appel (who is not alleged to have made any statement and is not a Section 10(b) Defendant (SAC ¶ 159)), the CWs simply characterize his role.[27] And no CW allegation even concerns Cordani or McCarthy.[28]

In sum, no CW alleges *anything* about any Individual Defendant's knowledge of any particular compliance issue, concern, violation, or risk.  It is axiomatic that such vague, unsupported, and conclusory allegations cannot support an inference of scienter.  *See, e.g., In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352, 360 (S.D.N.Y. 2011) (recklessness not alleged where plaintiffs "fail[ed] to identify any meetings, documents, or reports that connect the confidential sources with the Individual Defendants"); *Pitney Bowes*, 2013 WL 1188050, at *36 ("[T]here is no allegation that any CW met the Individual Defendants, reported any concerns [to defendants] . . . or made any personal contact with them . . . The absence of such communication undermines the inference that Defendants recklessly disregarded the truth . . . .") (citation omitted); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (no scienter where "Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants").

---

[27] *See, e.g.,* SAC ¶¶ 83 (CW 1: "Cigna appointed Defendant Appel—a legacy Cigna executive who had minimal experience in Medicare—as its most senior Medical Compliance Officer, and his/her supervisor."); 86 (CW 2: "noted the addition of Mr. Appel as the Company's chief Medicare compliance officer, and . . . met Mr. Appel only once."); 89 (CW 4: "the appointment of Mr. Appel as the Company's most senior Medicare compliance officer was a 'joke.'"); 90 (CW 6: "Mr. Appel was acknowledged within the Company . . . as its Medicare Compliance Officer.").
[28] Indeed, because the SAC is glaringly devoid of *any* allegation concerning scienter on the part of McCarthy (*see* SAC ¶¶ 154-72, 173-82), the Section 10(b) claim against him must be dismissed even if other claims survive.

4.    ***The Only Compelling Inference Is That The Acquisition, and Integration, of HealthSpring Was Difficult.***

As the Supreme Court explained in *Tellabs*:

> A court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  To qualify as "strong" within the intendment of [the PSLRA], an inference of scienter must be . . . at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs*, 551 U.S. at 314.  Here, rather than fraudulent intent, the far more cogent and compelling inference based on the totality of the allegations is that upon acquiring HealthSpring, Cigna had difficulties maintaining full compliance with a changing and complex system of regulations.  There are no particularized allegations of motive to commit fraud or suggesting that any Defendant knew and concealed material facts contradicting public statements about this issue.  Even if Plaintiff's allegations were to be fully credited and ultimately proven, the worst plausible conclusion would be that managerial errors eventually set the stage for CMS sanctions.  That is not securities fraud.  *See Boca Raton Firefighters*, 506 F. App'x at 36 ("Section 10(b) . . . does not reach mere instances of corporate mismanagement.") (internal quotes and alterations omitted); *C.D.T.S.*, 2013 WL 6576031, at *7 ("It is well established in the Second Circuit that Section 10(b) claims are not supported if the crux of the allegations is that a company was mismanaged; the allegations must allege manipulation or deception.") (quotation omitted).

## C.      The SAC Fails to Plead Loss Causation

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *accord Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 207 (D. Conn. 2014).  If that link "is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Lentell*, 396 F.3d at 174.  "Generally, a plaintiff does not adequately plead loss causation by alleging merely that the price of a security on the date of purchase was inflated as a result of the misrepresentation or omission." *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014).  Rather, a plaintiff must specify that a subsequent disclosure "corrected a prior falsehood," which "precipitated a change in the security's price causing [plaintiff's] loss.'" *Fila v. Pingtan Marine Enter. Ltd.*, 2016 WL 3962015, at *5 (S.D.N.Y. July 19, 2016). Thus, "[a]n alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation . . . .'" *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *14 (S.D.N.Y. Mar. 30, 2012).

Here, Plaintiff alleges the existence of two partial corrective disclosures, but neither "reveals the falsity" of any challenged statement.  With respect to the January announcement of CMS sanctions, Plaintiff makes the conclusory assertion that it "revealed the false and misleading nature of the statements alleged" and "revealed the materialization of the risk that Cigna's Medicare Advantage and Medicare Part D offerings were non-compliant with CMS regulations."  SAC ¶ 184.  But Defendants never asserted that Cigna was in full

**45**

compliance with CMS regulations; instead, the statements at issue concern the existence of policies and procedures (SAC ¶ 120), the allocation of resources (SAC ¶¶ 121-22, 133-34), and the importance of acting ethically and with integrity (SAC ¶¶ 128-29).  Thus, the January disclosure could not have revealed that the earlier statements were false.

