# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MINOHOR SINGH,** | : | |
| **Individually and On Behalf of All Others** | : | |
| **Similarly Situated,** | : | |
| _Plaintiff_, | : | **CIVIL ACTION NO.** |
| | : | **3:16-cv-00182 (VLB)** |
| **v.** | : | |
| | : | **September 28, 2017** |
| **CIGNA CORP., ET AL.,** | : | |
| _Defendants_. | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [Dkt. 66]

Proposed Lead Plaintiff Minohor Singh ("Proposed Lead Plaintiff" or "Singh") brings this action individually and on behalf of all others similarly situated[1] against Defendants Cigna Corp. ("Cigna"), Cigna Chief Executive Officer David M. Cordani ("Cordani"), Cigna Chief Financial Officer Thomas A. McCarthy ("McCarthy"), former HealthSpring CEO and Chairman of the Board of Directors Herbert A. Fritch ("Fritch"), and Cigna Medicare Compliance Officer Richard A. Appel ("Appel") (collectively, "Defendants"). The Second Amended Complaint ("SAC") alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or "Act"), codified under 15 U.S.C. §§ 78j(b) and 78t(a) respectively, and Rule 10b-5 promulgated by the Securities Exchange Commission ("SEC") under 17 C.F.R. § 240.10b-5, that occurred during the Class Period. Defendants move to dismiss the case in its entirety for failure to satisfy

---

[1] The putative class comprises all persons and entities that purchased or otherwise acquired Cigna's publicly traded common stock from February 27, 2014 until August 2, 2016 ("Class Period"). [Dkt. 57 (Second Am. Compl.) at 1].

Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA").   For the following reasons, the Defendants' Motion to Dismiss is GRANTED.

## BACKGROUND[2]

The following facts and allegations are taken from the SAC, exhibits attached to the SAC, the public documents and filings, or any other document upon which Plaintiff references and relies.

Cigna is a health services organization incorporated in Delaware that provides medical, dental, disability, life, and accident insurance both in the United States and internationally.  [Dkt. 57 (Second Am. Compl.) ¶ 37].  In early 2012, Cigna acquired HealthSpring, a managed health care organization ("MCO") focusing primarily on providing Medicare Advantage and Part D medical insurance plans. *See id.* ¶¶ 50-51, 66.  Cigna acquired HealthSpring for $3.8 billion: its largest ever acquisition.  *Id.* ¶ 62.  HealthSpring was one of the largest private Medicare insurers in the United States as of 2010.  *Id.* ¶ 57.  Its Medicare Advantage and Part D medical insurance plans are regulated by the Center for Medicare and Medicaid Services ("CMS").  *Id.*  The acquisition was intended to create "synergies" across Cigna's health insurance offerings and to complement its commercial health business for those who are current Cigna customers as they transition to Medicare, *id.* ¶ 66. Prior to the acquisition, CMS had never cited or sanctioned HealthSpring for non-

---

[2] The following facts and allegations are taken from the SAC and from the public documents and filings on which Plaintiff references and relies.

compliance and never prohibited marketing or selling Medicare policies to new customers. *Id.* ¶ 60. One year after the acquisition HealthSpring became Cigna's largest source of revenue. *Id.* ¶ 68. This growth continued throughout 2013 and 2014. *Id.* ¶ 69.

The SAC alleges that the 2011 Form 10-K acknowledges Cigna would be subject to CMS compliance reviews in light of the HealthSpring acquisition, which could lead to changes in business practices, fines, penalties, or other sanctions. *Id.* ¶ 70. The Defendants' excerpt of the 2011 Form 10-K specifically states the success of the acquisition "will depend on Cigna's ability to integrate HealthSpring with its existing businesses and the performance of the acquired business." [Dkt. 66-28 (2011 10-K) at 37]. In addition, the 2011 Form 10-K recognizes the integration will be complex, costly, time consuming, and will likely pose various difficulties.[3] Ultimately, "[i]f Cigna is unable to integrate the HealthSpring business successfully, or if the acquired business underperforms, it could have a material adverse effect on Cigna's business, results of operations and financial conditions." *Id.*

---

[3] The listed difficulties include: "implementing the Company's business plan for the combined business; executing Cigna's growth plans by leveraging its capabilities and those of the businesses being acquired in serving the Seniors segment; unanticipated issues in integrating logistics, information, communications and other systems; changes in applicable laws and regulations or conditions imposed by regulators; retaining key employees; operating risks inherent in HealthSpring's business and Cigna's business; retaining and growing membership; renewing or successfully rebidding for contracts with CMS, leveraging the information technology platform of the acquired businesses; and unanticipated issues, costs, obligations and liabilities." *Id.*

On January 17, 2013, CMS publicly issued a memorandum to All Medicare Advantage Organizations, Prescription Drug Sponsors, Cost Plans, and Medicare-Medicaid Plans regarding the 2014 Application Cycle Past Performance Review Methodology Final. [Dkt. 66-7 (Mot. Dismiss Ex. 6 (CMS Mem.)].  This memorandum documents the review methodology used by CMS "to evaluate the performance of all Medicare contractors" and to "identify organizations with performance so impaired that CMS would prohibit the organization from further expanding its Medicare operations." *Id.* at 1.  It applies to an organization's application to offer Medicare benefits under a new contract or in an expanded service area, and CMS may deny the application if the past performance is out of compliance pursuant to the methodology. *Id.* at 1.  CMS identified 11 performance categories for which "negative performance points" may be assigned, including a category for Compliance Letters and a category for Enforcement Actions.[4] *Id.* at 6.  "The number of potential negative performance points corresponds to the risk to the program and our beneficiaries from deficient performance in that particular area." *Id.* Pursuant to this memorandum, CMS Groups Directors will notify the affected organizations during the application review process if they will receive a Notice of Intent to Deny, so that they may proactively withdraw applications. *Id.* at 17.

---

[4] All eleven performance categories are listed as follows: (1) Compliance Letters; (2) Performance Metrics; (3) Multiple Ad Hoc Corrective Action Plans (CAPs); (4) Ad Hoc CAPs with Beneficiary Impact; (5) Failure to Maintain Fiscally Sound Operations; (6) One-Third Financial Audits; (7) Performance Audits; (8) Exclusions; (9) Enforcement Actions; (10) Terminations and Non-Renewals; and (11) Outstanding Compliance Concerns Not Otherwise Captured. *Id.* at 6.

The memorandum includes a chart and describes in detail the differences between compliance letters:

| Compliance Letter Type | Weight | Rationale for Weight |
|---|---|---|
| Notice of Non-Compliance | 1 | Mildest type of letter.  Does not contain specific language regarding further compliance escalation or other consequences should the behavior/non-compliance continue. |
| Warning Letter | 3 | Formal communication that describes the consequences of continued non-compliance; weighted 3 times greater than notices of non-compliance. |
| Warning Letter with a Business Plan | 4 | The matter is serious enough to warrant a written response from the organization but not significant enough to warrant a CAP. |
| CAP – Ad hoc compliance event | 6 | Ad hoc CAPs represent the most serious form of compliance notice. Rated at twice the weight of warning letters because the issuance of this type of letter indicates continuing and/or severe, systemic problems. |

*Id.* at 7.  The memorandum details that CMS calculates a total Compliance Letter score and then ranks the contracts in descending order; the contracts in the 90th percentile receive an additional 2 negative performance points in the Compliance Letter category.  *Id.* at 8.

With respect to CAPs, the memorandum states that ad hoc CAPs are "relatively rare and are typically issued only when other forms of interventions have failed to correct a problem and/or the problem was especially egregious," noting as well that "[r]eceiving more than one such CAP during a performance

period is a powerful indication of ongoing performance problems."  *Id.* at 9.  CAPs with Beneficiary Impact are defined as those "related, directly or indirectly, to a beneficiary's experience with the services and protections the contracting organization is required to provide. . . ."  *Id.*  Examples include "proper administration of the organization's beneficiary call center," as well as the following:

> 4RX data submissions to CMS, enrollment and disenrollment processing, application of correct low income subsidy (LIS) status for plan members, volume of member complaints logged into CMS' Complaints Tracking Module (CTM), failure to provide appropriate Part D drugs, failure to apply safety edits when processing claims, processing of member appeals and grievances, marketing abuses, overall failure to appropriately administer the Part D benefit, execution of benefit coverage determinations, and formulary administration.

*Id.*  CAPs that are not a "significant threat to beneficiaries (and therefore [present] no beneficiary impact as defined here)" include "late reporting of financial information to CMS."  *Id.*

When CMS applies immediate sanctions, contracts under immediate sanction but released before the end of the end of the performance period receive 3 negative performance points.  *Id.* at 12.  Sanctions still in place at the end of the performance period yield 4 negative performance points, bringing the possible total to 7 negative performance points for immediate sanctions in the Enforcement Action category.  *Id.*

On February 27, 2014, the first day of the Class Period, Cigna filed its 2013 Form 10-K.  [Dkt. 57 ¶ 119].  The 2013 Form 10-K states, "We have established policies and procedures to comply with applicable requirements."  *Id.* ¶ 120.  Under the "Medicare Regulations" section, Cigna recognized the right to obtain payment,

enroll and retain members as well as the marketing and sales activities are heavily regulated by CMS, but Cigna "expect[s] to continue to allocate significant resources to [its] compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs." *Id.* ¶ 121.  Acknowledging that the Federal Government prioritizes the prosecution of health care fraud and abuse, Cigna further stated in the "Federal Audits of Government Sponsored Health Care Programs" section that "[t]he regulations and contractual requirements in this area are complex, are frequently modified, and are subject to administrative discretion. We expect to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness." *Id.* ¶ 122.  Cordani certified that based on his knowledge the 2013 Form 10-K did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. . . ." *Id.* ¶ 123.  McCarthy signed a similar Sarbanes-Oxley Act ("SOX") certification of compliance. *Id.* ¶ 124.