Plaintiff's missing causal link is even more pronounced as to the July 2016 disclosure.  As alleged in the SAC, the July disclosure (1) announced a higher than expected cost associated with remediation; and (2) resulted in analyst speculation that sanctions would not be lifted in time for Cigna to participate in the upcoming open Medicare enrollment period.  SAC ¶¶ 143, 147-48.  Plaintiff does not (because he cannot) explain how this announcement revealed that any prior statement about compliance procedures, resource allocation, and/or ethical standards was false.  Indeed, Plaintiff does not (and cannot) even establish that the July disclosure constituted *new* information, as is required for a disclosure to correct something, because Cigna consistently disclosed to the market prior to July that remediation would be costly and continue for an undefined duration. *See* Exs. 8 & 10; *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (corrective disclosure must contain information that is new to the market); *In re New Energy Sys.*, 66 F. Supp. 3d at 406 (plaintiff failed to plead loss causation where any risk was already apparent to the market).

In sum, Plaintiff has failed to plead loss causation because he has not pled a "corrective disclosure."  *See Janbay*, 2012 WL 1080306, at *14.[29]

## II.   PLAINTIFF'S SECTION 20(a) CLAIM AGAINST DEFENDANTS CORDANI, MCCARTHY, AND APPEL MUST BE DISMISSED.

To adequately plead "control person" liability under Section 20(a), "a plaintiff must show:  (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quotations omitted). Plaintiff's Section 20(a) claim must be dismissed for three reasons.

*First*, as explained above, Plaintiff fails to allege a primary violation, and thus there can be no Section 20(a) liability.  *See In re World Wrestling Entm't, Inc. Sec. Litig.*, 2016 WL 2946155, at *22 (D. Conn. Mar. 31, 2016) ("If a plaintiff has failed to allege a primary violation, then the § 20(a) claims must be dismissed").[30]

*Second*, Plaintiff does not sufficiently allege "culpable participation" by Defendants Cordani, McCarthy, or Appel, as he fails to "allege particularized facts

---

[29] Plaintiff's apparent attempt at a "materialization of the risk" theory of loss causation fails.  Under such a theory, one must allege "that the loss was foreseeable and caused by the materialization of the risk *concealed* by the fraudulent statement."  *Omnicom*, 597 F.3d at 513 (emphasis added).  Here, Plaintiff does not (and cannot) allege that the risks that purportedly materialized with the alleged corrective disclosures (namely, the CMS sanctions and failure to complete remediation before open enrollment) were previously concealed, as they were expressly disclosed.  *See* Ex. 2 at 16, 19-21; Ex. 1 at 19, 21; *Abuhamdan*, 9 F. Supp. 3d at 209 (complaint did "not even attempt to explain why the materialization of the concealed risk, not the disclosed risk, caused . . . the decline").

[30] *Collier v. Aksys Ltd.*, 2005 WL 1949868, at *17 (D. Conn. Aug. 15, 2005) (dismissing Section 20(a) claim for failure to adequately plead Section 10(b) and Rule 10b-5 claims); *Chien*, 566 F. Supp. 2d at 120 (same).

of [their] conscious misbehavior or recklessness."[31]  *Brodzinsky v. FrontPoint Partner LLC*, 2012 WL 1468507, at *5 (D. Conn. Apr. 26, 2012).  Plaintiff makes generalized allegations that Cordani and McCarthy "were privy to confidential and proprietary information," "had access to undisclosed information," and "had access to adverse undisclosed facts" (SAC ¶¶ 186-87), but does not allege any particularized facts as to either.  As for Appel, Plaintiff alleges merely that in his capacity as a compliance officer, Appel received notices and letters from CMS (*id.* ¶¶ 115-18), but says nothing about what Appel did or did not do with such information or how he participated in any fraud.  (*Id.* ¶ 161.)  These allegations cannot support a Section 20(a) claim.  *See, e.g., Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404, 407 (S.D.N.Y. 2007) (complaint "must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness"); *Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 572 n.4 (S.D.N.Y. 2009) (dismissing Section 20(a) claim where complaint failed to plead "any particularized facts raising a 'strong inference' [of] scienter").