The 2013 Form 10-K also contains a Risk Factor section, an excerpt of which is submitted as an exhibit to the Defendants' Motion to Dismiss.[5]  *See* [Dkt. 66-3

---

[5] The SAC does not expressly address the risk factor section although it refers to other sections of the 2013 Form 10-Ks.  In addition to "the facts as asserted within the four corners of the complaint," a court is permitted to utilize "the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Accordingly, the Court refers to the risk factor sections as these Form 10-Ks are

(Mot. Dismiss Ex. 2, 2013 Form 10-K) at 18].  This section documents "risks related to litigation, regulatory audits and investigations" and states that such regulatory audits or agency reviews could lead to "changes to or clarifications of [Cigna's] business practices, retroactive adjustments to certain premiums, significant fines, penalties, civil liabilities, criminal liabilities or other sanctions, including restrictions on [Cigna's] ability to operate, that could have a material adverse effect on [Cigna's] business, results of operation, financial condition, and liquidity."  *See Id.* at 19.   With respect to risks involving Medicare participation, Cigna also acknowledges that failure to comply with CMS and state governmental contractual requirements can lead to "fines or penalties that could impact [Cigna's] profitability.  *See id.* at 20.  Failure to comply with state and federal health care laws and regulations can result in "fines, limits on expansion, restrictions or exclusions from programs or other agreements with federal or state governmental agencies that could adversely impact [Cigna's] business, cash flows, financial condition and results of operation."  *See id.* at 20-21.

The SAC alleges that CMS "cited" Cigna in April 2014 "for misleading advertising in October and November 2013 relating to its Florida MA and PDP offerings," although the type of compliance letter is not specified.  [Dkt. 57 ¶ 117].  Later that year in October 2014, CMS issued two separate notices of non-compliance "for failure to provide required medical records and improper payments to approximately 410 non-eligible medical service providers."  *Id.*

---

incorporated by reference and were provided to the Court as exhibits to Defendant's Motion to Dismiss.

Also in October 2014, CMS's Medicare Parts C and D Oversight and Enforcement Group ("MOEG") published its 2013 Part C and Part D Program Annual Audit and Enforcement Report. [Dkt. 66-6 (Mot. Dismiss Ex. 5, 2013 Audit Report)]. This annual audit publication is designed to "provide a brief overview of the Part C and Part D program audit and enforcement processes, a current and projected snapshot of the program audit landscape, a summary of the program audit and enforcement activities in 2013, and other highlights and noteworthy developments in MOEG's operations since the issuance of our 2012 annual report." *Id.* at 3-4. The private companies that contract with CMS to provide health and prescription drug benefits to Medicare beneficiaries, i.e. "sponsors," can be audited by MOEG through this program. *See id.* at 7. MOEG chooses certain sponsors based on "data-driven risk assessment," which "generate[s] a risk score and subsequent ranking for all sponsors. . . ." *Id.* Both low and high ranking sponsors can be chosen, and MOEG reserves resources to conduct Ad Hoc audits and audits based on referrals. *Id.* MOEG's goal for this program since its inception in 2010 is to "audit every sponsor in the Part C and Part D programs within a reasonable time period." *Id.* at 11. Cigna was not listed as an audited sponsor for 2013.

The SAC alleges that in December 2014, Cigna received five separate notices of non-compliance for improper pharmacy coverage. [Dkt. 57 ¶ 117]. Defendants submitted two warning letters from December 2014 pertaining to the failure of Cigna Healthcare of Arizona, Inc. and Bravo Health Pennsylvania, Inc. to comply with Medicare Part D in administering Cialis coverage contracts. *See* [Dkt. 66-16

(Mot. Dismiss Ex. 15, Cigna of Ariz. Warning Letter); Dkt. 66-17 (Mot. Dismiss Ex. 16, Bravo Warning Letter)].

The SAC also refers to Cigna's Code of Ethics and Principles of Conduct ("Code of Ethics"), published in December 2014. *Id.* ¶ 127. McCarthy is cited in the Code of Ethics as saying it is important to do things "the right way," which includes reporting financial results fairly and accurately. *Id.* ¶ 128. This is because "shareholders who invest in us expect it, as do the analysts who follow us" and accordingly "it's so important for every employee on the global Cigna team to handle[,] maintain, and report on this information in compliance with all laws and regulations." *Id.* The Code of Ethics also includes a statement from Fritch acknowledging the responsibility to act with integrity, including under circumstances dealing with government officials. *Id.* ¶ 129. Proposed Lead Plaintiff believes these statements were materially false and misleading when made because Defendants knew about the notices of non-compliance, such non-compliance constituted a "serious threat to the health and safety" of Medicare patients and showed a lack of integrity in dealing with government officials, and CMS's notices would have a material impact on Cigna if left unaddressed. *Id.* ¶ 130.

The 2014 Form 10-K filed on February 26, 2015, contains the same compliance statements[6] as those from the 2013 Form 10-K set forth in the

---

[6] Namely, the Medicare Regulation states Cigna "expect[s] to continue to allocate significant resources to [its] compliance, ethics and fraud, waste and abuse programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs." *Id.* ¶ 133. The "Federal Audits of Government Sponsored Health Care Programs" states that "[t]he regulations and

"Medicare Regulations" and "Federal Audits of Government Sponsored Health Care Programs" sections. *Id.* ¶¶ 133-34.[7]  It does not contain the statement from 2013: "We have established policies and procedures to comply with applicable requirements." *Id.* ¶ 120.  The 2014 Form 10-K does include the same language from the risk factor section as those alleged in the 2013 Form 10-K above. *Compare* [Dkt. 66-2 at 18]; *with* [Dkt. 66-3 at 18].  Both Cordani and McCarthy issued certifications substantially similar to that which is stated above. *Id.* ¶ 135.

The SAC lists several compliance letters sent over the course of 2015, which are alleged to be addressed to Appel as the Medicare Compliance Officer and establish violations that later became the basis for the sanctions. *See* [Dkt. 57 ¶¶ 115-18].  In February 2015, Cigna "was cited" for "inadequate claims processing systems that 'were not accurately configured to capture and track the [maximum-out-of-pocket] amounts and ensure appropriate payment," although the type of

---

contractual requirements in this area are complex, are frequently modified, and are subject to administrative discretion.   [Cigna] expect[s] to continue to allocate significant resources to comply with these regulations and requirements and to maintain audit readiness." *Id.* ¶ 134.

[7] Contrary to the aforementioned provisions cited by the Proposed Lead Plaintiff, the SAC also contains the allegation that over time, as Cigna became aware of the failures to comply with CMS regulations, it accordingly altered its annual filings. For example, Proposed Lead Plaintiff alleges the 2013 Form 10-K states, "We have established policies and procedures to comply with applicable requirements." *Id.* ¶ 113.  However, the 2014 Form 10-K makes no such statement, and Proposed Lead Plaintiff contends this fact establishes Defendants knew that during 2014 either "(i) any established policies did not actually ensure Company compliance with applicable regulations; or (ii) there were no such policies." *Id.*  Without including citations to regulations or policies, the Court cannot determine to what section this allegation pertains and whether it conflicts with the 10-K language set forth by the Proposed Lead Plaintiff in a different section.

compliance letter is not specified.  *Id.* ¶ 117.  The next month Cigna received five separate notices of non-compliance "for failure to provide required certifications and failure to send members required timely explanations of benefits."  *Id.*  In April 2015, Cigna received two notices "for wrongly discontinuing coverage for 433 members and improper denial of prescription coverage for more than 1,700 claims."  *Id.*  In May, Cigna received two separate notices of non-compliance "for inaccurately describing benefits and failing to inform more than 500 physicians of their appeal rights who had been terminated by HealthSpring."  *Id.*  Then in June 2015, Cigna received at least 21 separate notices or warning letters "for failing to add a requisite class of pharmaceuticals to its plan formulary and for failure to meet call center timeliness requirements."  *Id.*  In July, CMS then sent Cigna at least 20 notices of non-compliance, warning letters, and a Corrective Action Plan Request "for failure to timely process enrollment applications, double billing, submission of incorrect and unreadable data for audit purposes, failure to submit required plans to regulatory agencies, untimely processing of approximately 1,600 appeals or redetermination requests, improper and untimely call center service, and failure to maintain an adequate network."  *Id.*  The SAC does not specify to what topic the Corrective Action Plan pertains.  Cigna "was cited" in August 2015 "for failure to comply with pharmacy formulary submission and review requirements," but the type of compliance letter is unspecified.  *Id.*  In October 2015, Cigna "was cited" for "directing customer coverage determination requests to a voicemail line."  *Id.*

On October 13, 2015, CMS published its 2014 Part C and Part D Program Audit and Enforcement Report.  [Dkt. 66-5 (Mot. Dismiss Ex. 4, 2014 Audit Report)]. Cigna was not listed as an audited sponsor for 2014.