*Third*, the SAC does not plausibly plead that Appel had any ability to control any primary violator.  To plead "control" under Section 20(a), one "must allege that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *In re NQ Mobile, Inc. Sec. Litig.*, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (quotation omitted).  The SAC does not allege (because it would be absurd to do so) that Appel, a compliance

---

[31] The SAC does not assert a Section 20(a) claim against Fritch.

officer of a Cigna subsidiary, possessed the power to control the public statements of Cigna or its senior management team. *In re SAIC, Inc. Sec. Litig.*, 2013 WL 5462289, at *15 n.10 (S.D.N.Y. Sept. 30, 2013), *rev'd on other grounds, Indiana Pub. Ret. Sys. v. SAIC, Inc.* 818 F.3d 85 (2d Cir. 2016) ("[T]here is nothing alleged in the Complaint to establish that Defendant [] was anything more than a[n] employee at the middle-management level, thus making it impossible to demonstrate that he exercised control over the executives in charge of signing and issuing the securities filings."); *see also Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1175 (S.D.N.Y. 1990) (on summary judgment, dismissing control person claim against director of compliance whose role was to "advis[e] the policy-makers and report[] directly to them," which could "hardly be said to imply control person status").

## III.    PLAINTIFF SHOULD NOT BE PERMITTED TO REPLEAD.

The SAC should be dismissed with prejudice, and Plaintiff should not be given a fourth attempt to plead this case. As noted above, the Court already afforded Plaintiff additional time "to file an amended complaint that fairly reflects *all of the information that [he] can reasonably acquire* in conducting thorough due diligence of [his] allegations." Ex. 28 at 18-19. The SAC is the third complaint here, and Lead Plaintiff has now had over *one year* since this case was filed to investigate his claims.

Lead Plaintiff's continued failure to plead a colorable claim demonstrates that further amendment would be futile and wasteful, and that Plaintiff's claims should be dismissed with prejudice. *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("it is proper to deny leave to replead

where there is no merit in the proposed amendments or amendment would be futile"); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (denying leave to replead where complaint did not suggest that "plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe"); *Rocco v. Painewebber, Inc.*, 739 F. Supp. 83, 86 (D. Conn. 1990) (dismissing amended complaint with prejudice where a "lack of particularity permeates the plaintiffs' federal securities fraud claims"); *see also Treppel v. Biovail Corp.*, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless").

<u>CONCLUSION</u>

This Court should dismiss the SAC in its entirety and with prejudice.

Dated:   February 13, 2017
        Hartford, Connecticut

RESPECTFULLY SUBMITTED,

DEFENDANTS CIGNA CORP., DAVID M. CORDANI, THOMAS A. McCARTHY, HERBERT A. FRITCH, AND RICHARD APPEL

By: ___/s/ Thomas J. Finn_____
     Thomas J. Finn
     Federal Bar No.: ct 20929
     tfinn@mccarter.com
     Paula Cruz Cedillo
     Federal Bar No.: ct 23485
     pcedillo@mccarter.com
     McCARTER & ENGLISH LLP
     CityPlace I, 36th Floor
     185 Asylum Street
     Hartford, Connecticut 06103
     Tel.: (860) 275-6700
     Fax: (860) 724-3397

**– and –**

**Andrew W. Stern**
**(admitted *pro hac vice*)**
**astern@sidley.com**
**Dorothy J. Spenner**
**(admitted *pro hac vice*)**
**dspenner@sidley.com**
**James O. Heyworth**
**(admitted *pro hac vice*)**
**jheyworth@sidley.com**
**SIDLEY AUSTIN LLP**
**787 Seventh Avenue**
**New York, New York 10019**
**Tel.: (212) 839-5300**
**Fax: (212) 839-5599**

## CERTIFICATE OF SERVICE

This is to certify that on February 13, 2017, a copy of the foregoing Memorandum of Law of in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint was filed electronically with this Court.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's electronic system.

/s/  Thomas J. Finn
Thomas J. Finn