The SAC states that in December 2015, Cigna received 16 notices of non-compliance or warning letters "for improper and untimely call center service and failure to ensure the accurate entry of Notice of Change/Evidence of Coverage documents." *Id.*

On January 22, 2016, Cigna filed a Form 8-K disclosing that the day prior CMS informed the company in a letter ("CMS Letter") that it would impose intermediate sanctions suspending the enrollment of Medicare beneficiaries and the marketing to new Medicare beneficiaries effective at 11:59 p.m. on January 21, 2016.  *Id.* ¶ 101; [Dkt. 57-2 (Am. Compl. Ex. B., CMS Letter) at 1].  Cigna announced that the sanctions were imposed on account of operative deficiencies relating to its Parts C and D appeals and grievances, Part D formulary and benefit administration, and compliance program.  [Dkt. 57 ¶ 102].  The Form 8-K states that "Cigna is working to resolve these matters as quickly as possible and is cooperating fully with CMS on its review."  *Id.* ¶ 139; [Dkt. 66-9 (Mot. Dismiss Ex. 8, Form 8-K (Jan. 21, 2016)), Item 8.01].  Proposed Lead Plaintiff alleges Cigna failed to acknowledge the severity of the findings stated in the CMS Letter: that Cigna's conduct was a "serious threat to the health and safety of Medicare beneficiaries" and that the violations resulted in delays, denials and increased costs regarding medical services and prescription drugs.  *Id.* ¶ 103; [Dkt. 57-2 at 2].

The CMS Letter stems from an audit performed from October 5, 2015, to October 20, 2015, and it notes that "Cigna has had a longstanding history of non-compliance with CMS requirements." [Dkt. 57-2 at 2]. Specifically, "Cigna has received numerous notices of non-compliance, warning letters, and corrective action plans from CMS over the past several years. *Id.* A number of these notices were for the same violations discovered during the audit, demonstrating that Cigna has not corrected issues of non-compliance." *Id.* Many of these notices of non-compliance were sent during the Class Period, including a notice of non-compliance sent as early as 2013. *See id.* at 5. A subsequent warning about continued non-compliance was sent in 2015. *Id.* The CMS Letter also cited the HealthSpring acquisition, which added over one million beneficiaries to Cigna's operations, "creat[ed] an organizations structure that is decentralized and fragmented." *Id.* Notably, the CMS Letter states that on December 9, 2015, CMS met with Cigna's senior leadership "to discuss the serious nature of the deficiencies discovered during the audit." *Id.* The breakdown in operations, according to the CMS Letter, is attributable to the failure to integrate operations, which leads to inadequate monitoring and oversight of Part C and D requirements. *Id.* In failing to satisfy CMS regulations, Cigna "substantially failed to provide its enrollees with services and benefits. . . ." *Id.* ¶ 139; [Dkt. 57-2 at 2].

Cigna's stock fell from $140.13 closing price on Thursday, January 21, 2016, to $137.90 closing price on Friday, January 22, 2016. [Dkt. 57 ¶ 140]. By the end of the next closing day, Friday, January 25, 2016, Cigna's stock price fell to $135.85.

After receiving sanctions, Fritch announced in a media interview that Cigna

14

had internal quality review processes that identified some areas prior to the audit findings.  *Id.* ¶ 114.

On July 29, 2016, Cigna filed a quarterly report, Form 10-Q, for the quarter ending June 30, 2016.  *Id.* ¶ 143.  This report indicated that Cigna would reduce its 2016 financial outlook due, in part, to substantial $30 million in costs to remedy compliance violations related to the CMS sanctions.  *Id.*  Such costs were expected to continue to grow until sanctions could be remediated, which Cigna acknowledged may not occur in a "timely and satisfactory manner. . . ."  *Id.* ¶ 144. Stock price fell from $135.99 at closing on Thursday, July 29, 2016, to $128.96 at closing on Friday, June 29, 2016.  *Id.* ¶ 151.  By closing on August 2, 2016 (the third consecutive trading day), stock price fell to $124.13, representing a drop of $11.86 per share.  *Id.* ¶ 152.

On the same day Cigna held an earnings conference call with analysts where Cordani and McCarthy addressed Cigna's failure to comply with regulations and the timing and costs for remedying the violations.  *Id.* ¶ 145.  McCarthy acknowledged the costs were higher than expected and that they would continue at the same pace until violations were fully redressed.  *Id.* ¶ 146.  Analysts expressed concern about whether Cigna could resolve the audit issues prior to the annual enrollment period ("AEP") beginning October 15 and ending December 7 each year.  Specifically, analysts understood that Cigna's inability to participate in the AEP could lead to loss of membership and impact revenue and earnings contributions.  *See id.* ¶¶ 149-50.

During the Class Period (February 27, 2014 to August 2, 2016), Cordani sold 668,529 shares and Fritch sold 455,180 shares of Cigna stock.[8] *Id.* ¶¶ 176.  Such sales sharply contrast with their share sales from February 28, 2012 to January 21, 2014[9]: Cordani sold 137,621 shares and Fritch sold 0 shares.  *Id.*  Proposed Lead Plaintiff alleges that the timing of the sales are suspicious given CMS already provided at least one notice of non-compliance but Cigna had not yet publicly reported any substantial non-compliance.  *See id.* ¶ 180.  The stock sales, Proposed Lead Plaintiff contends, are evidence of scienter.  *See id.* ¶ 173.

Proposed Lead Plaintiff alleges the market prices of Cigna's common stock became artificially inflated as a result of Cigna's material misstatements and omissions.  *Id.* ¶ 183.  This artificial inflation was partially removed as a result of the stock prices falling after the filing of the Form 8-K on January 22, 2016, and the filing of the Form 10-Q on July 29, 2016.  *Id.* ¶¶ 184-85.

As senior executives and/or directors, Cordani, McCarthy, and Appel are alleged to have obtained confidential and proprietary information about Cigna's operations, compliance, information about Cigna's failure to comply with regulations, including the 75 notices of non-compliance, and the effects of non-compliance.  *See id.* ¶¶ 186-87.  They took part in drafting, preparing and/or approving information and reports circulated to the public, shareholders, and

---

[8] As a result of the sales, Cordani's net proceeds were $71,942,705 and Fritch's net proceeds were $59,835,369.  *Id.*

[9] Proposed Lead Plaintiff picked these dates as the "Control Period," "the approximately two-year period immediately preceding the Class Period. . . ." *Id.* ¶ 174.

investors, which contained material misstatements and omissions. *Id.* ¶ 187. By acting as senior executives and directors, Cordani, McCarthy and Appel were "controlling persons" of a publicly held company who had a duty under the Exchange Act to disseminate accurate information or correct any incorrect information. *Id.* ¶ 188.

Also, Proposed Lead Plaintiff alleges that HealthSpring's employees had "extensive institutional knowledge" but nonetheless Defendants "systematically engaged in a pattern of conduct in the wake of the acquisition that would lead to the exodus of many of HealthSpring's regulatory compliance employees," which included some confidential witnesses. *Id.* ¶ 77. Confidential witnesses reported that Cigna replaced HealthSpring's senior leadership team with new senior leadership from Cigna who were inexperienced with Medicare compliance, *id.* ¶ 78, and Cigna underpaid its compliance employees resulting in high turnover, *id.* ¶ 80. As such, approximately 90% of the employees brought in were legacy Cigna employees with little to no experience in CMS regulations or compliance. *Id.* ¶ 82. Appel chose not to seek out legacy HealthSpring employees with institutional knowledge about compliance. *Id.* ¶ 84. As Medicare Compliance Officer, Appel "was legally Cigna's most senior officer charged with ensuring CMS's Medicare regulations were followed" and therefore was legally responsible for reporting compliance problems up the chain of senior management, including Cordani, McCarthy, and Fritch. *Id.* ¶ 90 (emphasis omitted). Cigna also elected to reduce customer service staff during this time. *Id.* ¶ 91.

In addition to the turnover from HealthSpring to Cigna employees, data processing systems failed to properly integrate patient information stored by the two companies. *Id.* ¶ 93. Without a centralized system Cigna could not quickly and accurately access information necessary to patient or provider needs. *Id.* ¶ 95. HealthSpring's Vice President of Health Services, Claudia Douds, issued a plan in response to findings from internal audits that Cigna was out of compliance; despite its estimated cost of less than $5 million, Cigna rejected the plan and continued to oust HealthSpring legacy employees with significant experience. *Id.* ¶ 98. CMS sanctioned Cigna for non-compliance in January 2016, by the next month Cigna had not developed a plan to fully integrate the system. *Id.* ¶ 100.

On September 6, 2016, CMS published its 2015 Part C and Part D Program Audit and Enforcement Report. [Dkt. 66-4 (Mot. Dismiss Ex. 3, 2015 Audit Report)]. Cigna was listed as an audited sponsor for 2015. It received a worse than average audit performance with a score of 1.90, wherein the average was 1.76 and the lower audit score represents better performance. *See id.* at 15. Specifically, Cigna received a better than average score for Compliance Program Effectiveness, *id.* at 16; Part D Coverage Determinations, Appeals, and Grievances, *id.* at 18; and Special Needs Plans Model of Care, *id.* at 20; but it received a worse than average score for Part D Formulary and Benefit Administration, *id.* at 17; and Part C Organization Determinations, Appeals, and Grievances, *id.* at 19. The publication cited the 2015 Program Audit as the reason for imposing the sanctions. *Id.* at 33.

## DISCUSSION

### I.   Legal Standard

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy*, 482 F.3d at 191. The Court may also consider "matters of which judicial notice may be taken" and "documents either in

plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (acknowledging that in a § 10(b) case "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

A complaint alleging violations of § 10(b) and Rule 10b-5 must meet the heightened pleading standard of Fed. R. Civ. P. 9(b) and the rules prescribed by the PSLRA, 15 U.S.C. § 78u-4(b). *See Tellabs, Inc.*, 551 U.S. at 321. Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this requirement the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted). Under the PSLRA, the complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . shall state with particularity all facts on which that belief is formed;" and (2) plead facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B), (b)(2)(A). *See Tellabs, Inc.*, 551 U.S. at 321; *Kleinman v.*

*Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013).  As with any other type of 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true."  *Id.* at 322.

## II.   Count 1: Section 10(b) of the Exchange Act and Rule 10b-5

Proposed Lead Plaintiff alleges that Cigna, Cordani, McCarthy and Fritch (i.e. all Defendants except Appel) violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated by the SEC under 17 C.F.R. § 240.10b-5.  Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC to implement this portion of the Exchange Act, makes it unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security "[t]o employ any device, scheme or artifice to defraud; (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b–5.

Under § 10(b) promulgated under Rule 10b-5, it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  A plaintiff must establish

the following five factors: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance ...; (5) economic loss; and (6) loss causation." *Kleinman*, 706 F.3d at 152 (internal citations and quotation marks omitted).  Defendants argue that the § 10(b) action should be dismissed on three grounds: failure to plead materiality, scienter, and loss causation.  Proposed Lead Plaintiff challenges all three assertions.  Accordingly, the Court addresses each assertion in turn.

### A. *Material Misstatements or Omissions*

Defendants set forth several reasons why the SAC fails to plead with particularity a material misstatement or omission.  First, they argue the SAC does not adequately allege the statements at issue were false at the time they were made because Proposed Lead Plaintiff mischaracterizes the Defendants' statements, mischaracterizes the CMS notices, and relies on confidential witness statements that do not plead falsity.  [Dkt. 67 at 19-20].  Second, Defendants posit the alleged misstatements are inactionable puffery because they are too general to create reliance from a reasonable investor.  *Id.* at 27.  Third, Defendants contend the allegations of omission are not material.  *Id.* at 30.

Proposed Lead Plaintiff disagrees for several reasons.  The primary reason is that at least nine CMS regulations notified Defendants that their compliance procedures were insufficient.  [Dkt. 68 at 2].  Despite disclosing various risks in the public filing documents, such risk disclosures could not insulate them from liability because they already happened.  *Id.* at 17.  In addition, Proposed Lead Plaintiff avers the SAC does not allege fraud-by-hindsight because the failure to disclose

insufficient compliance practices created the risk they attempted to conceal.  *Id.* at 18.  And finally, Defendants' statements were material, not puffery, because they contained fact-based information as opposed to hopes or aspirations.  *Id.* at 20.

The duty of a company registered on a public exchange to disclose information to the public is prescribed by a series of laws and regulations.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 258-59 (1988) (citing as an example 15 U.S.C. §§ 78m, 78o(d) (1982 ed. And Supp. IV)).  These laws and regulations do not impose a duty of continuous disclosure.  *See Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760, (7th Cir. 2007) (rejecting duty to update before next quarterly report) (citing *Basic Inc.* and *Dirks v. SEC*, 463 U.S. 646 (1983)); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (11 Cir. 2001) (explaining that securities laws do not require continuous disclosure); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) (rejecting duty to update forward-looking statements that have become incorrect due to changing circumstances); *see also In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 105 (2d Cir. 1998) (no duty to correct because the statements were not misleading when made, and there was no duty to update vague statements of optimism or expressions of opinion); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 261 (2d Cir. 1993) (ruling Time Warner's statements regarding "serious" discussions of strategic alliances "lack the sort of definite positive projections that might require later correction" and "suggest only the hope of any company on talks with multiple partners, that the talks would go well").  "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011).  A

reasonable investor's interest is not sufficient, standing alone, to require disclosure of an item.  *See Kleinman*, 706 F.3d at 153; *In re Time Warner Sec. Litig.*, 9 F.3d at 267 ("But a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

The duty to disclose instead arises where there is "a statute or regulation requiring disclosure" or a "corporate statement that would otherwise be inaccurate, incomplete, or misleading."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see Kleinman*, 706 F.3d at 153 ("Disclosure is required only when necessary to make statements made, <u>in the light of the circumstances under which they were made</u>, not misleading.") (citing 17 C.F.R. § 240.10b-5(b)) (emphasis added).  Pursuant to the Exchange Act, a company registered with the SEC must make annual and quarterly filings disclosing information as specified by the Act.  *See generally,* 17 C.F.R. Ch. II, Pt. 249, *et seq.*  In addition to these annual and quarterly filings, there are certain regulatory filing requirements, such as those imposed by 17 C.F.R. § 229.303(a),(b) (Item 303), which requires disclosure of the "registrant's financial condition, changes in financial condition and results of operations" each full fiscal year, including a description of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," as well as "any material changes in the registrant's results of operations" for an interim period.  The central tenet for disclosure requirements, whether by statute, regulation, or a corporate statement, is that "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to

accurately inform rather than mislead prospective buyers." *Kleinman*, 706 F.3d at 153; *In re BioScrip, Inc. v. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (same).

A misstatement or omission is material if there exists a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc.*, 485 U.S. at 231-32). In other words, there must be a substantial likelihood the omitted fact would "significantly alter the 'total mix' of information made available" in the eyes of a reasonable investor. *Id.* This question is a mixed one of law and fact, and as such a court should not dismiss the complaint on a 12(b)(6) motion for lacking materiality unless the misstatements or omissions alleged in the complaint were required to be disclosed and are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*

Proposed Lead Plaintiff does not point to a statute or regulation requiring disclosure of the CMS notices, any CMS audits as the one from October 2015 referenced in the Opposition to the Motion to Dismiss, *see* [Dkt. 68 at 2], or other allegedly material information, and therefore at issue is whether a corporate statement would otherwise be inaccurate, incomplete, or misleading.  When a defendant does speak to an issue or topic, the "duty to tell the whole truth" arises. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  A court cannot merely look at "[t]he literal truth of an isolated statement" but must examine "defendants' representations, taken together and in context." *Id.* (quoting *In re*

*Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 247, 366 (2d Cir. 2010)).  This "duty to tell the whole truth" has limitations, because a defendant is not required to reveal everything about a subject after disclosing one fact.  *Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016).  Indeed, a company need not disclose all communications with a regulator even where the regulator has notified the company about its operation's deficiencies, particularly because "mismanagement alone does not constitute fraud."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) ("It is well settled that section 10(b) was not designed to regulate corporate mismanagement.") (internal quotation marks omitted); *Alibaba*, 192 F. Supp. 3d at 470 (finding a company does not have a duty to disclose communications with a regulator where deficiencies in operations have already been identified).  That being said, "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."  *Jinkosolar*, 761 F.3d at 251; *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

### 1.     *2014 Code of Ethics: McCarthy and Fritch*

The Court first addresses whether the statements from McCarthy and Fritch published in the 2014 Code of Ethics constitutes a materially misleading statement.  McCarthy's quote advises employees to "do[ ] things 'the right way'" and comply with laws and regulations.  [Dkt. 66-15 at 7].  Fritch opines that employees "have a responsibility to act with integrity," including any interactions with government

officials.  *Id.* at 13.  Although the Code of Ethics was made publicly available on the website and therefore was open for an investor to peruse, there is no reasonable investor who would rely on such "puffery" as these quotations reflect the precise meaning of the term: "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning they are too general to cause a reasonable investor to rely upon them."  *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206 (2d Cir. 2009)).  Moreover, the SAC does not allege at what point these individuals actually made these statements—Fritch and McCarthy could have uttered these words years before they were actually published in the Code of Ethics.  Therefore, Proposed Lead Plaintiff cannot show these are opinions or beliefs that are actionable because they were "objectively false and disbelieved by the defendant at the time it was expressed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *In re BioScrip, Inc.*, 95 F. Supp. 3d at 728 (same).  Accordingly, these statements by Fritch and McCarthy are not material misstatements actionable under the PSLRA.

> **2.**      *2013 and 2014 Form 10-Ks: Cigna, Cordani, and McCarthy*

The Court next addresses the statements issued in the 2013 and 2014 Form 10-Ks in light of the "total mix of information made available" to the reasonable investor.  *See ECA*, 553 F.3d at 197.  After the acquisition, at the time when the statements were made, Proposed Lead Plaintiff alleges that Cigna received "at least nine [CMS] Notices prior to the first Class Period compliance statements, and at least 18 Notices before the final actionable statements. . . ."  [Dkt. 68 at 23].  The

SAC does not contain factual details about all 18 notices allegedly sent by the final actionable statement, however it does provide a few examples: that Cigna received "two separate notices for failure to provide records, and for improper payments to approximately 410 medical service providers" in October 2014; and "five separate Notices of Non-compliance for improper pharmacy coverage" in December 2014. [Dkt. 57 ¶ 13]. Defendants clarify that five of the initial nine notices concerned the same coverage issue for the drug Cialis and they were sent to Cigna plans in different states. [Dkt. 67 at 23]. Proposed Lead Plaintiff also claims that Cigna received at least 75 CMS notices by the end of the Class Period. [Dkt. 57 ¶ 13]. Defendant avers that 66 of the 75 notices were issued after the alleged misstatements. [Dkt. 67 at 22]. Although the numerosity of the notices is worth noting, the materiality question requires the Court to focus on the content of the notices in order to decide whether the information would be important to a reasonable investor.

On the one hand, it is widely understood that companies cannot be expected to comply with applicable regulations 100% of the time, particularly if they do not profess to do so. *See Jinkosolar*, 761 F.3d at 251 (acknowledging the defendant company did not guarantee compliance and stating "[s]uch compliance may often be unobtainable, and reasonable investors may be deemed to know that"); *Alibaba*, 192 F. Supp. 3d at 470 ("[A] corporation is not required to disclose every communication it has with a regulator—even where, as here, a regulator has informed a company of deficiencies in its operations."); *In re FBR Inc. v. Securities Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (finding that boilerplate language on

regulatory risk is not misleading when the description is not company-specific and a reasonable investor would not infer anything about the company's state of compliance").   Cigna's Form 10-Ks do not guarantee 100% compliance with administrative regulations.   Indeed, the 2013 and 2014 Form 10-Ks state, "We expect to continue to allocate significant resources to our compliance, ethics, and fraud . . . programs to comply with the laws and regulations governing Medicare Advantage and prescription drug plan programs."  [Dkt. 66-2 at 16; Dkt. 66-3 at 15]. If anything, Cigna's decision to allocate *significant* resources supports the inference that Cigna is aware its compliance needs to improve, otherwise such an expansion would be a needless waste of resources.   This is further supported by the fact that Cigna eliminated from Form 10-Ks the statement that it "established policies and procedures to comply with applicable requirements," [Dkt. 66-3 at 12], which appeared only in the 2013 Form 10-K but not thereafter.  The correction does not inherently mean that, at the time when the 2013 Form 10K was published, the statement was materially misleading.  As such, Cigna's receipt of nine to 18 non-compliance notices is not, in it of itself, a reason requiring a duty to disclose.

On the other hand, although a company cannot be expected to maintain 100% compliance with every applicable regulation, the existence of "ongoing and substantial" violations of regulations that are left undisclosed can lead to a material misstatement or omission if a reasonable investor would consider such information important.  *See Jinkosolar*, 761 F.3d at 251-52.  In *Jinkosolar*, the defendant was a solar cell and solar panel manufacturing company that failed to disclose in the prospectus its Chinese facilities' ongoing and substantial violations

of Chinese environmental, safe production, and construction regulations.  *Id.* at 251.  The prospectus contained information about defendant's pollution abatement equipment and its 24-hour monitoring of environmental teams.  *Id.*  It also disclosed the costly nature of regulation compliance and warned that non-compliance "may lead to bad publicity, fines, and even a suspension of the business."  *Id.*  The Second Circuit held that, even though the prospectus included a general warning of relevant risks, its "failure to disclose *then* ongoing regulations pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk."  *Id.* (emphasis added).  Such an omission was material because "substantial non-compliance would constitute a substantial threat to earnings, if not to the entire venture."  *Id.* at 252.

Like the defendant in *Jinkosolar*, Cigna publicly reported its requirement to comply with regulations and warned that non-compliance could lead to "changes to or clarifications of our business practices, as well as fines, penalties or other sanctions."  [Dkt. 66-2 at 13; Dkt. 66-3 at 12].  Cigna also stated that its "right to obtain payment . . . , enroll and retain members and expand into new service areas is subject to compliance with CMS' numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion."  [Dkt. 66-2 at 16; Dkt. 66-3 at 15].

By February 2014, Cigna received at least nine notices.  [Dkt. 68 at 2].  Neither the SAC nor the Opposition brief set forth the content of these notices or state in what way they would be material other than by volume.  The Court therefore cannot determine that these nine notices were sufficiently material to require disclosure

in the 2013 Form 10-K in order to prevent the statement that Cigna had "established policies and procedures to comply with applicable requirements" from being an actionable misstatement. *See* [Dkt. 57 ¶ 120].

The only notices referenced in the SAC indicates that Cigna was cited for "failure to provide records" and for "improper payments to approximately 410 medical service providers in October 2014, and then "in December 2014, Cigna received five separate Notices of Non-Compliance for improper pharmacy coverage." [Dkt. 57 ¶ 13]. Such notices are relevant to the materiality of the 2014 Form 10-K statement. The Court finds that a reasonable investor would *not* view these notices, which could at a later point be cured, to be "substantial and ongoing violations." In support of this conclusion is the January 2013 publicly issued memorandum titled "2014 Application Cycle Past Performance Review Methodology Final," which states that a notice of non-compliance is the "mildest type of letter" that "does not contain specific language regarding further compliance escalation or other consequences should the behavior/non-compliance continue." [Dkt. 66-7 at 7]. The Court notes that Defendants submitted as exhibits two warning letters issued in December 2014, and warning letters are described as "formal communication that describes the consequences of non-compliance." *Id.* These are not, however, referenced in the SAC and furthermore may also be cured with corrective action.

The Court does not find Proposed Lead Plaintiff's reference to *BioScrip* persuasive here. In *BioScrip*, the court held the plaintiff adequately alleged material misstatement because the company "suggest[ed] it routinely responded

to investigatory requests from the Government, but was not presently in the process of responding to such a request." *Id.* at 727. Even though the company's 2013 Form 10-K explained there was "no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time," the company had already received a civil investigative demand from the Government. *Id.* The company also stated that it "believes it is in substantial compliance with all laws, rules and regulations that its business and operations" but warned that it could be subject to scrutiny or challenge at some point in the future. *Id.* at 728. Investigatory requests from the Government are not at issue here and Cigna's notifications of non-compliance are not equivalent to a Government investigation. It is true that the 2013 Form 10-K stated it "established policies and procedures to comply with applicable requirements." [Dkt. 66-3 at 12]. However, Cigna made no contention that it was in "substantial compliance" with all laws, and the Court finds the facts in *Jinkosolar*, as stated above, more applicable. The reasoning in *Jinkosolar*, acknowledging a company cannot be expected to be in compliance with regulations 100% of the time, is therefore instructive. Accordingly, the Court gives greater weight to *Jinkosolar*.

The CMS Letter attached as an exhibit to the SAC notifies Cigna of immediate sanctions and describes Cigna as having a "longstanding history of non-compliance with CMS requirements." [Dkt. 57-2 at 2]. Because the Court has not been provided with all notices referenced in the SAC, the CMS Letter provides a useful reflection of the type of conduct that occurred. The CMS Letter reveals that the magnitude of the non-compliance was not just volume or length but also in

breadth.   In reviewing various operational areas, CMS discovered Cigna "substantially failed to comply with  CMS requirements regarding Part C and Part D organization/coverage determinations, appeal and grievances; Part D formulary and benefit administration; access to facilities and records; and compliance program effectiveness." *Id.*   Cigna also received a variety of non-compliance notifications in the form of "notices of non-compliance, warning letters, and corrective action plans from CMS over the past several years." *Id.* at 2.  Notably, the CMS letter does not detail when these types of notifications were received and the content therein.

Upon receiving immediate intermediate sanctions, Cigna was prohibited from enrolling Medicare beneficiaries onto Cigna contracts and from marketing to Medicare beneficiaries. *See* [Dkt. 66-8 at 1].  In essence, the sanctions halted the growth of Cigna's private Medicare business for 1.5 years while the sanctions remained.  The sanctions were recently lifted off Cigna-HealthSpring on June 16, 2017. *See* Centers for Medicare & Medicaid Services, *Part C and Part D Enforcement Actions*, available at https://www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/PartCandPartDEnforcementActions-.html (last visited August 23, 2017) (documenting Cigna's release from sanctions on June 16, 2017).  It is important context that, as a result of the acquisition, CMS' Medicare premiums became the "largest single source of revenues" for Cigna, accounting for approximately 21-22% of Cigna's overall revenues between 2012 and 2014, and throughout the Class Period "CMS was Cigna's only client that accounted for more than 10% of the

Company revenues." [Dkt. 57 ¶ 8]. The inability to market and grow this extremely large source of revenue constitutes a substantial threat to earnings.

The Court finds that a "reasonable investor" might view the breadth and volume of these compliance violations to be "ongoing and substantial," particularly in light of the fact that notices, warning letters, and corrective action plans were elicited during this time. However, the "duty to tell the whole truth" only arises when the "ongoing or substantial" violations are occurring *at the time.* *See Jinkosolar*, 761 F.3d at 250-51. The SAC does not sufficiently allege that there existed an "ongoing and substantial" violation at the time when the 2013 and 2014 Form 10-Ks statements were made. Because Proposed Lead Plaintiff does not allege that a statute or regulation required disclosure of non-compliance at some point after the Form 10-K statements but before the January 2016 Form 8-K disclosure of sanctions, the Court cannot find that subsequent compliance violations were material omissions.[10] *See Stratte-McClure*, 776 F.3d at 101. The Court finds that the omissions made at the time when the alleged actionable statements were made are "*obviously* unimportant to a reasonable investor" because these early stage notices could be rectified at any time without risking a threat to earnings. *See ECA*, 553 F.3d at 197; *Jinkosolar*, 761 F.3d at 252.

---

[10] Proposed Lead Plaintiff also alleges Cigna experienced a shifting employee base with a leadership team inexperienced in compliance, *see* [Dkt. 57 ¶ 78], and could not properly integrate data, *see id.* ¶ 94. Although the SAC alleges that CMS regulations required compliance reporting to senior leaders, *id.* ¶ 73, it raises no statute or regulation requiring disclosure of the failure to comply with regulations as to these issues. It furthermore does not indicate how any alleged actionable statements were materially misleading or there existed any material omissions in relation to these issues. *See Stratte-McClure*, 776 F.3d at 101 (stating a duty to disclose arises when a statute or regulation requires disclosure).

Truisms, such as generic and theoretical "[c]autionary words about future risk cannot insulate from liability the failure to disclose that risk has transpired." *Rombach v. Chang*, 355 F.3d at 173.  The 2014 Form 10-K expressly states that

> regulatory audits or reviews or actions by other governmental agencies could result in changes to or clarifications of our business practices, retroactive adjustments to certain premiums, significant fines, penalties, civil liabilities, criminal liabilities, or other sanctions, including restrictions on our ability to operate that could have a material adverse effect on our business, results of operation, financial condition and liquidity.

[Dkt. 66-2 at 19].  The risk of the above changes had not already transpired because the CMS notices received by Cigna between the first and last actionable statement are not material misstatements or omissions.  *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]he Second Circuit previously has held that cautionary statements concerning forward-looking statements cannot insulate a defendant from potential liability for failure to disclose known material, adverse facts, *see Rombach*, 355 F.3d at 173. . . .").  Indeed, in *Rombach* the Second Circuit acknowledged that Plaintiffs' reference to a "handful of incidents" involving the now-bankrupt company were not sufficient to demonstrate already-transpired risk given that "[a] company that operates 119 separate facilities nationwide is bound to have some problems . . . ."  *Rombach*, 355 F.3d at 173.  Notices of non-compliance involving potentially disparate topics unspecified by Plaintiff is not sufficiently "risky" to be actionable.

In summary, the Court finds that the 2013 and 2014 Form 10-Ks did not contain material misstatements or omissions, and the statements from Cordani and Fritch were inactionable puffery.  Proposed Lead Plaintiff additionally did not

identify any duty to disclose under a regulation or statute, such as those set forth under Item 303.  While this finding is sufficient to dismiss the case in its entirety, the Court will address the remaining disputed issues.

### B. *Scienter*

"The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313. "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324).  The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at, 322-23.  The "strong inference" standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered.  *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324). This inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  Such a high bar is intended to prevent allegations of fraud by hindsight. *Id.* at 320 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

A plaintiff may show an inference of scienter in two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior

or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).   In making the scienter determination, the Court must also consider "plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323.

### 1.    *Motive and Opportunity*

In the scienter analysis, "[o]pportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130.  The Court assumes Defendants had the opportunity to commit fraud as the individuals were officers of either Cigna or its subsidiary, HealthSpring, and Defendants do not directly challenge opportunity in their briefing.  *See Kalnit v. Eichler*, 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000) *aff'd*, 264 F.3d 131 (2d Cir. 2001) (directors of company had opportunity to commit fraud); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (individual defendants had opportunity to manipulate company stock where they held the highest positions of power and authority within the company).

Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields*, 25 F.3d at 1130.  In order to raise a strong inference of scienter by motive and opportunity, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198.  "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139; *see Novak v. Kasaks*, 216 F.3d

300, 307 (2d Cir. 2000) (stating that plaintiffs cannot satisfy the pleading standard "based on motives possessed by virtually all plaintiffs").  The Second Circuit has held generally that, among others, (1) "the desire for the corporation to appear profitable," (2) "the desire to keep stock prices high to increase officer compensation," and (3) the "desire to maintain the appearance of profitability" are such insufficient motives.  *Id.*; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("such a generalized motive [as the desire to justify an investment and make it appear profitable], one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").  However, the motive can be sufficiently pleaded where "defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Kalnit*, 264 F.3d at 139.

The SAC generally alleges that Defendants Cigna, Cordani, McCarthy and Fritch made materially false and misleading statements or omissions "in an effort to conceal the Company's non-compliance with CMS regulations, and to maintain the Company's common stock at artificially inflated prices."  *See* [Dkt. 57 ¶ 208]. The act of artificially inflating securities prices is not in it of itself motive.  *See ECA*, 553 F.3d at 201 n.6 (We acknowledge that the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter.  But the inquiry is an extremely contextual one, and in this case Plaintiffs simply did not allege a unique connection between the fraud and the acquisition.") (internal quotation marks and citations omitted).  Rather, it becomes actionable

when viewed in connection with an actionable motive.  *Kalnit*, 264 F.3d at 139 (acknowledging that artificially inflated stock must be connected with motive).  The SAC does not indicate how concealing non-compliance constitutes a concrete or personal benefit to the Defendants and instead the Court is left to assume that Defendants did so for personal benefit.  Furthermore, that Defendants did so for "significant personal pecuniary gain" does not satisfy the particularity requirement, because the SAC does not allege the type of "pecuniary gain" that motivated the sales.  If the executive was motivated by a desire for executive compensation, to maintain the appearance of profitability or to protect their position, the conduct would not be actionable.  In contrast, if they were motivated by the opportunity to sell stocks at inflated prices it would be actionable.  Proposed Lead Plaintiff fails to assert sufficient facts to sustain his burden.

Proposed Lead Plaintiff alleges slightly more information with respect to Defendants Cordani and Fritch, who sold stock during the Class Period.  [Dkt. 57 ¶ 173].  Specifically, Cordani sold 668,529 shares worth $71,942,705 and Fritch sold 455,180 shares worth $59,835,369 during the Class Period (lasting from February 27, 2014 to August 2, 2016).  *Id.* ¶ 176.  In the Opposition to the Motion to Dismiss, Proposed Lead Plaintiff claims the Cordani and Fritch had "motive and opportunity" for "significant personal pecuniary gain," [Dkt. 68 at 38], and "to continue concealing the Company's ongoing and increasingly frequent failures in compliance policies and procedures," *id.* at 36.  Although both parties agree that in some circumstances selling stock is indicative of motive and opportunity to commit fraud, they dispute whether this situation demonstrates a strong inference

of scienter.  Cordani and Fritch both acquired more stock than they sold, but did so at no cost to them.  *See* [Dkt. 67, at 34; Dkt. 68 at 38].  Further, these stock sales were made according to Rule 10b5-1 trading plans.  [Dkt. 67 at 35].  Such plans allow company insiders who may possess material, non-public or inside information about the company to enter into an agreement with a broker dealer to purchase and sell company stock on behalf of the insider on a predetermined schedule specified in the plan and can provide an affirmative defense against an allegation that trades under this plan were based on such information.  *See* 17 C.F.R. § 240.10b5-1(c).  Cordani's trading plan was renewed annually, including during the Class Period.  [Dkt. 71 at 10].  Fritch's trading plan was created during the Class Period because the "holdings were subject to a lock-up until September 15, 2014. . . ."  *Id.*  Notably, "[t]rading plans are not a cognizable *defense* to scienter allegations on a motion to dismiss where . . . they were adopted during the Class Period."  *Id.* at 201 (emphasis added).

"The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *see Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) (stating an example of adequate motive is where "the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices") (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007)).  It may be permissible to infer scienter when "unusual" insider sales are made while negative corporate news is withheld, and factors determining

"unusual" include: "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74; *see In re Lululemon Secs. Litig.*, 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014) ("Stock sales may support allegations of scienter when those trades are suspicious in timing or amount." ); *In re EVCI Coll. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) (finding that defendant "sold far too much stock," i.e. 41% if stock options are counted and 80% if they are not, only two weeks after the company was required to take measures having significant revenue implications); *c.f. Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) (finding the combination of defendants' knowledge of fraud and access to information as well as their stock sales *throughout the Class Period* was sufficient to show a strong inference of scienter).   A plaintiff ultimately must point to a "specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders, not just the defendant directors specifically. *Kalnit v. Eichler*, 264 F.3d 161 (2d Cir. 2001).

The SAC alleges Cordani and Fritch earned "extraordinarily large" net proceeds as a result of selling shares during the Class Period: $71,942,705 for Cordani and $59,835,369 for Fritch.   *See* [Dkt. 57 ¶ 176].   The selling of even considerable shares is not sufficient, standing alone, to infer scienter.   *See In re Lululemon*, 14 F. Supp. 3d at 585.   Proposed Lead Plaintiff does not allege the portion of stockholdings sold.   Proposed Lead Plaintiff compares the Class Period sales to the time period between February 28, 2012, and January 21, 2014; Cordani

sold 137,621 shares worth $8,622,160 and Fritch did not sell any shares.  *Id.* ¶ 174.  As Defendants rightly point out, this roughly two-year time period does not match the duration of the Class Period and in all other respects it appears arbitrarily chosen.  Fritch was also prohibited from selling any shares until September 15, 2014, which explains at least in part the drastic shift.  [Dkt. 71 at 10].  Proposed Lead Plaintiff does not inform the Court whether McCarthy or Appel held stock and, if they did, whether they sold any shares.  Were these defendants to elect not to sell their shares during the Class Period, it might undermine Proposed Lead Plaintiff's claim.  *See San Leandro*, 75 F.3d at 814 (finding that one company executive's decision to sell stock does not give rise to fraudulent intent where other defendants did not do the same).  Furthermore, the SAC does not allege what day these sales were made and what portion of the sales were made after the sanctions were disclosed.  The Court need not decide whether the stock sales themselves demonstrate a "motive and opportunity" to defraud, because there is no indication they concurrently made any misrepresentations of material facts.

During the class period Cordani acted as CEO, President, and Director of Cigna.  [Dkt. 57 ¶ 38].  Fritch was President of HealthSpring throughout the Class Period.  *Id.* ¶ 40.  The SAC alleges that Cordani and Fritch "were able to, and did, control the contents of the Company's SEC filings, reports press releases, and other public statements."  *Id.* ¶ 182.  It further alleges "Cordani and Fritch knew that these adverse facts alleged herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading."  *Id.* ¶ 187.  The SAC alleges "Cordani and

Fritch profited from the artificial inflation embedded in the trading price of Cigna stock caused by their false and misleading statements and omissions to investors during the Class period." [Dkt. 57 ¶ 173]. The SAC, however, does not allege any facts concerning any statements other than the ones the Court has already addressed.

The Court has already determined that the 2013 and 2014 Form 10-K statements did not create any material misstatements or omissions. Cordani, therefore, is not liable for his certification of these forms. Proposed Lead Plaintiff specifically alleges Cordani "either knew or recklessly disregarded the fact that the Company was so decentralized and fragmented that it either could not comply with CMS regulations or could not determine whether it was compliant with CMS regulations." *Id.* ¶ 165. Without alleging he had a regulatory duty to disclose this information, his knowledge or reckless disregard alone does not mean that Cordani "misrepresent[ed] material facts to keep the price of stock high while selling [his] own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74.

Fritch, in an interview published by USA Today on the same day as sanctions were established, stated, " Cigna "[has] internal quality review processes in place that identified some of the areas in advance of the audit findings and we have already started working to remedy them." [Dkt. 66-27 (Mot. Dismiss Ex. 26, Sanctions Article) at 2 of PDF; Dkt. 57 ¶ 114 (referencing media article)]. This statement appears to be truthful at the time when it was made. A plaintiff must adequately allege the defendants "were aware of or had access to information contrary to their public statements." *See Freudenberg*, 712 F. Supp. 2d at 201. The

43

SAC does not identify a public statement previously made by Fritch that would be contrary to this statement.

Accordingly, because these Defendants did not make any material misrepresentations, their stock sales do not reflect actionable "motive and opportunity" to defraud.

> **2.**     ***Circumstantial Evidence of Conscious Misbehavior or Recklessness***

As an alternative to motive and opportunity, "the scienter element can be satisfied by a strong showing of reckless disregard for the truth . . . [or] conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Where motive is not apparent, as here, "the strength of the circumstantial allegations must be correspondingly greater. . . ." *ECA*, 553 F.3d at 199.  A plaintiff can satisfy this standard by alleging "facts showing 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendants must have been aware of it.'" *S. Cherry Group*, 573 F.3d at 109 (quoting *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000)); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 CIV. 975 RPP, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) *recon. denied*, No. 10 CIV 00975 RPP, 2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) (quoting same).  A plaintiff may also plead scienter by sufficiently alleging "that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud, and

hence should have known that they were misrepresenting material facts." *S. Cherry St.,* 573 F.3d at 109.  Further, securities fraud claims will suffice "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" and where they "specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 308-09.

Proposed Lead Plaintiff raises numerous arguments that there is substantial circumstantial evidence sufficient to establish scienter, which the Court has attempted to distill into cogent topics: (1) Appel received the CMS notices and CMS regulations required him to report violations to senior management, including Cordani, McCarthy, and Fritch, [Dkt. 68 at 30]; (2) Defendants' access to information means they knew or should have known they were misrepresenting material facts, *id.* at 30; (3) Defendants must have known about non-compliance issues due to the nature of their roles during the acquisition, the importance of the acquisition, and HealthSpring's history of strong compliance, *id.* at 39-41; and (4) the confidential witnesses' information bolsters the inference that Defendants knew or were intentionally ignorant of potential compliance failures given that Defendants did not take advantage of HealthSpring's institutional knowledge and the data processing systems were inaccurate, *id.* at 41.

Proposed Lead Plaintiff's arguments are unavailing because, in essence, they merely allege that Defendants "*must have known* their statements to be untrue."  *BioScrip*, 95 F. Supp. 3d at 738 ("Plaintiffs' allegations boil down to the charge that Defendants *must have known* their statements to have been untrue due to the segment's significance and the size of the client.").  It may be true that Appel

had "a duty to monitor information," but the SAC does not allege he failed to monitor any information. *See S. Cherry St.*, 573 F.3d at 109. Assuming Appel had a duty to report each and every CMS notice to senior management, it is unclear how knowledge of these nine to 18 notices without acting upon them would be "highly unreasonable" or an "extreme departure from the standard of care to the extent that the danger was either known to the defendants or so obvious that the defendants *must have been aware of it.*" *See S. Cherry Grp.*, 573 F.3d at 109. Likewise, by merely alleging that Defendants had *access* to information, the Court cannot then conclude there exists circumstantial evidence of conscious misbehavior or reckless disregard. In addition, the SAC alleges facts suggesting Defendants were unaware, because they did not take advantage of HealthSpring's institutional knowledge and the data processing systems were inaccurate. A plaintiff also cannot demonstrate scienter merely by "noting that an area of business was vital to a company" and then conclude that Defendants must have known of any false information. *BioScrip*, 95 F. Supp. 3d at 738.

Like the confidential witnesses in *BioScrip*, the confidential witnesses here do not directly state "what. . . Defendants knew, when they learned it, or from whom." *Id.* at 739. Rather, the confidential witnesses speak generally about HealthSpring's history of compliance, [Dkt. 57 ¶ 60], Fritch's "passion for Medicare and compliance," *id.* ¶ 61, the post-acquisition replacement of HealthSpring employees with Cigna employees, *see, e.g., id.* ¶ 78, Appel's failure to meet frequently with employees, *id.* ¶ 86, and Cigna's data processing difficulties, *see, e.g., id.* ¶ 95. Not one confidential witness could speak to any Defendants' specific

knowledge.  "Allegations premised on the testimony of confidential sources must show the individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient."  *BioScrip*, 95 F. Supp. 3d at 739 (internal quotation marks omitted).  Accordingly, the allegations of the SAC attributed to the confidential witnesses are inadequate as a matter of law and contrary to their asserted premise, and therefore they are unpersuasive.

Proposed Lead Plaintiff has not made a "strong showing" of either reckless disregard for the truth or conscious recklessness.  *S. Cherry St.,* 573 F.3d at 109. The Court cannot even identify specific facts sufficient to find heightened negligence.  *See id.*  When presented with Proposed Lead Plaintiff's circumstantial evidence, the Court cannot conclude that "the inference of scienter . . . [is] at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs, Inc.*, 551 U.S. at 324.  Defendants' proposed competing inference— that "managerial errors eventually set the stage for CMS sanctions"—is highly probable particularly in light of Proposed Lead Plaintiff's inability to provide compelling circumstantial evidence.   *See* [Dkt. 67 at 44].

### C. *Loss Causation*

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  The PLSRA confers upon the plaintiff "the

burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).   Loss causation is akin, although not quite identical, to "proximate cause" in tort law: "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."   *Lentell*, 396 F.3d at 173.   This means that the plaintiff must adequately allege "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."   *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).   In other words, a plaintiff must show "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."   *Lentell*, 396 F.3d at 173.   To sufficiently plead the subject of the fraudulent statement or omission caused the actual loss, a plaintiff may either allege (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."   *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014); *BioScrip*, 95 F. Supp. 3d at 733 (applying this standard).   For the purposes of the loss causation analysis, the Court will assume that Defendants committed a material misrepresentation or omission (although they did not).

The SAC alleges that Cigna's common stock market prices were artificially inflated due to the material misstatements or omission, and two disclosures

48

corrected this artificial inflation.  First, Cigna filed an 8-K on January 22, 2016, notifying investors that CMS imposed immediate sanctions on Cigna on January 21, 2016.  [Dkt. 57 ¶ 184].  Cigna's stock price fell from $140.13 at the close of business on January 21, 2016, to $137.90 at the close of the next business day.  *Id.* ¶¶ 25, 140.  It then dropped to $135.85 on January 25, 2016, yielding a market cap loss of $1.1 billion and a decline of 3.05% per share.  *Id.* ¶ 25.  Second, Cigna announced in its July 29, 2016, Form 10-Q that it would be reducing its 2016 financial outlook.  *Id.* ¶ 143.  Specifically, it stated the costs to remedy the sanctions totaled approximately $30 million as of June 30, 2016.  *Id.* ¶ 185.  Cigna held an earnings conference call on the same day wherein McCarthy acknowledged Cigna was spending more than expected on remediation costs and might not be able to rectify matters in a timely and satisfactory matter, which prompted analysts to raise concerns about the possibility that Cigna's failure to lift sanctions by the fall could prevent them from participating in the open enrollment period.  *Id.*  Stock fell from $135.99 at the close of business on July 28, 2016, to $128.96 at the close of business on July 29, 2016.  *Id.* ¶ 151.  Over the course of three consecutive trading days, Cigna's share price fell $11.86 per share, approximately 8.8% from the July 28, 2016 closing price.  *Id.* ¶ 152.

To plead corrective disclosure, a plaintiff must allege "a disclosure of fraud by which the available public information regarding the company's financial condition [was] corrected, and that the market reacted negatively to the corrective disclosure."  *Carpenters*, 750 F.3d at 233 (internal quotation marks and citations omitted); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (stating the

plaintiff must do more than state that prices were artificially inflated as an "'artificially inflated purchase price' is not itself a relevant economic loss").  A plaintiff is not required to plead the corrective disclosure is the *only* reason the stock price declined.  *See Carpenters*, 750 F.3d at 233*.*

Proposed Lead Plaintiff alleges Defendants failed to disclose the widespread and systemic failure to comply with CMS regulations.  It was not until the 8-K filed on January 22, 2016, revealing CMS issued sanctions against Cigna, that the public became aware Cigna had been struggling with non-compliance.  *See* [Dkt. 57 ¶ 138]. The very next day Cigna's stock price dropped.  This is not a situation where the plaintiff fails to demonstrate a loss suffered.  *See Dura*, 544 U.S. at 347.  Both the Second Circuit and district courts within the circuit have found similar allegations sufficiently plead loss causation.  *Carpenters*, 750 F.3d at 233-34 (citing district court cases).  Accordingly, assuming there existed a material misrepresentation or omission about systemic non-compliance that was corrected with the January 22, 2016 disclosure, which there did not, the Court would find loss causation adequately pleaded at the 12(b)(6) motion to dismiss stage.[11]

Even if Proposed Lead Plaintiff could not demonstrate corrective disclosure, "[a] risk allegedly concealed by Defendants which materialized and arguably caused the decline in shareholder value suffices."  *Freudenberg*, 712 F. Supp. 3d at 202; *see Lentell*, 396 F.3d at 175 (providing that one way to show loss causation

---

[11] The first disclosure would be sufficient, standing alone, to survive a motion to dismiss.  The Court thus does not address the subsequent disclosure on July 29, 2016.

would be to adequately allege that defendant "misstated or omitted risks that did lead to the loss").  The Court agrees with Proposed Lead Plaintiff that the issuance of sanctions constitutes the materialized risk.  The Form 10-Ks explicitly states that regulatory audits, such as those conducted by CMS, could lead to "sanctions that could have a material adverse effect on [Cigna's] business, results of operation, financial condition, and liquidity."  [Dkt. 66-2 at 19; Dkt. 66-3 at 19].  This risk of sanctions materialized on January 21, 2016, as stated in the CMS Letter.  That the stock price fell by the very next day is sufficient to satisfy a causal connection, upon which any intervening event breaking this connection is a matter not to be decided on a motion to dismiss.  *Emergent Capital Inv. Mgmt, LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

## III.   Count II: Control Person Liability under Section 20(a)

Finally, Proposed Lead Plaintiff alleges control person liability under Section 20(a) of the Exchange Act against Defendants Cordani, McCarthy, and Appel. Section 20(a) provides that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of

the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108.  Because Proposed Lead Plaintiff has failed to establish a violation of section 10(b) of the Exchange Act, Proposed Lead Plaintiff has not established a primary violation and therefore the allegation of control person liability under section 20(a) cannot stand.  *See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 704 (2d Cir. 1994) (stating that "to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations"); *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d at 587 (applying rule). Accordingly, like the count before it this count is DISMISSED.

## IV.   <u>Leave to Amend</u>

Proposed Lead Plaintiff requests that, should the Court find the SAC fails to state a claim upon which relief may be granted, it grant leave to amend.  Leave to amend is to be given freely "when justice so requires," Fed. R. Civ. P. 15(a), unless the moving party acted with "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed," or the amendment would create undue prejudice to the opposing party or be futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI Comms., Inc.,* 493 F.3d 87, 108 (2d Cir. 2007).  However, it is well within the court's discretion to grant leave to amend under Fed. R. Civ. P. 15(a) "and a district court may therefore properly deny leave to amend where a plaintiff has already been given one opportunity to plead fraud with greater specificity."

*Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 212 (D. Conn. 2014) (quoting *Endovasc, Ltd. v. J.P. Turner & Co., LLC*, 169 F. App'x. 655, 657–58 (2d Cir.2006)).

As a review, Jyotindra Patel filed the initial complaint in this lawsuit on February 4, 2016. [Dkt. 1 (Compl.)]. In April 2016, Plaintiff moved to appoint Minohor Singh as Proposed Lead Plaintiff, which the Court granted. [Dkt. 28 (Mot. Appoint Counsel); Dkt. 34 (Order]. Singh thereafter amended the complaint, raising substantially more factual allegations. *See* [Dkt. 40 (Am. Compl.)]. In September 2016, Singh filed a Motion to Modify Pretrial Deadlines indicating intentions for requesting leave to amend due to "key developments" since the previous filing. [Dkt. 50 at 3]. Defendant opposed this objection and argued that Singh had six months from the filing of the original complaint and two months from his appointment as Proposed Lead Plaintiff to amend the complaint. [Dkt. 51 (Opp'n Mot. Modify) at 2].

The Court held a telephonic conference on October 7, 2016, and granted Plaintiff a modification of the scheduling order as well as leave to amend. *See* [Dkt. 54 (Tr. Tel. Conf.) at 19-21]. During the hearing the Court specifically asked Proposed Lead Plaintiff's counsel, "[D]o you expect that if you were to amend you would be able to state with more particularity the basis of your claims?" *Id.* at 15:9-14. Counsel responded in the affirmative. *See id.* 15:15-18. Defense counsel posited that discovery had been ongoing for several months and that they "were prepared and have worked hard under [the Court's] order to prepare a motion to dismiss that [they] were prepared to file in 10 days. . . ." *Id.* at 17:24-18:3. Upon considering the arguments the Court determined Plaintiffs should have "a

reasonable opportunity to complete discovery to the point where they are able to file an amended complaint that fairly reflects all of the information that they can reasonably acquire in conducting thorough due diligence of their allegations." *Id.* at 18:8-16.  The Court reasoned, "[W]e want this matter to be resolved one way or the other on the merits with full consideration of all of the relevant facts, and if that takes an additional couple of months to do I think it's time well spent for everyone involved, including Defendants." *Id.* at 19:14-20.  Proposed Lead Plaintiff thereafter filed the SAC, which is operative today.

Importantly, § 78u-4 of the PSLRA contemplates that in general "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss. . . ."  15 U.S.C. § 78u-4(b)(3)(B).  Therefore when the Court granted leave to amend the Amended Complaint and extended the deadline for the motion to dismiss, there were practical implications enabling Proposed Lead Plaintiff to continue in his pursuit of discovery well past the period typically allowed.  The Court contemplated these implications and determined it fair and necessary to give the Proposed Lead Plaintiff an opportunity to plead with particularity, in compliance with Rule 9(b), from the outset. As the Court directed, Proposed Lead Plaintiff was granted a modification of the scheduling order and leave to amend with the understanding that he would exercise due diligence.

The Second Amended Complaint did indeed provide more factual allegations indicating Proposed Lead Plaintiff attempted to cure any defects with particularity. For example, the SAC contains a new section documenting that Cigna received 75 notifications of non-compliance from CMS, with explicit references to the content

of certain notifications. [Dkt. 57 ¶¶ 115-18].  The SAC also raises new allegations that Defendant Appel was required to report to senior management information about Medicare compliance.  *Id.* ¶¶ 159-61.  These allegations are clear examples of Proposed Lead Plaintiff attempting to address the Rule 9(b) particularity requirements.  For the reasons set forth above, they are substantively insufficient.

Proposed Lead Plaintiff has already been given a chance to replead with greater specificity.  *See Abuhamdan*, 9 F. Supp. 3d at 212-13.  Proposed Lead Plaintiff believes he should be given another opportunity "after hearing the Court's assessments of the merits of the Complaints."  [Dkt. 68 at 49].  But this is not how leave to amend works.  If it were, all plaintiffs would automatically be given leave to amend when they fail to satisfy Rule 9(b).  Proposed Lead Plaintiff cites *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508(SAS), 2009 WL 33466754, at *2 (S.D.N.Y. Oct. 15, 2009), for the proposition that "a dismissal with prejudice is generally appropriate where a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment."  At the telephonic conference held on October 7, 2016, the Court discussed with the parties the need to amend the complaint a second time, and specifically stated Proposed Lead Plaintiff must due its "due diligence," allowing additional discovery to afford Proposed Lead Plaintiff the opportunity to plead with particularity.  *See* [Dkt. 54 at 18:8-16].  This is sufficient notice.

In consideration of this ruling on Motion to Dismiss and request for leave to amend, on August 28, 2017, the Court ordered Proposed Lead Plaintiff to file a proposed third amended complaint on or before September 4, 2017 so that the

Court could consider such a proposed amended complaint.  [Dkt. 72].  Proposed Lead Plaintiff filed a Motion for Reconsideration four days later asking to defer filing an amended complaint until after the Court's ruling on the pending Motion to Dismiss.  The Court denied in part and granted in part the relief sought, and in its ruling denying relief it identified aspects of the SAC that failed to meet the heightened Rule 9(b) pleading standard and included case citations.  The Court once again afforded the Proposed Lead Plaintiff an opportunity to file a Third Amended Complaint on or before September 16, 2017, prior to a ruling on the Motion to Dismiss.  On September 15, 2017, Proposed Lead Plaintiff declined the Court's offer to amend the complaint once again, notifying the Court that it would not file a Third Amended Complaint.  [Dkt. 78].

Proposed Lead Plaintiff has failed to "cure deficiencies by amendments previously allowed."  *See Foman*, 371 U.S. at 182.  The Lead Plaintiff declined to do so knowing the deficiencies of the SAC. The fact that Proposed Lead Plaintiff has failed to sufficiently allege scienter after conducting considerable discovery (more than that customarily afforded) despite having knowledge of the SAC's deficiencies indicates that  Proposed Lead Plaintiff has not discovered sufficient evidence to allege either a failure to disclose or scienter.  Proposed Lead Plaintiff's claims are substantively deficient and Proposed Lead Plaintiff has not presented any basis for the Court to believe he could allege facts that could withstand a 12(b)(6) motion. *See Alibaba*, 192 F. Supp. 3d at 482; *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (ruling in an inmate's civil rights case that "the problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be

futile.").  Accordingly, further leave to amend would be futile.  *See Foman*, 371 U.S. at 182.

**CONCLUSION**

For the aforementioned reasons, this case is DISMISSED with prejudice.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 28, 2017